## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | | |
|---|---|---|
| FABARC STEEL SUPPLY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 02-PT-449-E |
| | ) | |
| ZURICH AMERICAN INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTERED**

FEB 1 0 2004

### MEMORANDUM OPINION

This cause comes to be heard upon the parties' cross-motions for summary judgment, i.e.,

defendant Zurich American Insurance Company's ("Zurich") Motion for Summary Judgment

and plaintiff FabArc Steel Supply, Inc.'s ("FabArc") Motion for Summary Judgment on

Insurance Contracts Against Zurich American Insurance Company, With Leave for Further

Proceedings for Equitable Relief,[1] both filed on December 8, 2003.

### FACTS[2] AND PROCEDURAL HISTORY

#### I.    Insurance Policies

On August 29, 1997, Shimizu American Corporation ("Shimizu")[3] and FabArc entered into

a  subcontract  wherein  FabArc  agreed  to  provide  and  install  structural  steel  for  the  Toray

---

[1] Should this court declares as a matter of law that Zurich owes FabArc defense and indemnification for claims against FabArc in the *Sanchez* litigation, plaintiff further requests "an Order setting further proceedings to permit FabArc to present evidence and arguments in support of the equitable relief to which FabArc is entitled as a result of a declaration of insurance coverage."

[2] The court notes where relevant facts appear disputed.  The fact and argument sections of this memorandum opinion overlap somewhat.

[3] Shimizu was insured by Great American Assurance Company ("Great American").

Construction Project in Decatur, Alabama.  FabArc retained the obligation of fabricating the structural steel for Shimizu but subcontracted out erection and installation responsibilities to its own subcontractor, Composite Construction Services, Inc. ("CCSI").

Provisions from the Shimizu/FabArc subcontract included:

**Article 10**
**INSURANCE**

All insurance required to be provided by the Subcontractor for the performance of this work shall name SAC as a beneficiary and shall also designate SAC's client as a separate and specific named additional beneficiary of such insurance.  Subcontractor shall maintain insurance on materials, property and/or equipment as set forth in the General Conditions to this Subcontract and said insurance shall cover all such items provided to this Project by the Subcontractor whether provided pursuant to this Agreement or provided by the Subcontractor under separate purchase order agreement between the parties.

**SECTION 13**
**INSURANCE REQUIREMENTS**

**(A) CERTIFICATION OF INSURANCE**: . . . All insurance in connection with this project shall provide that it is primary coverage regarding any insurance event.[4]

. . . .

(3) Contractual Liability:  Each and every policy for liability insurance, carried by each Subcontractor and lower tier subcontractor as required by this Section, shall specifically include Contractual Liability coverage.[5]

. . . .

(G) THIRD PARTY REQUIREMENTS:  Should [FabArc] sublet any of the work to a third party, [FabArc] shall require such third party to furnish the same insurance and indemnity as are required of [FabArc] hereunder and show evidence therefor to SAC on a

---

[4] Jackie Ward, Zurich's 30(b)(6) corporate representative, confirmed that the Shimizu/FabArc contract includes this requirement regarding primary insurance coverage.  *See* Pl. Ex. J, Jackie Ward Dep. at pp. 158-59.

[5] Ward admitted that CCSI is a lower-tier subcontractor as contemplated by this section.  *See* Ward Dep. at pp. 159-60.

2

certificate furnished by SAC.[6]

. . . .

## SECTION 15
## INDEMNITY AGREEMENT;DAMAGES; LOSS

**(A) SUBCONTRACTOR'S PERFORMANCE**: To the fullest extent permitted
by law, the Subcontractor shall indemnify and hold harmless the Owner, the Architect,
SAC . . . and other contractors and subcontractors and all their agents and employees
from and against all claims, damages, loss and expenses, including but not limited
to attorney's fees, arising out of or resulting from performance of the Subcontractor's
Work provided that:

> (1) Any such claim, damage, loss, or expense is attributable to bodily
> injury, sickness, disease or death, or injury to or destruction of tangible
> property (other than the Subcontractor's Work itself) including the loss
> of use resulting therefrom to the extent caused or alleged to be caused in
> whole or in any part by any negligent act or omission of the Subcontractor
> or anyone directly or indirectly employed by the Subcontractor or anyone
> for whose acts the Subcontractor may be liable, regardless of whether
> it is caused in part by a party indemnified hereunder.

. . . .

## SECTION 23
## SUBCONTRACTS

No lower-tier subcontract entered into by Subcontractor shall relieve Subcontractor
of any of his liabilities or obligations under this Subcontract, and Subcontractor
shall be fully responsible to SAC for the acts and omissions of lower-tier
subcontractors and of persons either directly or indirectly employed by them in the
performance of the lower-tier subcontract. . . . Subcontract shall require any of its
subcontractors or suppliers doing any work on or supplying any materials, equipment,
tools, supplies or other items for the project to fully comply with all applicable
provisions, terms and conditions of the subcontract . . . .

On November 10, 1997, FabArc and CCSI entered into a subcontract ("FabArc/CCSI

subcontract"). According to FabArc, CCSI assumed all of the on-site duties of FabArc under the

Shimizu/FabArc contract. FabArc alleges that it subcontracted its entire <u>erection</u> and angle clip

---

[6] Again, Ward acknowledged this requirement in the Shimizu/FabArc contract. *See* Ward Dep. at p. 162.
According to FabArc, Ward stated that the terms of the construction contract control whether Zurich's insurance is
primary and non-contributing. *See* Ward Dep. at p. 74.

installation[7] responsibilities to CCSI. *See* Pl. Ex. D, Alan Heathcock Dep. at pp. 14, 23.[8] Further,

FabArc avers, CCSI was FabArc's only subcontractor on the Toray project and performed all of

FabArc's on-site work there. *See* Pl. Ex. F, Donald Dobbins Dep. at pp. 44-45.[9]

According to FabArc, the FabArc/CCSI subcontract required CCSI to purchase insurance

coverage for FabArc and required CCSI to name FabArc as an additional insured (under CCSI's

Zurich policies). In the FabArc/CCSI subcontract, CCSI agreed to provide FabArc with general

liability insurance coverage "for a minimum of $ 1,000,000/occurrence and $ 1,000,000/aggregate."

*See* Pl. Ex. C at p. 2. The FabArc/CCSI subcontract provided: "As a condition precedent of [CCSI]

beginning work on the project, [CCSI] shall furnish a certificate satisfactory to FabArc from each

insurance company showing the required insurance is in force and effect . . . ." *Id.* CCSI's

indemnification obligation to FabArc was as follows:

> The Subcontractor [CCSI] hereby covenants and agrees to defend, indemnify, and
> exonerate FabArc from all liability claims, actions, causes of action, lawsuits,
> and demands (including all judgments and settlements made at arms length
> and all attorney fees and litigation expense connected therewith) for,
> personal injury or death (including personal injury or death of the Sub-
> Contractor's own employees) and/or property damage arising out of any work
> or operation performed by, for and on behalf of the Sub-Contractor or
> arising out of the Sub-Contractor's negligence, even if Sub-Contractor is
> only partly negligent for the damage or injury. The foregoing covenant and
> Agreement shall include all such liabilities, claims, lawsuits and demands
> where it is charged, alleged or proven that the Sub-Contractor (or its
> agents or employees) was in any way at fault in causing or contributing
> to such injury, death or property damage. The Sub-Contractor's liability

---

[7] The angle clip installation issue, the court notes, comes into play because of the Sanchez plaintiff's claims against FabArc and/or its employees/agents, *see infra* p. 12.

[8] Alan Heathcock ("Heathcock") was FabArc's project manager on the Toray project. *See* Def. Ex. P. A review of Heathcock's deposition, the court notes, reveals his admission that under the Shimizu/FabArc contract, FabArc retained responsibility to Shimizu for the erection work even if FabArc had hired a subcontractor to actually do the erection work. *See* Heathcock Dep., pp. 15-16.

[9] Donald Dobbins ("Dobbins") is CCSI's president.

insurance policies shall each contain contractual insurance coverage as to the covenant contained in this section. The contractor shall be named as an additional insured in the Sub-Contractor's general comprehensive and public liability policy. . . .[10]

According to FabArc, the FabArc/CCSI subcontract incorporates the FabArc/Shimizu contract in its entirety, including the requirement that all insurance furnished in connection with the Toray project be primary.[11] The FabArc/CCSI subcontract stated:

> This agreement is made the 10th day of November, 1997 by and between FabArc Steel Supply, Inc., hereinafter called FabArc and Composite Construction Services, Inc. (CCSI), hereinafter called the Sub-Contractor.
>
> The Sub-Contractor agrees to furnish all labor, equipment, and insurance necessary to unload and complete the erection of steel and decking studs to include but not necessarily limited to: Structural steel, bar joists and bridging, composite deck, shear connectors, roof deck, checker plate, expanded metal grating, moment connections.
>
> All items per Attachment "A". (Contract between Shimizu and FabArc Steel)

*Id.* at p. 1. *See also* Pl. Ex. E, Bruce Stewart Deposition at p. 73;[12] Dobbins Dep. at p. 42.

Stewart signed the FabArc/CCSI subcontractor on behalf of CCSI. *See* Stewart Dep. at pp. 23, 27-28. The FabArc/CCSI subcontract, Stewart testified, incorporated the Shimizu/FabArc contract. *Id.* at pp. 73, 78. Additionally, Dobbins reviewed and approved the FabArc/CCSI subcontract before CCSI entered into it and also reviewed and approved the attached Shimizu/FabArc contract. *See* Dobbins Dep. at p. 38. Dobbins stated that the FabArc/Shimizu

---

[10] Based on this policy language, Zurich argues: "The requirement of CCSI to indemnify FabArc is triggered, under the terms of the indemnity agreement, only when 'it is charged, alleged or proven that the Subcontractor (or its agents or employees) was in any way at fault in causing or contributing to such injury, death or property damage.'"

[11] Zurich appears to dispute the full incorporation of the Shimizu/FabArc contract.

[12] Bruce Stewart ("Stewart") was CCSI's vice president of marketing.

5

contract is an essential part of the FabArc/CCSI contract because it sets out important matters relating to the scope of CCSI's work. *Id.* at 58. According to Dobbins, the FabArc/Shimizu contract is attached to the FabArc/CCSI contract so CCSI "can comply with project requirements as to [CCSI's] scope that [CCSI] can comply with what FabArc is committed in their contract to comply with related to the erection scope that we have." *Id.* at 59.

The FabArc/CCSI subcontract also states:

> Sub-Contractor's Work shall be performed in accordance with the requirements of this Agreement and Contract Documents. With respect to Subcontractor's Work, Sub-Contractor agrees to be bound to FabArc by all the terms and provisions of the Contractor Documents, and to assume toward FabArc all of the duties, obligations, and responsibilities that FabArc, by those Contract Documents, assumes toward the Owner and/or the General Contractor, including all obligation of owners' and/or general contractors' safety program.

*See* Pl. Ex. C at p. 3.[13]

Zurich issued two policies of insurance to CCSI for the policy period January 1, 1998 to January 1, 1999.[14] The comprehensive general liability policy contained an Additional Insured Endorsement under which CCSI named FabArc as an additional insured. *See* Pl. Ex. 6 at bates no. 000065. The endorsement stated:

---

[13] Plaintiff relies on an excerpt from Dobbins deposition:

*Q: And was your company required to – basically say that your company was agreeing to be bound to FabArc by all of the terms and provisions of the contract or documents and to assume toward FabArc all of the duties, obligations and responsibilities that FabArc by those contract documents assumes toward the owners and/or the general contractor, including all obligations of owners and/or general contractor's safety program?*
A: Correct.

[14] Zurich issued a primary (comprehensive general liability) policy of insurance to CCSI with policy number CPO 842234604. *See* Pl. Ex. U. The Zurich primary policy sets general liability limits of $ 1,000,000 for each occurrence. *Id.* at bates no. 000076. Zurich also issued an excess (umbrella) policy of insurance to CCSI with policy number CC 8422349-03. *See* Pl. Ex. V. The Zurich excess (umbrella) policy sets limits of $ 5,000,000. *Id.* at bates no. 000157.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ CAREFULLY

ADDITIONAL INSURED - DESIGNATED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE PART: SCHEDULE

Name of Person or Organization:

"ANY PERSON, ORGANIZATION, TRUSTEE OR ESTATE TO WHOM THE INSURED HAS AGREED TO NAME AS AN ADDITIONAL INSURED BY WRITTEN CONTRACT OR AGREEMENT PRIOR TO LOSS.  COVERAGE WILL BE EXCESS OVER ANY OTHER VALID AND COLLECTIBLE INSURANCE UNLESS THE AGREEMENT BETWEEN THE INSURED AND ADDITIONAL INSURED REQUIRES THIS COVERAGE TO BE PRIMARY."

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement)

WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule as an insured but only with respect to liability arising out of **your operations** or premises owned by or rented to you.

(Emphasis added).  The Zurich policies further provided:

**SECTION I - COVERAGES**

**COVERAGE A.   BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.     INSURING AGREEMENT.**
a.     We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend any "suit" seeking those damages.  We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result.

. . . .
b.     This insurance policy applies to "bodily injury" and "property damage" only if:
(1)     The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and
(2)     The "bodily injury" or "property damage" occurs during the policy period.

7

The Zurich CGL policy also contains the following exclusion:

> **2.    EXCLUSIONS.**
> This insurance does not apply to:
>
> . . . .
>
> **b.    Contractual Liability**
>
> "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:
>
> (1) Assumed in a contract or agreement that is an "insured contract," provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or
> (2) That the insured would have in the absence of the contract or agreement.

**SECTION V – DEFINITIONS**

. . . .

> 8.    **"Insured Contract"** means . . .
>
> f.    That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

The Zurich policy contains the following designation of an insured.

**SECTION II -WHO IS AN INSURED**

> 1.    If you are designated in the Declarations as: . . .
>
> c.    An organization under a partnership or joint venture, you are an insured . . . .

The Declarations page shows under "Named Insured" "Cable Concrete Structures" and further states "(See Endorsement TII-A-0008)." That schedule lists the following as "Named

8

Insureds": Cable Concrete Structures; Eastern Professional Group; Composite Construction Systems, Inc. (CCSI); CCS Special Structure, Inc.; and Executive Services, a Georgia Partnership. Neither FabArc nor Shimizu is listed on the schedule.

Palmer and Cay is CCSI's insurance agent. *See* Dobbins Dep. II at p. 20. CCSI contacted Palmer and Cay and requested that they add FabArc to CCSI's primary and excess (umbrella) policies as an additional insured. *See* Pl. Ex. CC (November 11, 1997 facsimile from CCSI to Palmer and Cay).[15] It is undisputed, FabArc asserts, that Palmer and Cay had binding authority to issue certificates of insurance on behalf of Zurich and to issue certificates as evidence of additional insured status under the above-stated Zurich policies. *See* Ward Dep. at pp. 75-76; *see also* Pl. Ex. I, Helen Farrell Dep. at p. 257.[16] According to Ward, CCSI sent exemplars of certificates naming contractors as additional insureds to Palmer and Cay. *See* Ward Dep. at pp. 75-76.

Palmer and Cay issued certificates of insurance to FabArc.[17] *See* Pl. Ex. BB, Certificates of Insurance. The certificates cited the $ 1,000,000 Zurich primary policy limit and $ 5,000,000 excess (umbrella) policy limit and further provided:

> PROJECT: TORAY CFA, DECATUR, AL
> FABARC STEEL SUPPLY, INC. SHIMIZU AMERICA CORP. AND TORAY, INC. ARE ADDED AS ADDITIONAL INSUREDS AS RESPECTS THEIR INTEREST IN THE ABOVE PROJECT.

*Id.*

---

[15] The fax read: "Jen - Alan asks that we fax - (ASAP so he doesn't get fired!) AH Ins Cert on the Toray CFA Project, Decatur, AL." The subject line read: "Insurance Certif." and said to fax to FabArc.

[16] Helen Farrell ("Farrell") is a Zurich Claims Case Manager.

[17] Ward testified that a certificate of insurance is relied upon to show that insurance is in place and represents the insurance coverage that was purchased and is in force at the time the certificate is issued. *See* Ward Dep. at pp. 78-79. According to FabArc, Zurich admitted that Palmer and Cay and Zurich anticipated that contractors would rely on the certificates that Palmer and Cay issued to the contractors. *Id.* at 80.

9

According to FabArc, the certificates of insurance do not contain any limiting language with regard to FabArc's position as an additional insured under the Zurich policies.   Neither Zurich, Palmer and Cay, nor CCSI ever provided FabArc with a copy of the Zurich insurance policies.   *See* Farrell Dep. at Ex. 6.  Dobbins testified that FabArc was an additional insured under both of CCSI's Zurich policies and that certificates of insurance were issued to FabArc evidencing FabArc's position as an additional insured under those policies.  *See* Dobbins Dep. II at p. 94.[18]

Zurich also relies on provisions from the Travelers Indemnity Company of Illinois ("Travelers") policy issued to FabArc, which allegedly resemble the Zurich provisions at issue.[19] The Travelers' additional insured endorsement provided:

> **BLANKET ADDITIONAL INSURED (Contractors)** . . .
>
> > a.   **WHO IS AN INSURED** (Section II) is amended to include any person or organization you are required by written contract to include as an insured, but only with respect to liability arising our of "your work."  This coverage does not include liability arising out of the Independent acts or omissions of such person or organization . . . .

---

[18] Specifically, Dobbins testified:

*Q: Is the issue of whether FabArc has protection under Zurich's policy an important issue to the business of CCSI?*
Mr. Rea: Objection to the form.
A: It was important to us to provide everything that we were contractually obligated to provide.  And that coverage as far as the additional insured was requested of us, so, yes, is the answer.

Dobbins further testified: CCSI expected Zurich would provide "whatever coverage we paid for extending to whoever is due that coverage" (*Id.* at 102); CCSI desired that its insurance agents and insurance carriers would comply with all of the insurance provisions of its construction contracts (*Id.* at 72); The FabArc/CCSI contract requires that FabArc be named an additional insured under the Zurich policy (*Id.* at 102-03); The FabArc/CCSI subcontract requires that the insurance must be primary (*Id.* at 103); CCSI did everything it needed to do because it turned FabArc's demands for defense and indemnification over to Zurich (*Id.* at 72); "My concerns w[ere] that this was being handled for my customer, FabArc, and that our interests were protected.  I was assured by Zurich that it was being handled.  I was assured by my insurance agent it was being handled." (*Id.* at 83); He did not now why Zurich had not defended FabArc with regard to the claims asserted in the *Sanchez* case.  (*Id.* at 88-89).

[19] Zurich contends that this endorsement is similar to the one in the Zurich policies.  FabArc contends that the Travelers' language is irrelevant to the issues in this case.

10

      b.     Where required by written contract, this Insurance is primary and noncontributing as respects the person or organization included as an insured under this endorsement and any other Insurance available to any such person or organization shall be excess and noncontributing with this Insurance.

The Travelers policy also contained the following "insured contract" provisions:

      2.     **Exclusions.**

      This insurance does not apply to: . . .

      b.     Contractual Liability

      "Bodily Injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.  This exclusion does not apply to liability for damages:
      (1) Assumed in a contract or agreement that is an "insured contract," provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or (2) That the insured would have in the absence of the contract or agreement. (p. 1 or 11).

      **SECTION V - Definitions**

      8.     "Insured contract" means: . . .

      f.     That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement. (p. 9 of 11).

**II.**     **Sanchez Litigation**

     In May 10, 1999, Cynthia Sanchez ("Mrs. Sanchez") as personal representative of the estate of Evodio Fernando Sanchez ("Mr. Sanchez"), filed a wrongful death suit in the Circuit Court of

11

Morgan County, Alabama.[20]  Mr. Sanchez was killed on the Toray project when a masonry wall being constructed by his employer, J&J Masonry, Inc., ("J&J") collapsed on April 13, 1998 during Mr. Sanchez's removal of J&J's scaffolding abutting the wall. *See* Sanchez Compl., Exh. K.

Sanchez's initial complaint named the following defendants: Shimizu, certain individual managers and safety directors, J &J (the masonry contractor), and two J&J co-employees. Sanchez's complaint averred that Shimizu had breached its duty as the general contractor.

On December 17, 1999, Sanchez amended the complaint to add several other defendants, including FabArc. *See* Pl. Ex. K.[21]  Specifically, Sanchez alleged: "Defendant FABARC and any employees and/or agents thereof, negligently or wantonly failed to provide and/or install proper and adequate supports, anchors, and fasteners to secure and stabilize the masonry wall which collapsed and killed Plaintiff's decedent, Evodio Sanchez.  Said negligent or wanton conduct was a proximate cause of the wrongful death of Evodio Sanchez."

On January 20, 2000 (approximately one month after FabArc was added to the *Sanchez* suit), counsel for FabArc wrote to Stewart demanding defense and indemnity for FabArc for the claims brought against FabArc by the Sanchez estate. *See* Pl. Ex. M. This letter also demanded that CCSI place Zurich on notice of the claims against FabArc. *Id.*  Further, the letter provided copies of the certificates of insurance naming FabArc as an additional insured under Zurich's policies. *Id.*; *see also* Farrell Dep. at pp. 180-181. CCSI sent the January 20th demand letter to Palmer and Cay. *See* Dobbins. Dep. II at p. 29.  Zurich admits to receiving a copy of the demand letter, along with

---

[20] The state suit was styled *Cynthia Sanchez as personal representative of the Estate of Evodio Fernando Sanchez, deceased v. Shimizu American Corp., et al.,* CV-99-304.

[21] Shimizu contracted with the owner of the property, Toray Carbon Fibers America, Inc., to serve as a general contractor on the construction project. *See* Toray/Shimizu contract. The Toray/Shimizu contract contemplated that Shimizu would hire subcontractors to perform the actual construction of the project.

attachments, from Palmer and Cay. *See* Farrell Dep. at 131, 180-181.

After receiving no response, FabArc's counsel wrote directly to Zurich on May 23, 2000. *See* Pl. Ex. N. In that letter (which enclosed copies of the certificates of insurance showing FabArc as an additional insured as well as the FabArc/CCSI contract with the Shimizu/FabArc contract attached), FabArc's counsel again demanded insurance coverage under the Zurich policies. *Id.* Zurich admits receiving the May 23, 2000 letter along with all of its attachments. *See* Farrell Dep. at pp. 139-143.

By letter dated June 3, 2000, Farrell on behalf of Zurich responded to FabArc's counsel, acknowledging "several requests for defense and indemnification for FabArc Steel." *See* Pl. Ex. O. Farrell stated: "[Zurich] will provide FabArc Steel Supply, Inc. with a complete defense and indemnification for the above action [the *Sanchez* lawsuit]." *Id.* Moreover, FabArc argues, Zurich requested that Larry Harper ("Harper"), FabArc's counsel, "provide the undersigned with a copy of your complete investigation in this matter along with any medical bills, reports or funeral expense information."[22] *Id.* On the same day, Farrell telephoned Harper and confirmed that Zurich would defend FabArc against the claims made in the *Sanchez* litigation. *See* Farrell Dep. at pp. 80-81; *see also* Pl. Ex. W (excerpts from Zurich's claim notes). Harper then forwarded his defense file in the *Sanchez* litigation to Zurich. *See* Pl. Ex. S (June 15, 2000 letter from Harper to Farrell); Farrell Dep. at pp. 61-62. According to plaintiff, Harper's defense file, which contained attorney-client correspondence, mental impressions, and details of defense strategy,[23] is still in Zurich's claims file. By FabArc's account, Zurich has admitted that the materials were attorney work product materials

---

[22] Although the June 3, 2000 letter is addressed to Keith J. Pflaum, the court assumes that Mr. Harper acquired the case from Mr. Pflaum.

[23] *See, e.g.,* Ward Dep. at p. 187; Farrell Dep. at p. 67. Zurich disputes the contents of the file.

for the defense of FabArc in the underlying *Sanchez* litigation.[24]

In a June 14, 2000 letter from Farrell to Harper, FabArc alleges, Zurich changed its position and withdrew its unconditional offer of defense and indemnity. *See* Pl. Ex. P. Plaintiff contends: "[I]t went from an acceptance of complete defense and indemnity for FabArc, to withdrawing this acceptance and stating that FabArc would be accorded 'additional insured status but only in an excess capacity.'" *See* Pl. Ex. Q (August 10, 2000 letter from Farrell to Harper). Zurich did not provide a defense to FabArc. On November 29, 2000, Zurich sent another letter to FabArc's counsel, placing further limits on FabArc's position as an additional insured under Zurich's policies. *See* Pl. Ex. EE. In the present litigation, FabArc argues, Zurich's position has changed yet again as follows: in responses to FabArc's RFA, Zurich denied that FabArc is an insured under its policies;[25] Zurich denies that the certificates of insurance issued by Palmer and Cay evidence that FabArc is an additional insured under the Zurich policies;[26] and Zurich denies that FabArc is entitled to coverage in an excess capacity. *Id*.

On October 26, 2000, Shimizu cross-claimed against FabArc for indemnity for the damages Shimizu would incur as a result of the Sanchez death, alleging breach of the Shimizu/FabArc subcontract as well as fraud. Shimizu's cross-claim sought to enforce indemnity provisions in the Shimizu/FabArc subcontract. On November 17, 2000, FabArc filed a third party complaint against CCSI seeking to enforce the indemnity agreement in the FabArc/CCSI subcontract.[27] FabArc also

---

[24] *See* Ward Dep. at p. 174; Farrell Dep. at p. 109. The contents of this file are disputed by Zurich, *see infra*.

[25] *See* Pl. Ex. P.

[26] *Id*.

[27] Zurich emphasizes that the Sanchez estate did not name CCSI as a defendant in the Sanchez wrongful death case ("Sanchez case") or bring allegations against CCSI in pleadings or testimony.

claimed CCSI breached the subcontract by failing to name FabArc as an additional insured under its Zurich General Liability policy. FabArc sought as relief the following declarations: that CCSI had a duty to defend and indemnify FabArc in the Sanchez death case, a duty to hold FabArc harmless from any and all claims and losses, and a duty to indemnify FabArc for all costs including attorneys' fees.[28]

On or about January 30, 2001, Shimizu's insurers settled with the Sanchez estate as follows: Tokio Marine & Fire Insurance Co., Ltd (Shimizu's primary carrier) for $ 1 million and Great American Assurance Company (Shimizu's excess carrier) for $ 2.5 million. Travelers (FabArc's insurer) also settled with the Sanchez estate in the amount of $ 600,000.00.

On November 15, 2001, Great American filed a complaint in intervention against various Traveler's companies, FabArc, and CCSI. Great American's claims against CCSI were based on its claimed third party beneficiary status for FabArc's subcontract with CCSI. Great American did not claim that it or its insured (Shimizu) had a contract with CCSI. *See* Def. Ex. M, Great American Complaint in Intervention.

On September 3, 2002, CCSI filed a "Motion for Final Summary Judgment" (and accompanying legal memorandum) as to Great American's claims against it, arguing: (1) The undisputed evidence in the Sanchez case was that CCSI was not negligent; (2) Great American was not a third-party beneficiary to the FabArc/CCSI subcontract and its indemnity provision; (3) Even if Great American were a third party beneficiary to the FabArc/CCSI subcontract and indemnity provision, Sanchez's death did not "arise from" CCSI's work within the meaning of the indemnity provision; and (4) CCSI was not contractually obligated to name Shimizu on CCSI's insurance

---

[28] It is not apparent how the Morgan County Circuit Court resolved this third-party complaint.

policies or to provide Shimizu with any insurance. *See* Exhibits C & D.

On January 22, 2003, the Morgan County Circuit Court issued an order granting CCSI's Motion for Summary Judgment. *See* Ex. E. On April 9, 2003, the Morgan County Circuit Court signed an order reaffirming its grant of CCSI's Motion for Summary Judgment as to all of Great American's claims which was entered on September 2, 2003. *See* Ex. I.

On or about April 8, 2003, Travelers (FabArc's insurer) filed a third party complaint against Zurich in the Sanchez death case seeking a declaratory judgment that Zurich's Commercial General Liability ("CGL") policy to CCSI provided primary and excess coverage for Shimizu; for a decree that Zurich was obligated to defend, indemnify, and cover all claims against Shimizu; and/or to declare that to the extent Travelers owes coverage to Shimizu, Zurich must share in the coverage. *See* Travelers' Third Party Complaint, Ex. N. In addition to seeking a declaratory judgment, Travelers also alleged that Zurich breached its obligation to defend, indemnify and cover all claims asserted against Shimizu in the Sanchez case. *Id.* The insurance certificate relied upon by Travelers in the *Sanchez* suit is the same certificate relied upon by FabArc and Travelers in this federal court action. *See* Zurich Cert. of Ins., Ex. O.

On September 2, 2003, the state court entered an Order on Partial Summary Judgment, *see* Def. Exs. F & I, in which it ruled that FabArc's obligation to defend and indemnify Shimizu under the indemnity provision in the Shimizu/FabArc subcontract was triggered only at the point at which the Sanchez plaintiff amended her complaint to allege that the death was proximately caused by the negligent or wanton act of the indemnitor FabArc.[29] On September 9, 2003, the Morgan County

---

[29] Defendant argues: "The Sanchez Estate never added CCSI as a Defendant. In fact, there has never been an allegation by the Sanchez plaintiff or by any other party to this action that Sanchez's death was proximately caused by any negligent or wanton act of CCSI. Thus the Morgan County Circuit Court, by its grant of Summary Judgment to CCSI, has found that CCSI was not liable nor responsible in any way for the Sanchez death and that

Circuit Court denied Great American's motion for reconsideration of the court's order granting

CCSI's motion for summary judgment. *See* Ex. J. On December 30, 2003, the circuit court entered

an order finalizing its summary judgment order against FabArc and in favor of Great American on

issues of contractual indemnity and entered a money judgment against FabArc in the amount of

$ 2.5 million plus prejudgment interest. *See* Pl. Ex. LL.

**III.    Facts Pertaining to FabArc's Contention that Any Liability of FabArc in the Underlying Sanchez Litigation Arose out of CCSI's operations**[30]

According to FabArc, CCSI was FabArc's sole agent on the Toray Project site (FabArc's

"eyes and ears" on the job) and was responsible for the installation of the angle clips in question.

FabArc is solely a steel fabricator, while CCSI is a steel erector for FabArc's fabrications. On the

Toray project, FabArc subcontracted all of its installation and erection work to CCSI. *See* Stewart

Dep. at 19; Tommy Hart Dep.[31], Pl. Ex. K, p. 14. According to Stewart, the FabArc/CCSI

subcontract defines CCSI's "scope of work" on the Toray Project. *See* Stewart Dep. at p 23.[32]

Stewart testified that the installation of angle clips on the Toray project became part of CCSI's scope

of work as a result of a change order (designated as "Change Order B") dated February 17, 1998

from FabArc. *Id.* at 34-35, 39; Pl. Ex. L, Change Order B. According to Stewart, the installation

of angle clips was not within the original scope of CCSI's work at the time of the November 20,

1997 subcontract with FabArc and not something that CCSI normally included in its scope of work

because it is normally done by a masonry contractor. *See* Stewart Dep. at 42-43.

---

Sanchez's death did not 'arise from' CCSI's work within the meaning of the FabArc/CCSI indemnity agreement."

[30] Zurich disputes that FabArc's liability arose out of CCSI's operations, *see infra*.

[31] Tommy Hart ("Hart") was CCSI's field foreman on the Toray project.

[32] Stewart testified that he read the subcontract carefully before signing it. *Id.* at 23, 27-28.

Hart testified that Don Chambers ("Chambers"), who was Shimizu's project superintendent, requested that CCSI undertake to install angle clips on the job as part of its scope of work. *See* Hart Dep. at pp. 17-19, 51. Hart further testified that FabArc was not present when this request was made. *Id.* at 20. According to FabArc, Zurich admits that the installation of angle clips was within CCSI's scope of work as a result of the change order. *See* Farrell Dep. at 154, 189.[33]

According to Heathcock, FabArc delegated to CCSI all duties to install the angle clips onto the horizontal beams. *See* Heathcock Dep. at 37. According to Hart, CCSI, not FabArc, was responsible for coordinating with Shimizu regarding the welding of the angle clips. *See* Hart Dep. at pp. 101-02, 109. While angle clips were included in CCSI's scope of work, Stewart testified, FabArc never directed CCSI in any manner with regard to the installation of the angle clips. *See* Stewart Dep. at p. 82.

FabArc was not present and/or working on the Toray project job site on a daily or weekly basis. *See* Dobbins Dep. at p. 45; Hart Dep. at 15; Heathcock Dep. at 14, 23. Instead, Dobbins (CCSI's President) testified, CCSI served as FabArc's "eyes and ears" on the Toray project. *See* Dobbins Dep. at p. 45. According to Hart, CCSI attended the general contractor's meetings on FabArc's behalf. *See* Hart Dep. at p. 114. Neither CCSI nor Shimizu expected FabArc to attend the weekly meetings with Shimizu. *See* Pl. Ex. H, John Lazau Dep. at p. 270; Hart Dep. at p. 114.[34]

According to FabArc, the Sanchez complaint alleges FabArc's wrongdoing with respect to work within CCSI's "scope of work." Dobbins testified:

---

[33] CCSI argued in the state court action that no duty had arisen to install the angle clips on the beam because the wall was still unfinished, and it had received no notification to move forward from Shimizu prior to the wall's collapse on Mr. Sanchez.

[34] CCSI's representative testified that references in job site minutes to "FabArc" really refer to "CCSI." *See* Hart Dep. at pp. 74-76, 108. For example, while the April 3 and April 10 meeting minutes state that FabArc needs to install angle clips, Hart testified that this reference really referred to work that needed to be done by CCSI.

Q:   *Let me just read to you from the complaint filed by Ms. Cynthia Sanchez on*
     *December the 7th of '99 . . . . "FabArc, and any employees and/or agents thereof*
     *negligently or wantonly failed to provide and/or install proper and adequate*
     *supports, anchors and fasteners to secure and stabilize the masonry wall which*
     *collapsed and killed plaintiff's decedent, Evodio Sanchez . . . ."*

A:   Okay.

Q:   *Is there any entity other than CCSI and FabArc who would have had any*
     *obligation to install these anchors, supports, and fasteners?*
     Mr. Rea: Object to the Form.

Q:   *Let me –*

A:   No.

Q:   *And so insofar as this count seven, paragraph one, references FabArc and its*
     *employees, there were no employees of FabArc who were responsible for the*
     *actual installation of, quote, supports, anchors and fasteners to secure the*
     *masonry wall, were there?*
     Mr. Rea: Object to the form.
     Mr. Collins: Object to the form.

A:   Well, the anchors actually were the responsibility of the block mason. The
     clips would have been the responsibility of CCSI under its subcontract with
     FabArc.

See Dobbins Dep. II at 117-119.

IV.   **Procedural History of Federal Litigation**

On February 20, 2002, FabArc filed its complaint for declaratory judgment in the above-styled case, seeking a declaration of the rights, duties, status, and legal relations of the parties under both Zurich's primary and its excess (umbrella) policies with CCSI described above. FabArc claimed that it was an additional insured under these two policies and relied on the Certificate of Liability Insurance described above. FabArc avers:"Zurich has a duty to defend and indemnify FabArc against the claims of Sanchez, Shimizu, and Great American." On May 16, 2003, Zurich simultaneously filed (1) a motion to stay the case pending resolution of the underlying state court action or to dismiss without prejudice FabArc's claims and (2) a request to add Travelers as a real party in interest, which this court granted on May 21, 2003. On August 15, 2003, this court denied Zurich's motion to stay and/or dismiss without prejudice. On September 22, 2003, FabArc filed a

first amended complaint.[35]  FabArc has noted that on December 30, 2003, the Morgan County

Circuit Court finalized Great American's $ 2.5 million judgment against FabArc.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings,

discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as

to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  A dispute is genuine

"if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party moving for summary

judgment bears the initial burden of explaining the basis of his motion.  *Celotex*, 477 U.S. at 323.

"It is never enough [for the movant] simply to state that the non-moving party could not meet their

burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted).  The

non-moving party then bears the burden of pointing to specific facts demonstrating that there is a

genuine issue of fact for trial.  *Celotex*, 477 U.S. at 324.  The non-moving party "must either point

to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict

motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141

(11th Cir. 1994) (quotation omitted).  Summary judgment is required where the non-moving party

merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial.

*Comer v. City of Palm Bay,* 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for

discovery.  *Comer*, 265 F.3d at 1192.  Moreover, "[w]hen deciding whether summary judgment is

---

[35] Plaintiff's first amended complaint struck references to the limit of $ 3,000,000 for the Zurich excess
(umbrella) policy because discovery had revealed a $ 5,000,000 policy limit.  Plaintiff also asserted that Zurich could
not deny coverage to FabArc based on the doctrines of estoppel and/or waiver.

appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I.    **Defendant's Motion**

  A.    **Introduction**

According to Zurich, it is entitled to summary judgment because: (1) FabArc was not owed any defense under Zurich's policy; and (2) FabArc was an "additional insured" under the Zurich policy but the Sanchez death did not "arise out of" CCSI's operations so as to trigger coverage under the "Additional Insured Endorsement" to the policy. Zurich bases the latter argument on the following: (a) the alleged res judicata effect of the Morgan County Circuit Court's determination that Sanchez's death did not "arise out of" CCSI's operations; (b) the Sanchez Estate's failure to name CCSI as a party defendant or allege that Sanchez' death arose out of CCSI's operations; and (c) equitable estoppel as preventing FabArc and Travelers from taking the position that the Sanchez death arose out of CCSI's work. Finally, Zurich argues, even if FabArc was more than an "additional insured" under the Zurich policy, no coverage is available because the indemnity provision in the FabArc/CCSI subcontract does not qualify as an "Insured Contract."

After reciting the text of the indemnity agreement in the construction subcontract between FabArc and CCSI, *see supra*, Zurich contends: "The requirement of CCSI to indemnify FabArc is triggered, under the terms of the indemnity agreement, only when "it is charged, alleged or proven

that the Subcontractor (or its agents or employees) was in any way at fault in causing or contributing to such injury death or property damage," which it contends did not happen. According to Zurich, by granting summary judgment to CCSI, the Morgan County Circuit Court "found that CCSI was not liable nor responsible in any way for the Sanchez death and that Sanchez's death did not 'arise from' CCSI's work within the meaning of the FabArc/CCSI indemnity agreement."

Moreover, Zurich contends, the  language from CCSI's Zurich policies, *see supra*, demonstrates that coverage was available to Shimizu or FabArc only as an "additional insured" and thus available only with respect to liability arising out of CCSI's operations. Even if FabArc or Shimizu could claim status as more than "additional insureds" under CCSI's policy, Zurich contends, there would still be no coverage "because contractual liability is excluded under the policy unless the contractual liability meets the definition of an 'insured contract.'" Zurich argues:

> A contract could give rise to coverage under the Zurich policy only
> if CCSI "assume[d] the tort liability of another party to pay for 'bodily injury'
> or 'property damage' to a third person or organization." An examination of the
> clear language of the indemnity agreement in the FabArc/CCSI contract
> clearly shows that CCSI agrees only to indemnify FabArc for CCSI's
> own negligence, that it does not "assume" the tort liability of FabArc.
> (Exhibit "A"). CCSI had no contract with Shimizu and, therefore, had no
> contractual obligation to defend Shimizu.

In conclusion, Zurich argues, no additional insured coverage for either Shimizu or FabArc applies because the Sanchez death did not "arise out of" CCSI's operations as required by the "Additional Insured Endorsement" to the Zurich policy, and doctrines of res judicata, collateral estoppel, and equitable estoppel bar any such argument that the death arose out of CCSI's operations. Even if FabArc somehow came within the definition of "insured" rather than "additional insured," Zurich contends, liability is excluded because the FabArc/CCSI subcontract's indemnity provisions do not meet the definition of an "insured contract" since CCSI did not agree to "assume

the tort liability of another party." Furthermore, Zurich asserts, the Morgan County Circuit Court's grant of summary judgment in favor of CCSI on the very indemnity provision at issue here establishes as a matter of res judicata and collateral estoppel that CCSI did not "assume the tort liability" of FabArc.

    **B.**      <u>**Argument**</u>

    **1.**      <u>**FabArc and Shimizu were "additional insureds" under the Zurich policy but the Sanchez death did not "arise out of" CCSI's operations so as to trigger coverage under the "Additional Insured Endorsement" to the policy.**</u>

While noting that FabArc and Shimizu were not named insureds, Zurich admits that they were "additional insureds" under the Zurich policy pursuant to the Additional Insured Endorsement.[36] However, Zurich focuses on limiting language in that endorsement, i.e., "WHO IS AN INSURED . . . is amended to include as an insured the person or organization shown in the Schedule as an insured <u>but only with respect to liability arising out of your operations</u> or premises owned by or rented to you." (Emphasis added). The "your," Zurich argues, references CCSI. While Zurich could locate no Alabama or Eleventh Circuit cases construing "your" in the phrase "your operations," Zurich relies upon the Court of Appeals of Ohio's statement in *Davis v. LTV Steel Company, Inc.*, 128 Ohio App. 733, 736, 716 N.E.2d 766 (Ohio App. 1998):

> The first issue is whether LTV is entitled to coverage as an additional insured under the language used in the policy endorsement. The general liability policy issued by Motorists to Shafer contained the following definition: "The word 'insured' means any person or organization qualifying as such under WHO IS AN INSURED (SECTION II)."
>
> LTV was not originally an "insured" under Section II of the policy. Pursuant to the contract between LTV and Shafer, however, Shafer secured an additional-insured endorsement naming LTV as an additional insured entity. The scope of coverage afforded by the endorsement was defined in

---

[36] For the text of the endorsement, *see supra* pp. 6-7.

this way: "WHO IS AN INSURED (SECTION II) is amended to include as an insured the person or organization shown in the Schedule as an insured but only with respect to *liability arising our of your operations or premises owned by or rented to you.*" (Emphasis added).  The words "you" and "your" refer to the named insured in the overall policy, to wit, Shafer.

**2.**     **The determination that Sanchez's death did not "arise out of" CCSI's operations is *res judicata* in this action.**

In the circuit court, Zurich notes, CCSI argued that Sanchez's death did not "arise from" CCSI's work.  Great American had claimed third party beneficiary status for the FabArc/CCSI indemnity agreement.[37]  The Morgan County Circuit Court, Zurich argues, judicially determined that Sanchez's death did not "arise out of" CCSI's operations in granting summary judgment to CCSI. Zurich sets out the elements of *res judicata* under Alabama law, *see infra*, and quotes from *Hughes v. Martin*, 533 So. 2d 1888 (Ala. 1998):

> Res judicata is a broad, judicially developed doctrine, which rests upon the ground that public policy, and the interest of the litigants alike, mandate that there be an end to litigation; that those who have contested an issue shall be bound by the ruling of the court; and that issues once tried shall be considered forever settled between those same parties and their privies.

According to Zurich, all four elements of *res judicata* have been met: (1) By granting summary judgment to CCSI, the Morgan County Circuit Court entered a judgment on the merits[38]; (2) The circuit court is a court of competent jurisdiction; (3) Substantial identity of the parties exists; and (4) The same cause of action was present in the state court litigation.

---

[37] Zurich quotes policy provisions discussed earlier in this memorandum opinion.

[38] Summary judgment, Zurich argues, acts as a judgment on the merits.  *See Ex Parte Jefferson County*, 656 So. 2d 382 (Ala. 1995).  *Ex Parte*, the court observes, further stated: "A prior judgment in favor of the defendant bars the plaintiff from relitigating any matter that could have been litigated in the prior action."

For (3), Zurich contends: "There is 'substantial identity of the parties' in this case in that Travelers' insured, FabArc, is party to the Sanchez case and filed its third party complaint against Zurich's insured, CCSI."   Zurich relies upon the Alabama Supreme Court's discussion of "substantial identity of parties" in *Taylor v. Liberty National Life Insurance Company*, 462 So. 2d 907, 920 (Ala. 1984):

> Judgments can bind persons not party (or privy) to the litigation in question where the nonparties' interests were represented adequately by a party in the original suit. *Southwest Airlines Co., v. Texas International Airlines*, 546 F.2d 84, 94-95 (5th Cir. 1977). A person may be bound by a judgment even though not a party to a suit if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative. *Aerojet-General Corporation v. Askew*, 511 F.2d 710, 719 (5th Cir. 1975). Moreover, if a party has "a sufficient 'laboring oar' in the conduct" of the litigation, then the principle of res judicata can be actuated. *Montana v. U.S.*, 440 U.S. 147, 155 . . . .

Moreover, Zurich argues, the "party identity" requirement is met where the party against whom res judicata is asserted was a party to the prior action. *See Dairyland Ins. Co. v. Jackson*, 566 So. 2d 723 (Ala. 1990).  Both FabArc and Zurich's insured (CCSI) were parties to the Sanchez litigation. As CCSI's insurer, defendant asserts, Zurich was so closely aligned with CCSI's interests as to be its virtual representative (since it would benefit by a judgment in favor of CCSI).  According to Zurich, the converse is true: "Travelers, as FabArc's insurer, is so closely aligned with its insured as to be [its] virtual representative and thus bound by the prior rulings of the Morgan County Circuit Court." Regarding element (4), Zurich argues, FabArc's and Great American's claims against CCSI in the Sanchez case sought to enforce the FabArc/CCSI subcontract's indemnity provisions, which include the same "arising under" test as presented in this case.[39]

_____

[39] While Zurich contends that the issue of whether Sanchez's death "arose out of" CCSI's operations also collaterally estops the same issue in this case, Zurich does not discuss separately the elements of collateral estoppel.

3.   **FabArc and Travelers are Equitably Estopped to take the Position that the Sanchez Death Arose out of CCSI's Work.**

In support of its motion for summary judgment against Shimizu in state court, Zurich notes, FabArc argued that Sanchez's death did not "arise out of" FabArc's work.[40]  Zurich provides further excerpts from FabArc's narrative of undisputed facts in the Sanchez action.  After quoting the Shimizu/FabArc indemnity provision,[41] FabArc argued:

> Shimizu is pursuing a claim for indemnity against FabArc for the monies it paid in the settlement of the underlying Sanchez lawsuit.  The indemnity provision in the Shimizu/FabArc subcontract upon which Shimizu bases its claim provides that FabArc will indemnify Shimizu, but only if the liability incurred by Shimizu "arises out of" FabArc's work and then only to the extent that FabArc's negligence caused the accident.  As such, Shimizu must, at a bare minimum, present substantial evidence that (1) FabArc breached its subcontract with Shimizu in its negligent performance of "the work" as defined by the contract and (2) that said negligent act or omission was the proximate cause of the wall's collapse which killed Mr. Sanchez and caused Shimizu to pay monies to the plaintiff in settlement.  Then and only then, would a duty to indemnity Shimizu ever potentially arise.

*Id.* at 12.

. . . .

> Shimizu is attempting to obtain indemnification from FabArc for what is clearly Shimizu's own negligence.

---

[40] Zurich quotes FabArc's "Narrative Summary of Undisputed Facts" in the Sanchez case:

> The only claims against FabArc asserted by the plaintiffs in the underlying case and, therefore, the only theory which Shimizu can now proceed (*sic*) is that FabArc failed to install the angle clips onto the horizontal steel beams and that said omission proximately caused Mr. Sanchez' death.  FabArc subcontracted the work at issue to CCSI and therefore, CCSI and FabArc will be used interchangeably since FabArc had no presence on the job site.  It is undisputed that CCSI was not ever instructed to install the angle clips. Shimizu cannot, as a matter of law, establish that the allegations against Shimizu and for which Shimizu paid settlement monies, were any way related to a breach of the FabArc subcontract or that the death of Mr. Sanchez arose from FabArc's "work" under this subcontract.

[41] *See supra* p. 3.  Although admitting that the Shimizu/FabArc indemnity provision is not identical to the FabArc/CCSI indemnity provision, Zurich contends, the provisions are "very similar" and both contain "arising out of" language.

26

. . . .

> . . . A plain reading of the indemnification in the Shimizu/FabArc subcontract shows that FabArc did not agree to indemnify Shimizu for its own negligence.
>
> Because Shimizu cannot recover from FabArc for its own negligence, Shimizu carries the heavy burden of proving, by circumstantial evidence, that its tremendous exposure was somehow related to FabArc and CCSI. The sole theory of liability against FabArc asserted by the Sanchez plaintiffs was that FabArc had the responsibility to install the angle clips on the horizontal beams adjacent to the wall which collapsed on Mr. Sanchez. In order for Shimizu to prevail on its cross-claim for indemnity, it must show that the settlement monies paid were paid on account of the fact that Sanchez's death "aros[e] out of or result[ed] from the performance of" FabArc's work. Shimizu cannot do so . . . .

*Id.* at 19-20.

FabArc's/Travelers's argument in the Sanchez litigation, Zurich contends, is the same one that Zurich now makes, i.e., Sanchez's death did not "aris[e] out of" the work performed by FabArc which was actually subcontracted to CCSI, and Sanchez's death was not in any way attributable to that work or negligence of CCSI. Now, Zurich argues, FabArc/Travelers should be estopped from taking a contrary position.[42]

**4.    Even if FabArc were more than an "additional insured" under the Zurich policy, no coverage is available under the Zurich policy because the indemnity provision in the FabArc/CCSI subcontract is not an "insured contract."**

Regarding the "insured contract" definition, *see supra*, Zurich argues, the FabArc/CCSI subcontract does not meet the definition because it does not require CCSI to "assume the tort liability of another party." Even if it did, Zurich argues, Zurich would still have no obligation to

---

[42] Zurich concedes that all the elements of judicial estoppel as defined in *Jinright v. Paulk*, 758 So. 2d 553 (Ala. 2000) "may not be present in this case." The elements are discussed *infra*.

However, Zurich cites *Golden v. Bank of Tallassee*, 639 So. 2d 1366, 1369 (Ala. 1994) as follows: "The doctrine of equitable estoppel operates to prevent an unjust result; it precludes a party from taking a position in one instance inconsistent with that party's position in another instance if to do so would prejudice another party."

defend/indemnify FabArc in the wrongful death action, as evidenced by case law from other jurisdictions.  First, Zurich discusses *Allianz, Inc. v. Goldcoast Partners*, 684 So. 2d 336 (Fla. App. 4 Dist. 1996), which involved a Burger King customer injured by an allegedly defective chair.  The customer sued the franchisee (Goldcoast) and the chair manufacturer (Decor).  Decor's contract with Goldcoast contained an indemnity provision where Decor agreed to indemnify Goldcoast except for injuries, death, and property damage caused by Goldcoast.  Further, that contract required Decor to maintain comprehensive liability insurance naming Goldcoast as an additional insured.  Decor's insurance policy with Allianz provided liability coverage for bodily injury assumed by Decor in an "insured contract" (defined in an identical way to the Zurich policy here).  The court found that the contract was not an "insured contract" because the indemnity provision did not require Decor to indemnify Goldcoast for Goldcoast's own negligence.[43]

---

[43] Addressing Goldcoast's argument that the agreement's Paragraph 10 required Decor to maintain insurance naming Goldcoast as an additional insured, the court found:

> Goldcoast argues that paragraph 10 should be read separate and apart from paragraph 9 [the indemnity agreement], and that it makes Goldcoast an additional insured even if Decor had no duty under paragraph 9 to indemnify Goldcoast for Goldcoast's own negligence.  We disagree.  That argument was also made in *University Plaza*, and the court held that a similar provision, requiring the tenant to obtain insurance to insure the landlord, did not provide for insurance coverage beyond the tenant's liability. . . . In the present case Decor is in the same position as the tenant in *University Plaza*.  It therefore follows that if there was no coverage for the active negligence of Goldcoast under Paragraph 9, there was no coverage by virtue of paragraph 10.

*Id.* at 337.

Zurich also discusses *University Plaza Shopping Center, Inc. v. Stewart*, 272 So. 2d 507 (Fla. 1973), involving the death of an employee of one of the shopping center tenants as a result of a gas line explosion in the center.  When the employee's widow sued the landlord, the landlord filed a third party complaint against the tenant and the tenant's insurer.  The lease contained an indemnity agreement whereby the lessee agreed to indemnify the landlord "from and against any and all claims for personal injury or loss of life in and about the demised premises" as well as a requirement that the tenant maintain CGL insurance for both the landlord and the tenant.  The court found that the general language used in the indemnity agreement did not authorize indemnification for negligence committed by the indemnitee alone.  Addressing the landlord's argument that the tenant's policy provided coverage, the court stated:

> [T]he landlord alleges that the tenant's insurer . . . who issued the . . . policy required by the lease agreement, is the guarantor of the tenant's contractual liability to indemnify

Furthermore, Zurich asserts, *Alex Robertson Company v. Imperial Casualty & Indemnity Company* is analogous to the instant case. *See* 8 Cal. App. 4th 338 (1992). There, a contractor (Robertson) entered into a contract with an architectural firm (Skinner) to provide plans and specifications. Skinner did not have professional liability insurance so Robertson demanded that Skinner obtain such insurance, and Robertson agreed to pay the premiums. The policy obtained specifically named Skinner as the named insured. Later, Robertson was sued by Jaffee, the developer of a retail store built by Robertson using Skinner's plans. Robertson tendered defense of the case to Skinner's insurer, which declined coverage on the basis that Robertson was not a named insured. The trial court found Robertson liable to Jaffee. Robertson sued Skinner's insurer claiming it was an insured under the policy since it paid the premium and by reason of the contractual liability coverage endorsement. In rejecting that argument, the appellate court reasoned:

> A contractual liability coverage endorsement does not make the person an insured whose liability is assumed by the party insured under the policy. Rather, as the endorsement clearly states, it extends the insurance afforded under the policy to include coverage for liability assumed by contract by the person insured. Here, the effect of the endorsement is to extend coverage, within the limits specified in the endorsement, to the liability assumed by [the architect] in its contract with [the contractor].

> ...[T]he effect of the endorsement was to provide liability coverage to Skinner in situations where Skinner had, by written contract, assumed the liability of Robertson. (Citations omitted). Robertson was a potential indemnitee of Skinner under the indemnification clause of the Skinner/Robertson contract . . . but Robertson was not an "insured" under the policy Imperial issued to Skinner. *Id.* at 344.

> In essence, Robertson has sued the wrong party . . . . Its indemnity agreement is with Skinner, not with [the insurer]. Robertson may be able to proceed against Skinner under contractual or equitable indemnity theories. (Citations omitted). In either case it must establish liability on the part of Skinner. The Skinner/Robertson contract provides

---

the landlord. We do not quarrel with this allegation. Under the insurance policy the insurer does guarantee payment for liability imposed upon the tenant. However, the insurance coverage does not extend beyond the tenant's liability. By this opinion we have held that the defendant (indemnitor) is not liable for damages arising solely from the landlord's (indemnitee) negligence. Therefore, it necessarily follows that the tenant's insurer has no legal obligation here.

Skinner will indemnify Robertson for "liability [arising] out of the negligent acts, errors or omissions of [Skinner]" . . . . In the case of equitable indemnity, 'one point stands clear: there can be no indemnity without liability.'(citations omitted). *Id.* at 347.

Robertson argues, however, Skinner's liability was established by the judgment in the Jaffee litigation. We find no support for this argument. Skinner was not named as a defendant in the Jaffee suit against Robertson and took no part in the trial of that action. Skinner is not mentioned in the trial court's statement of decision or judgment. The statement of decision suggests, if anything, Robertson was <u>solely responsible for the damage of Jaffee</u>. However, we do not decide this question here.

(Emphasis added). Like the insured architect in *Alex Robertson*, Zurich argues, CCSI was not named by Sanchez's estate as a defendant in the underlying litigation, and the only claims against CCSI were claims asserted either directly or as a third party beneficiary of the FabArc/CCSI indemnity agreement. By granting summary judgment to CCSI, Zurich contends, the state court determined that Sanchez's death did not "arise out of" CCSI's operations so as to trigger coverage. According to Zurich, coverage under CCSI's policy cannot exceed CCSI's liability under the indemnity provisions.

Finally, Zurich details facts and arguments from *Alliance Syndicate, Inc. v. Parsec*, 741 N.E.2d 1039 (2000). Parsec, an Alliance insured, contracted with CSX to load and unload CSX's freight containers at various rail yards. The contract required Parsec to indemnify CSX. A person injured in a rail yard accident sued both Parsec and CSX. In a separate action, CSX sued Parsec and Alliance for indemnity. Without consulting Alliance, Parsec agreed to indemnify CSX in the underlying action. The Parsec/CSX contract required Parsec to name CSX as an additional insured under the Alliance policy, which Parsec had failed to do. Therefore, the court did not have to interpret any "additional insured endorsement." While Parsec admitted its contractual obligation to indemnify CSX, it claimed Alliance, as Parsec's insurer, owed Parsec the cost of defense and indemnity of CSX.

30

The Alliance policy contained exclusions for bodily injury or property damages by reason of assumption of liability in a contract or agreement. Exceptions to the exclusion provided that exclusions do not apply to liability for damages assumed by Parsec in an "insured contract," which was defined as "[t]hat part of any other contract or agreement pertaining to your business under which you assume the tort liability of another to pay damages because of 'bodily injury' or 'property damage' to a third person or organization, if the contract or agreement is made prior to the 'bodily injury' or 'property damage.' Tort liability means a liability that would be imposed by law in the absence of any contract or agreement."

Parsec and CSX settled the personal injury lawsuit after Alliance refused to participate, contending that while it owed Parsec a defense, the railroad was not named as an insured and it owed no duty to defend the railroad. Alliance then litigated the coverage issue with Parsec and the railroad. Parsec, CSX, and Alliance agreed that the Parsec/CSX agreement was an "insured contract" as defined in the Alliance policy but disagreed "as to what that means in terms of coverage." *Id.* at 1045. Since CSX was not an "additional insured" under the policy, Alliance argued, Alliance's obligation "extended no further than a requirement to defend and indemnify Parsec for the claim made against Parsec by [CSX] under the terms of the indemnity clause of the Parsec/CSX agreement, an insured contract." *Id.* The Illinois appellate court held:

> Where CSX was not an additional insured under the Alliance policy, the above
> exclusions applied. The fact that the Parsec/CSX agreement was an
> "insured contract" did not expand the policy to automatically provide
> coverage for CSX or its liability, or impose any duty on Alliance to defend
> CSX in the underlying suit. Instead, Parsec, as the insured, was covered
> for the liability it assumed under the insured contract. Although the parties
> have not cited, and we have not found, an Illinois case with similar factual

31

circumstances, *Alex Robertson* ... reached the same conclusions on similar facts. We conclude, based on our reading of the record, that where CSX was not an additional insured under the policy, Alliance satisfied its obligation to Parsec under the policy by offering to defend Parsec against the counterclaim by CSX.

## II.   Plaintiff's Response[44]

According to plaintiff, Zurich mistakenly relies on a non-final state court order of summary judgment in favor of CCSI against Great American in the underlying state court action.[45]

### A.   Res Judicata and Collateral Estoppel Do Not Defeat Coverage for FabArc

According to plaintiff, CCSI's motion for summary judgment in the *Sanchez* case was directed only at the claims asserted by Great American against CCSI. Great American's subrogation claim against CCSI was made in Great American's capacity as the insurance carrier for Shimizu.[46] Plaintiff asserts that those issues and claims were different than those in the instant case.

#### 1.   The state court order upon which Zurich relies is not sufficient to form the basis of a defense of estoppel or preclusion.

In the state court litigation, FabArc asserts, Great American claimed that CCSI breached contractual duties to indemnify/defend Shimizu as well as procure insurance for Shimizu and

---

[44] While FabArc fully adopts and incorporates facts and arguments from its own motion for summary judgment, *see infra*, the court will not repeat such arguments here.

[45] FabArc argues as follows: (1) the only two entities subject to that order – CCSI and Great American – are not parties to the instant case; (2) Zurich was not a party to the state court action at the time of the state court's order; (3) Zurich is now a party to the state court action but only with respect to its insurance coverage for Shimizu; and (4) the issues addressed in that state court order are not the same issues presented to this court.

[46] Crucially, FabArc argues, Great American's claims against CCSI were based on alleged contractual duties owed by CCSI directly to Shimizu.

that CCSI negligently failed to provide insurance for Shimizu.  According to FabArc, Great

American contended that CCSI owed indemnity to Shimizu either as a third-party beneficiary to

the FabArc/CCSI construction subcontract or because of a direct contractual relationship

between CCSI and Shimizu.  In the state court, CCSI provided the following bases for summary

judgment against Great American: (1) Shimizu was not a third-party beneficiary to the

FabArc/CCSI indemnity clause; (2) Even if Great American provides substantial evidence that it

was a third-party beneficiary to the FabArc/CCSI indemnity clause, which CCSI expressly

denies, to recover, it [Great American] still must produce substantial evidence that decedent's

death  either arose from CCSI's work, or resulted from CCSI's negligence."  FabArc depicts the

issues presented to the state court by CCSI as

- • Whether the requisite contractual relationship existed between
  Shimizu and CCSI to require CCSI to indemnify Shimizu, whose
  indemnity claims were advanced by Great American as subrogee;

- • Whether the death of Mr. Sanchez "resulted from CCSI's negligence"
  under the terms of the FabArc/CCSI indemnity agreement; and

- • Whether the death of Mr. Sanchez "arose from CCSI's work"
  under the terms of the FabArc/CCSI indemnity agreement.

None of these issues, FabArc asserts, impact the federal court's interpretation of the Zurich

insurance policy.

Asserting that the state court order in favor of CCSI was non-final (not a final judgment),

FabArc deems unsupported Zurich's claim that "by its grant of summary judgment to CCSI [the

state court] has found that CCSI was not liable nor responsible in any way for the Sanchez death

and that Sanchez's death did not 'arise from' CCSI's work within the meaning of the FabArc/CCSI indemnity agreement." The circuit court's one-sentence order, FabArc argues, does not specify which of CCSI's alternative grounds for granting summary judgment provides the basis of the order. In fact, FabArc argues, the state court potentially granted summary judgment based on the finding that Shimizu and CCSI did not have the contractual relationship necessary to support Great American's claims. Because of its perfunctory nature, FabArc contends, the order no preclusive effect on the insurance coverage issues in this litigation.

Even assuming *arguendo* an express fact finding by the state court, FabArc contends, the order cannot bind this court's determination of the coverage issues here, since the state court was construing the FabArc/CCSI construction contract rather than Zurich's insurance policies. According to FabArc, the state court had to first interpret specific language in the construction contract and then interpret general Alabama contract law to determine whether there was contractual privity between the parties. While Alabama law controls interpretation of the construction contract, FabArc contends, Georgia law governs construction of the Zurich insurance contracts at issue here.[47]

### 2.   The doctrine of res judicata does not preclude FabArc from obtaining coverage under Zurich's policies.

The Alabama Supreme Court has stated: "The elements of *res judicata* are as follows: (1) prior <u>judgment</u> rendered by court of competent jurisdiction; (2) prior <u>judgment rendered on the merits</u>; (3) parties to both suits <u>substantially identical</u>; and (4) <u>same cause of action</u> present in both suits. *See Wheeler v. First Alabama Bank*, 364 So. 2d 1190, 1199 (Ala. 1978)(emphasis

---

[47] Zurich does not address FabArc's contention that Georgia law governs the construction of the Zurich insurance contracts.

added).  According to plaintiff, a "final judgment" is required.  *See West v. City of Mobile*, 689

So. 2d 14, 16 (Ala. 1997).  Here, FabArc asserts, no final judgment occurred.  *See Momar, Inc. v.*

*Schneider*, 823 So. 2d 701, 705 (Ala. Civ. App. 2001)(holding interlocutory order that has not

been certified as final pursuant to Rule 54(b) can be modified at any time and is therefore not a

final appealable order); *see also Winfrey v. School Bd.*, 59 F.3d 155, 157 (11th Cir. 1995)(in

absence of certification under Rule 54(b), a partial disposition of a multi-claim or multi-party

litigation does not qualify as "final judgment").

     FabArc argues that the state court order is not final because the state court cause is

ongoing, and the order is still subject to appeal; neither CCSI nor Great American sought or

received Rule 54(b) certification.  Regardless, FabArc contends, the other elements of *res*

*judicata* have not been met.  The parties are not "substantially identical," FabArc asserts, since

FabArc and Zurich were not parties to the state court order, and CCSI and Great American are

not parties to the present federal court litigation.  Moreover, FabArc repeats, Zurich was not a

party in the state court suit until after the order was entered.  Finally, plaintiff contends, Zurich

has failed to prove the "same cause of action present in both suits," e.g., the issue of Zurich's

coverage for FabArc was not before the state court at all.

### 3.    The doctrine of collateral estoppel does not preclude FabArc from coverage under Zurich's policies.

Under Alabama law,

> Collateral estoppel operates where the subsequent suit between the
> same parties is not on the same cause of action.  Requirements for collateral
> estoppel to operate are (1) issue identical to the one involved in previous
> suit; (2) issue actually litigated in prior action; (3) resolution of the issue
> was necessary to the prior judgment.[48]

---

[48] *See Wheeler* at 1199 (emphasis added)(citing *Stevenson v. Int'l Paper Co.*, 516 F.2d 103 (5th Cir. 1975)).

Again, FabArc contends, the state court order upon which Zurich relies is not a final

order,[49] and the issues between the state court and this action are not identical.  Furthermore,

FabArc argues:

> To the extent that the state court even reached the issue of whether Mr.
> Sanchez' death arose out of CCSI's work, the state court would
> have been interpreting the contract provisions of the CCSI subcontract
> under Alabama law . . . . The insurance policy language in the additional
> insured endorsement to which Zurich urges application of the doctrine of
> collateral estoppel is distinct and different language, and is set out in an
> insurance policy that must be interpreted under Georgia law.  Moreover,
> judicial construction of one contract can have no estoppel effect on
> construction of an entirely different contract where the contracts have
> different and independent terms and provisions.[50]

While the construction contract may require proof of proximate cause between the injury

and the contractor's acts, FabArc argues, proximate cause is not relevant in interpreting the

---

[49] *See Osborn v. Rocke*, 813 So. 2d 811, 819 (Ala. 2001).

[50] FabArc compares the FabArc/CCSI construction contract indemnity provision:

> The Sub-Contractor [CCSI] hereby covenants and agrees to defend,
> indemnify, and exonerate FabArc from all liability, claims, actions, causes
> of action, lawsuits, and demands (including all judgments and settlements
> made at arms length and all attorney fees and litigation expense connected
> therewith) for, personal injury or death (including personal injury or death
> of the Sub-Contractor's own employees) and/or property damage arising
> out of any work or operation performed by, for and on behalf of the
> Sub-Contractor or arising out of the Sub-Contractor's negligence, even if
> Sub-Contractor is only partly negligent for the damage or injury.  The
> foregoing covenant and agreement shall include all such liabilities, claims,
> lawsuits and demands where it is charged, alleged or proven that the
> Sub-Contractor (or its agents or employees) was in any way at fault
> in causing or contributing to such injury, death or property damage.
> The Sub-Contractor's liability insurance policies shall each contain
> contractual insurance coverage as to the covenant contained in this section.
> The contractor shall be named as an additional insured in the Sub-
> Contractor's general comprehensive and public liability policy.

to the Zurich insurance policy language:

> WHO IS AN INSURED (Section II) is amended to include as an insured the person or
> organization shown in the Schedule as an insured but only with respect to liability arising out of
> your operations or premises owned by or rented to you.

phrase "arising out of" in insurance policies governed by Georgia law. *See First Financial,*

*infra.* Moreover, FabArc contends, Zurich has not shown that the "resolution of the issue was

necessary to the prior judgment," because of the lack of specificity in the state court's order.

Plaintiff relies upon *Mike Smith Pontiac, GMC, Inc. v. Mercedes-Benz,* 32 F.3d 528, 532 (11th

Cir. 1994)("To evaluate whether collateral estoppel applies, [the court] must first identify the

issue decided in the prior litigation.") That is impossible here, FabArc argues.[51] Furthermore,

FabArc contends, the party asserting preclusion bears the burden to show actual decision on the

specific issues involved. *See* Wright & Miller § 4420 (2d ed. 2002); *see, e.g., Doctor's Assocs.*

*v. Distajo,* 66 F.3d 438, 450-51 (2d Cir. 1995)(where "it is impossible to ascertain which issue

was actually decided, [p]reclusion must be denied"); *Connors v. Tanoma Mining Co.,* 953 F.2d

682, 684-85 (D.C. Cir. 1992)(finding that the burden of showing that the same issue was actually

and necessarily determined in a prior action lies on the party asserting preclusion and preclusion

must be denied if the decision is unclear).

### B.   The doctrine of judicial estoppel does not preclude FabArc from coverage under Zurich's policies.

---

[51]FabArc also cites Wright and Miller and supporting cases: "The first rule for identifying the issues to be precluded is that <u>if there is no showing as to the issues that were actually decided, there is no issue preclusion.</u>" 18 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4420 (2d ed. 2002)(emphasis added) (*See also Matter of Troy Dodson Constr. Co.,* 993 F.2d 1211, 1214 (5th Cir. 1993)("There is simply no evidence in the state court pleadings that the court made any such decision as claimed in the argument for preclusion. There was no adjudication expressly nor by necessary implication."); *Casey v. Department of State,* 980 F.2d 1472, 1475 n. 3 (D.C. Cir. 1992)( "The government correctly observes that although a dismissal for lack of jurisdiction does not have the same broad preclusive effect as a dismissal on the merits, it will 'preclude relitigation of the precise issue of jurisdiction that led to the initial dismissal.' <u>GAF Corp. v. United States,</u> 818 F.2d 901, 912 (D.C.Cir.1987). In the Florida litigation, the government offered two alternative theories as to why the court lacked jurisdiction. The court granted the motion to dismiss without explaining on which ground it relied. Whatever the general preclusive effect of alternative and independent holdings in this circuit, *see <u>Dozier v. Ford Motor Co.,</u> 702 F.2d 1189, 1193-94 & n. 10 (D.C.Cir.1983),* we cannot isolate 'the precise issue of jurisdiction' decided by the Florida court and therefore assign no preclusive weight to the dismissal.); *Tucker v. Arthur Andersen & Co.,* 646 F.2d 721, 728-29 (2d Cir. 1981)("A general verdict for one of the defendants in the prior action could have rested on any of three issues, and accordingly could not support preclusion on the issue claimed.")

*Ex parte First Alabama Bank* sets out the elements of judicial estoppel: (1) the inconsistent position first asserted must have been successfully maintained;[52] (2) a judgment must have been rendered; (3) the positions must be clearly inconsistent; 4) the parties and questions must be the same; (5) the party claiming estoppel must have been misled and have changed his position; and (6) it must appear unjust to one party to permit the other to change. *See* 2003 WL 22113920 at * 4. In order for judicial estoppel to apply, the Eleventh Circuit has held, the alleged inconsistent statements "must be shown to have been calculated to make a mockery of the judicial system." *See Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002).

FabArc criticizes Zurich's reliance on arguments from FabArc's brief in support of its motion for summary judgment in the *Sanchez* litigation. The *Sanchez* litigation, FabArc reiterates, only addressed Shimizu's claims for indemnity and defense under the Shimizu/FabArc construction contract, <u>not</u> the provisions of Zurich's insurance policies. The statements relied upon by Zurich, FabArc asserts, relate to FabArc's arguments that it could be liable to Shimizu under the specific terms of the Shimizu/FabArc contract only "to the extent that FabArc's negligence caused the accident." Plaintiff argues: "Through its statements in the state court case, FabArc addresses the interpretation of the Shimizu/FabArc construction contract, which is not at issue in this case. Furthermore, the question of FabArc's negligence is not an issue in this case."[53] FabArc again analyzes "arising out of [CCSI's] operations" under Georgia law, *see supra*, then argues: "Because all of the job site operations on this Toray construction project

---

[52] FabArc emphasizes that it did not prevail at the state court level on the alleged inconsistent statement.

[53] While Zurich could have drafted its insurance policies to mandate proximate causation and negligence for additional insured coverage, FabArc contends, it did not.

were those of CCSI, if FabArc has liability, FabArc's liability necessarily flows from, or arises

out of, CCSI's operations."

FabArc's positions in the state and federal actions, plaintiff contends, are consistent.  In

its motion for summary judgment against CCSI, plaintiff contends, FabArc stated that any

liability of FabArc in the *Sanchez* litigation arose out of CCSI's operations, *see* Pl. Ex. HH, and

did not argue that Sanchez's death was proximately caused by CCSI's negligence.  Instead,

FabArc argues, FabArc stated in the state court that regardless of whether CCSI was actively

involved in Sanchez's death, CCSI served as FabArc's "eyes and ears" on the job.[54]  *Id.*

Furthermore, FabArc observes, its motion for summary judgment against CCSI on this point

remains pending the state court *Sanchez* litigation, thus no judgment has been rendered in state

court as required by judicial estoppel.

If Zurich is arguing that Travelers also took inconsistent positions in the state court case

and this case, FabArc contends, such argument is impossible because Travelers has taken no

position in the instant case; instead, this court has allowed Travelers to appears as a nominal

party only to the extent of its subrogation interest in FabArc's request for relief from Zurich.

Furthermore, plaintiff contends, Zurich cannot prove: (1) that the alleged contrary

positions were "successfully maintained" and "clearly inconsistent"; (2) that a "judgment" was

rendered, as required by *First Alabama Bank*, *see supra*; or (3) that the actions by FabArc and/or

Travelers were "calculated to make a mockery of the judicial system."

**C.    Whether the FabArc/CCSI Subcontract is an "insured contract" is an issue
only with regard to Zurich's coverage for CCSI.  That point is moot because
Zurich has already accepted unconditional coverage for CCSI.**

---

[54] FabArc repeats testimony from CCSI representatives, *see supra.*

39

FabArc deems its status as Zurich's insured to be independent of the policy definition of "insured contract." Whether the FabArc/CCSI contract is an "insured contract" is relevant only to coverage for CCSI, FabArc asserts. Since Zurich has already stipulated that it is providing full coverage to CCSI for any claims asserted in the *Sanchez* litigation (*see* Pl. Ex. KK – excerpts from September 8, 2003 hearing transcript in *Sanchez* litigation), which would include FabArc's claims against CCSI for defense/indemnity based on the FabArc/CCSI subcontract's indemnity provision, FabArc argues that Zurich's arguments about the "insured contract" are moot.

## III.    Defendant's Reply

### A.    Introduction

Zurich restates its earlier contentions, i.e., (1) the indemnity provisions in the FabArc/CCSI construction contract control as to coverage under the Zurich policy; (2) FabArc received the benefit of its bargain because it drafted the FabArc/CCSI contract and limited insurance coverage to the obligations of the indemnity provisions; (3) FabArc is due no coverage under the Zurich policy because no contractual indemnity obligation was triggered and, as Sanchez's injuries did not "arise out of" the work of CCSI; (4) in state court, FabArc contended that the FabArc/CCSI construction contract controls as to coverages provided under the Travelers' policy; (5) in state court, FabArc contended that the Travelers' additional insured endorsement complies with the insurance requirements in the FabArc/CCSI construction contract; and (6) in state court, Travelers contended that there was no coverage for Shimizu because Sanchez's injuries did not "arise out of" the work of FabArc.[55]

### B.    Discussion

---

[55] FabArc repeats policy language quoted earlier in this memorandum opinion.

Zurich notes FabArc's position that Georgia law governing insurance policies does not construe "arising out of" as requiring proof of proximate causation or negligence. However, Zurich cautions, FabArc's reliance on *First Financial*, *Red Ball*, and *Taliaferro* is misplaced because all of those cases interpret a common provision in automobile insurance policies (and inapplicable here): "[W]e will pay damages for bodily injury for which an insured person becomes legally responsible because of an accident arising out of the ownership, maintenance or use of a vehicle." *See Taliaferro* at 978. According to defendant, such a broad, comprehensive interpretation of "arising out of" is applied there because the automobile insurance provisions have been interpreted to include instances when the automobile is merely the situs of an accident.[56]

Zurich then highlights FabArc's argument in state court that it could owe no indemnity to Shimizu/Great American until a factual determination was made by a trier or fact in that action. Judge Brown's order provided: "FabArc denies Great American is entitled to Partial Summary Judgment and asserts the extent of indemnity owed, if any, by FabArc to Shimizu is unknown and cannot be ascertained until a factual determination is made after a trial to determine why the masonry wall fell and which party or parties are culpable therefore." Zurich notes that Travelers took the same position in state court, asserting: "Great American's Motion as it relates to

---

[56] In *Red Ball*, an employee failed to close valve after fueling a truck in preparation for a journey which resulted in an overflow of gasoline and an explosion after the truck had departed on its journey. In *First Financial*, a child was injured when a tree limb fell onto a car.

In *Taliaferro*, Zurich argues, the court discussed categories of cases involving accidental shootings in motor vehicles in which the "arising out of" language was addressed. Zurich contends that these cases are not applicable to the provisions in the Zurich policy. Zurich argues: "While an automobile is a physical object which can be loaded and unloaded and can be the situs for an accident, such is not the case with the 'work' of CCSI. FabArc can cite no cases to the Court which advance the broad interpretation of the 'arising out of' policy language in the Zurich policy because there are none."

Travelers is premature.  Until the potential liability of FabArc has been litigated and the extent of liability (if any), is determined by the fact finder, it is premature to analyze the potential for coverage under Travelers' policy."

Regarding the contractual indemnity provision, Zurich observes, the state court held that FabArc owed Great American/Shimizu indemnity because Sanchez "alleged" that her injuries were caused by FabArc when she added FabArc as a party to the litigation.[57]  Furthermore, Zurich observes, Great American asserted the same claims against CCSI under the contractual indemnity provisions, and the state court granted CCSI's motion for summary judgment. Therefore, Zurich contends:

> In that the insurance provisions of the FabArc/CCSI contract provide no more coverage than the indemnity obligations of the contract . . . the State Court has found as a matter of law that the injuries of Sanchez did not 'arise out of' the work of CCSI because Sanchez never 'alleged' that her injuries were caused in whole or in part by CCSI . . . . FabArc is equitably estopped from asserting in this action that Sanchez's injuries arose out of the work of CCSI when FabArc has asserted the opposite position in State Court as to Great American's claims.  While those alternative theories may be pled in the same lawsuit, FabArc is equitably estopped from contending in this lawsuit that the injuries arose out of CCSI's particularly, in that, the Circuit Court has entered Orders that may be dispositive of these claims based on pleadings filed by and relied upon by FabArc.

If this court disagrees with this argument, Zurich concludes, the issue of whether or not Sanchez's injuries arose out of the work of CCSI is a question of fact that must be determined by the Morgan County Circuit Court.  Necessary parties to that determination, Zurich asserts, are Shimizu, CCSI, and Great American (who are not parties to this litigation).  Zurich submits that the Zurich insurance provisions must be interpreted in light of the contractual indemnity provisions and that the Morgan County Circuit Court's interpretation of those provisions should

---

[57] That final order is on appeal to the Alabama Supreme Court.

control.[58]

## ARGUMENTS

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### I.     Plaintiff's Motion

### A.     Introduction

FabArc requests this court's declaration that Zurich owes FabArc defense and indemnity

for the claims asserted against FabArc in the underlying litigation.  FabArc seeks coverage from

Zurich under two policies of insurance issued in Georgia to CCSI.  In the underlying *Sanchez*

litigation presently pending in the Morgan County Circuit Court, FabArc notes, claims against

FabArc have been asserted by three parties -- Sanchez,[59] Shimizu, and Great American.[60]  Plaintiff

argues all such claims "arise out of" the death of Mr. Sanchez at the Toray site for work performed

by FabArc's sole agent at the site – CCSI.[61]  FabArc repeats its allegations regarding waiver.  As a

result, plaintiff contends, Zurich "is estopped from denying coverage to FabArc because of its own

actions, including the prior acceptance of FabArc's defense and indemnification without a

reservation of rights."

According to FabArc, state law controls the interpretation of insurance contracts, and when

a case is pending in federal court, the law of the forum state determines which state's substantive

---

[58] The Morgan County Circuit Court, Zurich repeats, found that indemnity was triggered by the "allegations by Sanchez that FabArc caused her decedent's injury."

[59] *See* Travelers' $ 600,000 settlement with Sanchez estate.

[60] *See* $ 2.5 million Judgment for Great American against FabArc.

[61] CCSI, FabArc repeats, is the named insured under both Zurich policies and agreed to and did name FabArc as an additional insured under its policies.  Zurich has accepted the duty to defend and indemnify CCSI with respect to the *Sanchez* litigation.

law will control.  *See Sprow v. Hartford Ins. Co.*, 594 F.2d 418, 420 (5th Cir. 1979).  Since Alabama

is the forum state, Alabama choice of law rules control.  "Alabama follows the principle of 'lex loci

contractus,' which states that a contract is governed by the laws of the state where it is made except

where the parties have legally contracted with reference to the laws of another jurisdiction."  *Cherry,*

*Bekaert & Holland v. Brown*, 582 So. 2d 502, 505 (Ala. 1991); *see also Chazen v. Parton*, 739 So.

2d 1104, 1107 (Ala. 1999).  According to FabArc, Alabama courts apply the substantive law of the

place where the last act necessary to enter into the insurance contract occurred.[62]   In this case,

plaintiff argues, Georgia law controls because Zurich issued its policies to CCSI at CCSI's

Columbus, Georgia address, through Zurich's Atlanta, Georgia insurance agent.  *See* Pl. Ex. U.

"Under Georgia law, contracts of insurance are interpreted by ordinary rules of contract

construction."  *Boardman Petroleum, Inc. v. Federate Mut. Ins. Co.*, 498 S.E.2d 492, 494 (Ga.

1998).  Although FabArc carries the burden of proof that it meets the requirements of the insuring

agreement of Zurich's primary policy,[63] FabArc argues, "[i]f the facts as alleged in the complaint

even arguably bring the occurrence within the policy's coverage, the insurer has a duty to defend

the action."  *Id.*

Under Georgia law, plaintiff contends, construction of insurance policies is a question for

---

[62] *See, e.g., Donegal Mut. Ins. Co. v. McConnell*, 562 So. 201, 203 (Ala. 1990)(holding, under Alabama's choice of law rule, that Pennsylvania law governed interpretation of automobile insurance policy executed in Pennsylvania); *Garnett v. Allstate Ins. Co.*, 567 So. 2d 1265, 1266 (Ala. 1990)(applying Georgia law to the interpretation of an insurance contract executed in Georgia).  The court notes, however, that *Garnett* does not specify whether the Allstate policies at issue were executed in Georgia – only that Allstate had insured three automobiles in Georgia.

[63] *See Georgia Farm Bureau Mut. Ins. Co. v. Hall County*, 586 S.E.2d 715, 717 (Ga. Ct. App. 2003)("The one claiming a benefit has the burden of proving that a claim falls within the coverage of the policy").

the court, not the jury, and thus properly the subject of a motion for summary judgment.[64] If plaintiff meets the requirements of the Insuring Agreement, FabArc contends, Zurich owes both the duty to defend and to indemnify. *See Nationwide Mutual Fire Ins. Co. v. Somers*, 2003 WL 22846099, *3 (Ga. Ct. App. 2003). For the duty to defend, FabArc argues, Georgia law provides: "If the facts as alleged in the complaint even arguably bring the occurrence within the policy's coverage, the insurer has a duty to defend the action." *See Georgia Farm Bureau*, 586 S.E.2d at 717.

While plaintiff bears the burden of proof that it comes within the definitions of the insuring clause, FabArc asserts, Zurich carries the burden of proof with regard to policy exclusions or conditions precedent. *See Southern Trust Ins. Co. v. Dr. T's Nature Products Co.*, 584 S.E.2d 34, 36 (Ga. Ct. App. 2003)("Where an insurance company seeks to invoke an exclusion contained [within] its policy, it has the burden of showing that the facts came within the exclusion."); *First Financial Ins. Co. v. Am. Sandblasting Co.*, 477 S.E.2d 390, 392 (Ga. Ct. App. 1996)(internal citations omitted);[65] *Richards v. Hanover Ins. Co.*, 299 S.E. 2d 561, 563 (Gal. 1983)(holding that exclusions will be strictly construed against the insurer and in favor of coverage).

---

[64] *See First Financial Ins. Co. v. Am. Sandblasting Co.*, 477 S.E.2d 390, 391-92 (Ga. Ct. App. 1996)("It is well settled that insurance policies, even when ambiguous, are to be construed by the court, and no jury question is presented unless an ambiguity remains after application of the applicable rules of contract construction."); *Board Petroleum, see supra* ("Any ambiguities in the contract are strictly construed against the insurer as drafter of the document; any exclusion from coverage sought to be invoked by the insurer is likewise strictly construed; and insurance contracts are to be read in accordance with the reasonable expectation of the insured where possible."); *Lunceford v. Peachtree Casualty Ins. Co.*, 495 S.E.2d 88, 91 (Ga. Ct. App. 1997).

[65] *First Financial* stated:

> Because insurance policies are contracts of adhesion, drawn by the legal draftsman of
> of the insurer, they are to be construed as reasonably understood by an insured. Exceptions,
> limitations and exclusions to insuring agreements require a narrow construction on the
> theory that the insurer, having affirmatively expressed coverage through broad promises,
> assumes a duty to define any limitations on that coverage in clear and explicit terms.

**B.    FabArc is Covered Under Zurich's Primary Policy**[66]

Plaintiff asserts that it satisfied the terms of the Zurich CGL policy.  FabArc reiterates its status as an additional insured pursuant to the Additional Insured Endorsement and as evidenced by the certificates of insurance issued to FabArc by Palmer and Cay.  According to FabArc, the damages claimed against it are as a result of "bodily injury" as defined in the policy.  FabArc quotes the Sanchez plaintiff's claims and notes Shimizu's/Great American's claims for indemnity from FabArc as the result of Mr. Sanchez's death.  Accordingly, FabArc argues, the damages sought against FabArc are "because of 'bodily injury,'" as defined by the Zurich policy.

Furthermore, plaintiff asserts, the "bodily injury" was caused by an "occurrence."  The Zurich policy defines "occurrence" as "an accident."  According to FabArc, the Sanchez plaintiff's allegations of negligence by FabArc and/or its agents or employees "are classic allegations of an accident," and Shimizu's/Great American's claims against FabArc are based on the same accident. FabArc also asserts that Mr. Sanchez's death took place in the "coverage territory" during the policy period of January 1, 1998 to January 1, 1999.  Based on the foregoing, FabArc argues, it is entitled to coverage under the Insuring Agreement of the Zurich primary policy.

**C.    FabArc Is Also Covered Under the "Insured Contract" Exception to Exclusions in the Zurich Policy**

In addition to the coverage provided under the principal section of the Insuring Agreement, plaintiff argues, it is entitled to coverage for liability to third parties pursuant to "insured contracts." FabArc quotes the relevant exception to Exclusion 2 in Coverage A of the Zurich policy. *See supra* p. 7.  According to FabArc, this provision covers Shimizu's/Great American's claim that FabArc, as Shimizu's subcontractor, had a contractual duty arising under the Shimizu/FabArc contract to

---

[66] The court does not repeat facts discussed earlier in this memorandum.

indemnify Shimizu, the general contractor, from Sanchez's claims. Thus, FabArc argues, it is entitled to coverage under Zurich's primary policy against Great American's/Shimizu's $2,500,000 breach of contract claim on account of funds paid on behalf of Shimizu to settle the Sanchez death suit.

### D.    FabArc is an Additional Insured Under the Additional Insured Endorsement[67]

A step-by-step analysis of the provisions of the Additional Insured Endorsement, plaintiff contends, reveals that FabArc qualified as an additional insured. According to FabArc, three tests must be met: (1) Did CCSI agree in writing to name FabArc as an "additional insured"? (2) If so, do the claims against FabArc by Sanchez and by Shimizu/Great American "arise out of [CCSI's] operations or premises"?;[68] and (3) Is Zurich's primary policy primary or excess as to FabArc?[69]

Regarding (1), FabArc argues, CCSI named FabArc as an "additional insured" pursuant to the written contract or agreement. *See* Pl. Ex. C at p. 2; Farrell Dep. at 170. Regarding (2), Zurich contends, any liability of FabArc for claims asserted in the Sanchez litigation by the Sanchez plaintiff or by Shimizu/Great American arises out of CCSI's operations. FabArc repeats its allegations about Zurich's initial acceptance of FabArc's defense and indemnity without reservation.[70]

FabArc criticizes the contentions of Ward (Zurich's corporate representative) and Farrell (Zurich's claims handler) that the insured endorsement allows FabArc coverage only if CCSI was

---

[67] For the text of the endorsement, *see supra* at pp. 6-7.

[68] If these first two tests are met, FabArc argues, coverage attaches.

[69] Plaintiff contends: "Zurich concedes that its policy is primary if the provisions of the construction contract provide for primary coverage."

[70] These facts have been discussed earlier in this memorandum opinion.

"negligent" and if Sanchez's death resulted from CCSI's independent act of negligence. According to FabArc, the endorsement is unambiguous and contains no language requiring an independent act of negligence by CCSI as a prerequisite to coverage for FabArc. Rather, FabArc argues, the Zurich policy provides for coverage if the damages "arose out of CCSI's operations" without requiring negligence or proximate cause. The phrase "arising out of" does not require a showing of "negligence," FabArc asserts, citing the fundamental principle that insurance contracts are construed liberally in favor of the insured and strictly against the insurer. *See Boardman Petroleum*.

In construing insurance contracts, plaintiff contends, Georgia courts have liberally construed the phrase "arising out of" in the context of a policy provision regarding the use of an automobile.[71] *See also Red Ball Motor Freight, Inc. v. Employers Mutual Liability Ins. Co.*, 189 F.2d 374, 378 (5th Cir. 1951)(in construing arising out of language of automobile policy in favor of coverage, the Fifth Circuit cited the Missouri Supreme Court as follows: "We rest our holding broadly upon the view . . . that the words 'arising out of the ownership, maintenance, or use of the (truck)' are not words of narrow and specific limitation, but are broad, general, and comprehensive terms effecting broad

---

[71] Plaintiff relies on the following statement from *First Financial Ins. Co. v. Rainey*, 394 S.E.2d 774, 775 (Ga. Ct. App. 1990):

> "The term 'arising out of' does not mean proximate cause in the strict legal sense,
> nor require a finding that the injury was directly and proximately caused by the use of
> the vehicle, nor that the insured vehicle was exerting any physical force upon the
> instrumentality which was the immediate cause of the injury . . . . [A]lmost any
> causal connection or relationship will do . . . . 'The question to be answered is
> Whether the injury "originated from," "had its origin in," "grew out of," or "flowed
> from" the use of the vehicle."

(Citation omitted).

The court notes a subsequent statement from the *Rainey* court:

> Thus, applying the general rule that an occupant's injuries will be deemed covered if they would
> not have occurred "but for" the use, operation or maintenance of the vehicle as a vehicle, we affirm
> the trial court's conclusion that the appellant's liability for basic benefits was established as a
> matter of law.

48

coverage . . . . 'Arising out of' are words of much broader significance than 'caused by.' They are ordinarily understood to mean 'originating from,' 'having its origin in,' 'growing out of,' or 'flowing from,' or in short, 'incident to, or having connection with'").

Any allegations against FabArc, plaintiff asserts, could only regard CCSI's activities since CCSI was charged with performance of work regarding the angle clips and was FabArc's only presence on the job site.[72]

---

[72] FabArc offers the following excerpt from Farrell's testimony:

*Q: Now I have represented to you that CCSI has testified in depositions in this case that
it was responsible for all of the work on the job site with respect to erection of the steel under
the FabArc contract. And I'm asking you to assume that's correct. You have told me you have
not seen the deposition, but I'm telling you that's what CCSI has said.*
A: Okay.
. . .
*Q: So, if it's correct, what CCSI says, that they were the only one working on this job, that FabArc
was not, then it would follow that if FabArc had a liability for what went on in the active performance
of the erection of steel, then [CCSI] would necessarily be vicarious for FabArc to have any liability
for what was going on in the erection of the steel, correct?*
     Ms. McMahon: I object to the form in that it misstates the testimony. You may answer.
A: As to FabArc?
*Q: Uh-huh.*
A: Yes.
. . .
*Q: Then, if something happens with respect to the erection of the wall, FabArc's liability for that would
necessarily be vicarious [through CCSI]?*
. . .
A: Okay. I say based on what you are telling me that I would agree with you.

. . . .
Q: On the other hand, if, in fact, FabArc was not guilty of anything active in the erection of the steel
*or the clips that we have been talking about and FabArc's only liability or the only allegations against
FabArc were for the active work of CCSI – do you follow me?*
A: Uh-huh (indicating affirmative).
*Q: – then FabArc would have coverage under the additional insured endorsements?*
     Mrs. McMahon: Object to the form.
A: In that situation that you have described, I would agree.
*Q: So, if you had had the opportunity before today to go to read the testimony of CCSI, and if
CCSI had confirmed that the angle clips were its responsibility to install and not FabArc's and if
CCSI had testified that it was the eyes and ears of FabArc on the job and if CCSI had testified that
all of the erection duties for installing the steel were CCSI's and not FabArc's that would support
this statement, that would bring FabArc within this statement that Zurich has coverage for FabArc's
liability that is vicarious?*
     Mrs. McMahon: Object to the form. It misstates the testimony. You may answer.
A: And I feel uncomfortable answering it, but I would say, I will answer it, if everything is the way

According to FabArc, Zurich's attempts to pinpoint the origin of FabArc's liability only represent opinions, not first-hand knowledge based upon presence at the site. The only one present at the site was CCSI, FabArc argues, and therefore the testimony of CCSI's principals is determinative.[73] FabArc reminds the court that it seeks a declaration of coverage as an additional insured under Zurich's primary policy.

Turning to the third test, i.e., whether Zurich's primary policy is "primary" or excess as regards FabArc, FabArc asserts that the FabArc/CCSI subcontract fully incorporates the Shimizu/FabArc contract, which has been affirmed by CCSI's own decision makers. According to FabArc, the Shimizu/FabArc contract indisputably requires that all insurance issued with respect to the Toray project must be primary, including the Zurich policy CCSI provided for FabArc. Plaintiff relies upon Section 13A of the Shimizu/FabArc contract: "All insurance furnished in connection with this project shall provide that it is primary coverage regarding an insurance event." (Emphasis added). FabArc contends that the coverage CCSI "furnished" to FabArc was "in connection with this project." Plaintiff further relies upon another provision from the Shimizu/FabArc contract: "Should [FabArc] sublet any of the Work to a third party, FabArc shall require such third party to furnish the same insurance and indemnity as are required of FabArc hereunder . . . ." (Emphasis added). Therefore, FabArc argues, the insurance coverage available to FabArc as an additional insured under the Zurich policy is primary rather than excess.

---

that you are telling me, that scenario, I would say, yes . . . .

*See* Farrell Dep. at 236-38.

[73] This testimony has been discussed earlier in this memorandum opinion.

E.    **FabArc is Also Covered under Zurich's Excess (Umbrella) Policy**

FabArc also asserts entitlement to a declaration of coverage under Zurich's excess policy.[74]

Plaintiff quotes the Zurich excess policy as follows:

> Insuring Agreements
>
> A.    Our coverage applies excess of, but in the same manner and on the same basis as the primary insurance shown on our Schedule A as applying to Coverage Part A-1.  We follow all the terms, conditions, definitions and exclusions of the primary insurance, except as otherwise provided by this Coverage Part A-1.

The Zurich primary policy is listed on "Schedule A" of the Zurich excess policy.  Therefore, FabArc argues, if coverage applies under Zurich's primary policy, coverage also applies under Zurich's excess policy.  The Zurich excess policy provided: "All persons or organizations who are insured or additional insureds on the scheduled primary insurance, but not for broader coverage than is available to them under the scheduled primary insurance."  As an additional insured under the Zurich primary policy, FabArc contends, it is also insured under the Zurich excess policy.

Additionally, FabArc asserts, the excess policy also covers FabArc's liability to third parties pursuant to "insured contracts."  FabArc emphasizes the following language from the section entitled "Coverage Part B-1 Special Liability Occurrence":

> Insuring Agreements
>
> A.    We will pay on behalf of the insured those sums the insured becomes legally obligated to pay or assumes under an insured contract, which are in Excess of the Retained Limit specified in the Declarations of our policy or any valid and collectible other insurance.  The injury or damage must be caused by an occurrence which results in bodily injury, property damage, personal injury, or advertising injury and which takes place during our policy period.

That section defines "insured contract" as "Any written or oral agreement entered into by the insured

---

[74] Again, FabArc observes, the Sanchez death fell within the policy period.

in the usual course of the insured's business operations, in which the insured assumes tort liability

of another to pay damages because of bodily injury, personal injury, property damages, or

advertising injury to a third person or organization, where the contract or agreement is made prior

to the injury." "Occurrence" is defined as "[f]or bodily injury or property damage, an accident,

including continuous or repeated exposure to substantially the same general harmful conditions."

Because the FabArc/CCSI construction contract meets the policy definition of "insured contract"

as set out in the Zurich excess policy, FabArc contends, it is entitled to coverage for Great

American's/Shimizu's $ 2,500,000 claim (described above).

### F.    FabArc Has Suffered and Continues to Suffer Serious Damages

Travelers paid $ 600,000 to the Sanchez estate to settle the Sanchez wrongful death claims

as well as FabArc's defense costs in that suit, and the $ 2,500,000 judgment against FabArc can be

satisfied with coverage funds of Travelers to the extent of the coverage limits of the Travelers

policies.    To date, FabArc adds, Travelers has also paid defense costs for the Great

American/Shimizu suit.

Despite Travelers' actions, FabArc argues, it has sustained and will continue to sustain

serious damage from Zurich's failure to defend and indemnify.  Marrilyn Everhart ("Everhart"), an

underwriter for Travelers, testified that FabArc's insurance rates with Travelers have increased

substantially directly because of the adverse claim history that FabArc has experienced on account

of the Sanchez losses. *See* Everhart Dep. at 71-72, 87-95, 100-01.  Prior to Travelers's $ 600,000

settlement payment to the Sanchez estate, Everhart alleged, FabArc's record was completely clean

regarding personal injury claims. *Id.* at 127.[75]  In contract negotiations with CCSI for the Toray project, plaintiff contends, FabArc shifted the risk of personal injury loss to CCSI, as CCSI was the only presence on the job site.  Because of Zurich's refusal to acknowledge FabArc as an insured under its policies, FabArc argues "the contractually bargained shifting of financial risk of the Sanchez personal injury claims did not occur.  As a result, FabArc has lost its market place as a preferred risk."

### G.  Zurich Is Estopped to Argue Limiting Language of Additional Insured Endorsement

Under Georgia law, FabArc argues, "[w]hile waiver and estoppel may not be used to enlarge coverage contained in a policy of insurance, nevertheless, '[a]n insurer may waive any provision in an insurance policy inserted for its benefit, and may waive any condition or limitation in the policy upon which it could otherwise rely.'" *See Barwick v. Gen. Am. Life Ins. Co.*, 324 S.E. 2d 758, 759 (Ga. Ct. App. 1984)(quoting 16B Appleman, Insurance Law and Practice 510-512, § 9083 (citation omitted)(emphasis added)).  Furthermore, FabArc contends, Georgia courts have held that coverage can be created by waiver or estoppel "where the insurer, without reserving its rights, assumes the defense of an action or continues such defense with knowledge, actual or constructive, of noncoverage." *See Prescott Altama Datsun, Inc. v. Monarch Ins. Co.*, 319 S.E.2d 445, 446 (Gal. 1984)(emphasis added).[76]

---

[75] FabArc notes that Travelers has funded the following on its behalf: FabArc's entire defense in the *Sanchez* litigation and a $ 600,000 settlement to the Sanchez estate. Additionally, FabArc argues, the $ 2.5 million Shimizu/Great American has obtained as a declaratory judgment in its favor against FabArc is now due and payable "unless Zurich assumes its obligations under its insurance contracts." That $2.5 million state court judgment is on appeal to the Alabama Supreme Court.

[76] The court presents additional language from *Prescott*:

> However, having found that in the absence of a reservation of rights a liability insurer may waive and be estopped to assert a defense of noncoverage by assuming the defense of a suit against its insured (or former insured), we find as a matter of law that the insurer here did not waive and is

Zurich specifically assumed FabArc's defense without reserving its rights, plaintiff asserts, by virtue of the June 3, 2000 telephone call from Zurich's Helen Farrell to Larry Harper, counsel for FabArc, which was followed by a letter to Mr. Harper to that effect and requesting a copy of his investigative materials.[77] Moreover, plaintiff argues, Georgia law estops Zurich from relying on the limiting language of the additional insured endorsement, *see supra*.   The certificates issued by Palmer & Cay did not reference limitations such as those set out in Zurich's additional insured endorsement or even reference the endorsement.[78]

## II.   Defendant's Response

### A.   Introduction

According to Zurich, FabArc's current claims against Zurich cannot be decided without reference to the *Sanchez* litigation in the Morgan County Circuit Court, including pleadings/testimony, the parties' positions, and the circuit court's rulings.  Zurich argues: "That is particularly the case in that CCSI, Shimizu, and Great American are not parties to this litigation." Zurich asserts that the indemnity and insurance claims made by Great American against FabArc and Travelers are similar to the indemnity and insurance claims made by FabArc against CCSI and Zurich.

---

not estopped to assert such defense under the facts of this case. Monarch's attorney did not answer Boatwright's suit on behalf of Prescott's; Universal Underwriters did. Monarch's attorney entered only an appearance, and entry of an appearance alone does not create an estoppel.

[77] Relevant facts are discussed in other portions of this memorandum opinion.

[78] FabArc argues: "Zurich's representatives testified that certificates of insurance are intended to be relied upon by third parties as setting forth the coverage afforded under contracts of insurance.  As Zurich expected, FabArc relied on the certificates of insurance and permitted CCSI to perform the erection functions on the Toray construction site, and received payment for these services, because Zurich, through Palmer and Cay, gave written certification that FabArc had primary and excess coverage under CCSI's Zurich policies 'AS RESPECTS [ITS] INTERESTS IN THE [TORAY] PROJECT.'"

**B.    Zurich's Alleged Waiver of Its Right to Dispute Coverage for FabArc**

Zurich deems meritless FabArc's waiver arguments based on Farrell's testimony.  By Zurich's account, Harper (FabArc's counsel) contacted Farrell and told her that the *Sanchez* incident arose out of CCSI's work.  Based on that erroneous representation, Zurich argues, Farrell stated that there would be coverage.  When Harper sent Farrell his "investigation," Zurich further contends, such investigative materials failed to establish that Sanchez's injury arose out of the work of CCSI.[79] After Farrell's independent investigation, she determined that Sanchez's injuries did not arise out of the work of CCSI, and therefore defense of FabArc was denied.

To the extent FabArc asserts estoppel based on Farrell's alleged receipt of confidential attorney/client privileged information from Harper, Zurich notes that Harper's letter forwarding information to Farrell references only his investigation.  Zurich also disputes that Farrell testified to receiving attorney-client privileged information from Harper.  Specifically, Zurich contends: "Farrell was questioned extensively about the information that she received from Harper, and she recalled receiving only pages 910-918 from Harper which includes one letter to Travelers and a representative of FabArc and a summary of a deposition."[80]  Essentially, Zurich argues, Farrell testified that she searched in vain for facts showing that CCSI's potential negligence contributed to Sanchez's death.  Contending that CCSI had agreed to install angle clips <u>once the wall was</u>

_____

[79] Zurich argues that coverage cannot be created by estoppel. *See Home Indemnity Co. v. Reed Equipment Co.*, 381 So. 2d 45 (Ala. 1980).  The court observes that Zurich proffers this Alabama case without addressing the choice of law issue.

[80] While the court has reviewed Farrell's lengthy deposition excerpts in Zurich's reply brief, it does not replicate those excerpts here.

   In reply, FabArc argues: "A close reading of Ms. Farrell's deposition shows only that Ms. Farrell cannot specifically recall reviewing all of the attorney-client documents from Mr. Harper's defense of FabArc that are present in Zurich's file.  She does not say they were not sent to Zurich; instead, she just testifies that she just cannot recall, at the time of her deposition, whether she read them all."

completed but that the wall was not completed when it fell on Sanchez, she testified:

> So I am saying that had the wall fallen after we had put the clips on, then
> absolutely, I would think, if the clips were responsible for the wall
> falling and they were put on wrong, then CCSI, having the same
> contracts with FabArc, probably would have to defend and indemnify
> FabArc. But because we did not touch the wall yet, we didn't do any
> work on the wall yet, no. So in other words, what was happening, the facts,
> from what I was being told as to what is coming out at this point did not
> align. It wasn't because we didn't put the clips on that the wall fell. The
> investigation that was sent to me said that the wall was poorly constructed,
> from what I recall.

### C. Pleadings, testimony, and orders in the Morgan County Circuit Court action that are dispositive of the issues in this case.

### 1. Great American's claims against Travelers in the Morgan County lawsuit.

In Travelers' response to Great American's motion for summary judgment,[81] Zurich
observes, Travelers contended that its policy provides no coverage for either Great American or
Shimizu because Sanchez's injuries did not "arise out of" FabArc's work and because "no actions
or work of FabArc, or of its subcontractors CCSI, contributed to cause the injuries for which
Shimizu was liable to the Sanchez estate. Accordingly, Great American has not met its burden of
proof."[82]

---

[81] *See* Def. Ex. R.

[82] Zurich further quotes Travelers' response:

> Travelers does not dispute that Shimizu would be entitled to coverage as an additional
> insured under its policies, if Shimizu meets the policy terms. However, Shimizu does
> not meet the policy terms and definitions under the facts of this case. Shimizu does not
> fall within the terms of the [CGL] policy because the policy provides coverage to "additional
> insureds" only if the additional insured incurs liability "arising out of your [FabArc's] work." . . .
>
> There is a total absence of proof that Shimizu's liability arose from FabArc's work. As is
> set out in the evidence, law, and argument previously submitted by Travelers and FabArc
> in the action, it is undisputed that no actions or work of FabArc, or of its subcontractor,
> CCSI, contributed to cause the injuries for which Shimizu was liable to the Sanchez Estate.
> Accordingly, Great American has not met its burden of proof and is not entitled to judgment
> as a matter of law.. . .

In the state court litigation, Zurich points out, Great American further claimed that the Shimizu/FabArc construction contract was an "insured contract" which entitled Shimizu (and Great American) to insured status under the Travelers' policy, to which Travelers responded:

> Travelers has accepted coverage for FabArc against the claims of Great American under the "insured contract" provisions of the Travelers' policies. The issue of FabArc's coverage from Travelers, however, is not raised in the Complaint filed by Great American, nor is it before the Court on the Motions now pending. Great American's coverage allegations are directed solely to the issue of Travelers' coverage for Shimizu.
>
> Under its "insured contract" coverage, Travelers will indemnify FabArc to the extent of Travelers' coverage limits as to such liability as FabArc may incur, against the claims of Great American and Shimizu. In other words, if, through the judicial process, it is finally determined that FabArc owes contractual indemnity duties to Shimizu, and through Shimizu to Great American, Travelers agrees that its contractual coverage will protect FabArc to the extent of the coverage limits of Travelers' policy.

## 2.    Great American's claims against CCSI in the Morgan County lawsuit.

In the Sanchez lawsuit, Zurich argues, Great American asserted the following claims against CCSI: 1) that CCSI assumed all the duties of FabArc under the Shimizu/FabArc contract; 2) that the FabArc/CCSI subcontract incorporated the FabArc/Shimizu contract in its entirety, including the requirement that all insurance furnished in connection with the Toray project be primary";[83] and 3)

---

[83] Zurich relies upon the following excerpt from Great American's opposition to CCSI's motion for summary judgment:

CCSI's argument that Shimizu was not a third party beneficiary to the FabArc/CCSI contract is meritless. . . . The intention to benefit Shimizu is clearly displayed by the fact that the entire contract between Shimizu and FabArc Steel is attached to the FabArc/CCSI contract and contains all of the paragraphs regarding insurance requirements, indemnity, and site rules . . . . Under Paragraph 5 of the FabArc/CCSI subcontract, CCSI agreed to perform in accordance with the requirements of not only its agreement with FabArc, but also the "contract documents." Don Dobbins testified that the "contract documents" included the provisions of the [Shimizu/FabArc contract]. Additionally, Paragraph 5 obligates CCSI to be bound to FabArc by all of the terms and provisions of the Contractor Documents, and to assume toward FabArc all of the duties, obligations, and responsibilities that FabArc has assumed toward Shimizu....Paragraph 5 puts CCSI in the shoes of

that CCSI assumed its indemnity and insurance obligations to Shimizu.  According to Zurich, FabArc has made the same claims here.  In response to Great American's claims, CCSI contended that it did not assume all of the obligations that FabArc had to Shimizu as a result of the Shimizu/FabArc being attached to the FabArc/CCSI contract. Zurich reiterates that the circuit court granted CCSI's motion for summary judgment as to all of the claims of Great American against CCSI.

### 3. Great American's claims against FabArc in the Morgan County lawsuit.

Great American claimed that it was entitled to reimbursement from FabArc for its costs in defending and indemnifying Shimizu, while FabArc responded that there was no duty to indemnify Great American because the Sanchez claims did not trigger FabArc's indemnity provision under the Shimizu/FabArc contract in that the loss did not "arise out of" the work of FabArc or CCSI.  FabArc further argued that the coverage provided by Travelers for Shimizu fulfilled the requirements in the Shimizu/FabArc subcontract but that there was no coverage because Shimizu/Great American did not sustain losses for "liability arising out of [FabArc's] work."

### D. CCSI did not assume all of the duties of FabArc under the Shimizu/FabArc contract including, but not limited to, FabArc's duty to provide primary coverage for Shimizu.

The state court's ruling, Zurich reiterates, is dispositive of FabArc's claim in this federal court action.  Further, Zurich argues, the construction contracts do not support FabArc's contention. Shimizu drafted the Shimizu/FabArc contract, while FabArc drafted the FabArc/CCSI contract. According to Zurich, while the Shimizu/FabArc contract requires the insurance provided by FabArc

---

FabArc in relation to the work of the Toray Project.  FabArc's obligations were CCSI's obligations. By agreeing to these terms, CCSI obligated itself to defend and indemnify Shimizu from any claims alleged.

to Shimizu to be primary, the FabArc/CCSI contract is silent on that issue. Zurich contrasts the "comprehensive and lengthy" insurance provisions in the FabArc/Shimizu contract with the brevity of the FabArc/CCSI contract, whose only insurance reference is allegedly "the contractor shall be named as an additional insured in the subcontractor's general comprehensive and public liability policy." In the latter contract, Zurich notes, FabArc (as the drafter) could have required CCSI to provide primary coverage for both FabArc and Shimizu but did not.

Absent clear and unequivocal contractual language indicating that all of FabArc's obligations to indemnify Shimizu were passed on to CCSI, Zurich argues, such a claim fails. Further, Zurich asserts, the following provision in the Shimizu/FabArc contract shows that FabArc could not transfer its liability to Shimizu to a third-party: "LIABILITY: The fact that subcontractor has obtained the insurance required in the subcontract shall in no manner lessen nor affect subcontractor's obligations or liabilities set forth in this subcontract."

> **E.**  **As an additional insured under the Zurich policy, FabArc has no coverage for the claims of Sanchez, Shimizu and Great American because FabArc has not met its burden of establishing that the injuries claimed by Sanchez arose out of the work of CCSI.**

Because FabArc asserted throughout the *Sanchez* litigation that Sanchez's injuries did not arise out of either FabArc's or CCSI's work, Zurich argues, it cannot now use this federal court action to circumvent rulings of the state court "particularly in that CCSI's motion for summary judgment as to FabArc's claims has been briefed and argued in the state court."

> **F.**  **Waiver**[84]

Although nothing indicates that Harper provided extensive attorney client privileged information to Farrell, Zurich asserts, even if such information were provided, Farrell did not request

---

[84] Zurich repeats facts cited earlier in this memorandum opinion.

privileged information per se but rather "repeatedly requested investigation materials and other information that supported Harper's contention that the injuries of Sanchez arose out of CCSI's work." Defendant concludes: "FabArc claims that Zurich has waived its right to dispute coverage because the Certificate of Insurance is ambiguous. There is no sworn testimony before this Court that such was the case. The coverage provided by Zurich tracked the coverage provided by Travelers to Shimizu – coverage only for injuries arising out of the work of CCSI."

### G.   FabArc has no coverage under the Zurich policy based on the "insured contract" provisions of the policy.

In the *Sanchez* litigation, Zurich argues, Travelers relied on identical policy provision to contend that Shimizu/Great American were not insured as a result of the "insured contract" provisions in the Travelers' policy and that the "insured contract" provisions created only an obligation for Travelers to defend and indemnify FabArc for the claims of Shimizu/Great American under the Shimizu/FabArc contract. Zurich argues that it has no greater obligation than that of Travelers.

### III.   Plaintiff's Reply[85]

#### A.   Introduction

According to plaintiff, Zurich's arguments based on *res judicata*, collateral estoppel, and judicial estoppel are meritless and divert attention from analysis of the Zurich coverage provisions. FabArc accuses Zurich of raising the following "non-issues": Travelers' coverage for Shimizu; Travelers' coverage for FabArc; Zurich's coverage for Shimizu; Great American's coverage for Shimizu; FabArc's claims for indemnity against CCSI; Shimizu's claims for indemnity against FabArc; and Shimizu's claims for indemnity against CCSI. Plaintiff reiterates its stance that the

---

[85] The court does not repeat arguments set out earlier in this memorandum opinion.

only documents this court needs to construe are Zurich's contracts of insurance.

**B.    Arguments**

1.    **The state court's non-final order deals with different issues and different parties than those of this case, and it cannot be dispositive of the issues before this Court regarding Zurich's coverage for FabArc.**

FabArc again argues that the Morgan County Court's order granting summary judgment for CCSI against Great American is not dispositive of coverage under Zurich's policies and can have no preclusive effect.[86]

2.    **The undisputed evidence shows that Zurich's policies provide primary coverage to FabArc.**

Again, FabArc contends, the FabArc/CCSI contract's incorporates the FabArc/Shimizu contract, which requires that all insurance obtained for the Toray project be primary. Additionally, FabArc asserts, CCSI's own representatives testified that the Shimizu/FabArc contract requires primary coverage and that all of its terms were incorporated into the FabArc/CCSI subcontract. FabArc argues: "Zurich's argument implies that it was necessary for FabArc to recite in the body of its subcontract each and every word of the Shimizu contract in order to incorporate the Shimizu contract into FabArc's subcontract with CCSI. To have done so would have been redundant."

3.    **The undisputed evidence, including the testimony of CCSI's representatives, shows that any potential liability of FabArc "ar[ose] out of the operations" of CCSI, and Zurich cannot rely on judicial or equitable estoppel to escape this fact.**

It is correct, FabArc argues, that FabArc has never admitted and does not now admit that it should be liable for Sanchez's death. If FabArc is responsible in any manner for that death, plaintiff contends, that responsibility arises vicariously out of CCSI's actions. As regards any alleged

---

[86] FabArc repeats arguments and facts discussed earlier in this memorandum opinion.

inconsistencies in FabArc's positions taken in the state court, FabArc repeats: "[I]n contrast to the present case, which deals exclusively with FabArc's coverage under Zurich's insurance policies, FabArc's positions in the state court case against Shimizu and Great American were directed solely against the Shimizu/FabArc construction contract. Again, FabArc observes, it did not prevail on the allegedly inconsistent position as required by judicial estoppel.

While still disputing the relevance of language of Travelers' policies, FabArc also notes that such policy provisions are not identical. FabArc states: "The insurance contracts to which Zurich cites are specialized contracts, where each word and phrase has meaning, such that the addition or deletion of one can make a substantial difference. 'Similar' is not sufficient."[87]    Additionally, FabArc reminds the court, Travelers is only present in this case as a nominal party to the extent of its subrogation interest in FabArc's request for relief from Zurich.

> **4.    By accepting coverage without a reservation of rights, and by retaining FabArc's attorney-client privilege defense file, Zurich is estopped from denying coverage to FabArc.**

Despite defendant's attempt to paint Mr. Harper's representation to Farrell that "Sanchez's injuries arose out of the work of CCSI" as a misrepresentation, FabArc argues, "the undisputed evidence . . . shows [that] any liability of FabArc for the death of Mr. Sanchez necessarily arose out of the operations of CCSI on the Toray construction project.  Even CCSI's own representatives admit this, and Zurich has presented no evidence in dispute."  Instead, FabArc contends, Farrell's

---

[87] In fact, plaintiff observes, the "who is an insured" section of the Travelers' policy contains a requirement not present in the Zurich primary policy at issue here, i.e., "This coverage does not include liability arising out of the independent acts or omissions of such person or organization." FabArc argues: "[This requirement] does not appear in Zurich's policy and is not only a significant provision, but is also a determinative provision with respect to Travelers's alleged coverage for Shimizu. It is contended that the work accident, which covered the death of Mr. Sanchez, arose out of the independent negligence of Shimizu. FabArc and Travelers have consistently argued in the state court case that, in contrast to Shimzu's liability, the liability of FabArc did not arise out of the independent negligence of FabArc."

deposition testimony indicates Zurich's confusion between the concept of "arising out of" (the test

under Zurich's policy) and the concepts of proximate cause and negligence (which are not required

by Zurich's policy).  FabArc also relies upon the pronouncement from an insurance treatise:  "The

phrase 'arising out of' is frequently given a broader meaning than proximate cause.  The phrase is

considered to mean 'flowing from' or 'having its origin in,' indicating that there only need to be 'a'

causal connection, rather than a proximate causal connection."  *See* 7 Couch on Insurance § 101:54

(3d ed.)(in discussion liability policies in general, not just automobile policies).  FabArc also repeats

its waiver argument based on the Georgia Supreme Court case, *Prescott. See supra.*

> 5.  **FabArc is entitled to "insured contract" coverage under the Zurich**
> **policies; Zurich's argument that the FabArc/CCSI subcontract is not an**
> **insured contract is misplaced, because that issue relate only to whether**
> **CCSI is entitled to coverage, which Zurich has already accepted.**

While alleging its entitlement to insured status under the "insured contract" provisions of the

Zurich policy, FabArc adds: "[W]hether the FabArc/CCSI subcontract is an insured contract is

relevant only to the question of whether Zurich owes insured contract coverage to CCSI."  Again,

FabArc argues, the Travelers policy provisions at issue in the state court litigation are irrelevant to

this case.  Even if they were somehow relevant here, FabArc adds, there is no analogy between

Travelers's position with regard to coverage for Shimizu and Zurich's position with regard to

coverage for FabArc.  Specifically, FabArc contends:

> One claim against FabArc in the *Sanchez* litigation is a claim for
> indemnification under the Shimizu/FabArc construction contract.
> Thus, FabArc seeks coverage for contract claims in the *Sanchez*
> litigation.  By contrast, there are no claims for indemnification
> against Shimizu in the state court case.  Therefore, Shimizu did
> not seek coverage from Travelers for any contract claims.  Instead,
> Shimizu sought coverage in the state court case from Travelers for
> tort claims that are not dependent on any contract, and Travelers
> denied coverage to Shimizu as a result of, *inter alia*, Shimizu's own

independent acts of negligence. Thus, any arguments regarding Travelers's coverage positions vis-a-vis Shimizu are not relevant to the inquiry before this Court regarding coverage for FabArc under Zurich's policies.

## CONCLUSIONS OF THE COURT

This court starts with the conclusions that neither collateral estoppel, res judicata, nor equitable estoppel apply to the case. There has been no applicable final judgment, the parties are not the same, and the insurance policies involved are not the same.[88] There has been no prejudice to defendant from any position taken by plaintiff.

This court does not reach the issue of whether Farrell's letter of June 3, 2000 which stated "[Zurich] will provide FabArc Steel Supply, Inc. with a complete defense and indemnification for the [*Sanchez* action]" is binding on Zurich, when the letter did not contain a reservation of rights.

This court is of the opinion that the primary issues here arise out of a consideration, construction, and interpretation of the pertinent Zurich policies and endorsements, etc.[89] The most significant provisions are the following:

### Zurich's Top II Package Policy
**Section I - Coverages**
**COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
1.  Insuring Agreement.
    a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this

---

[88] There has been no specific adjudication in state court *vis a vis* plaintiff here and either Zurich or CCSI. If this court were to consider itself bound by state court rulings, it might be bound by the state court ruling that FabArc and its insurer are liable to Great American. The relationship of CCSI and Zurich to FabArc and its insurer are similar to the relationship of FabArc and its insurer to Shimizu and Great American. The holding of the state court as to Great American's claim would appear to favor FabArc here. This court does not rely on such holding, but merely points out that the state court rulings may not entirely favor Zurich's position.

[89] The contract provisions, other than the insurance contract provisions, have little, if any, bearing on the issues. An exception may be the fact that CCSI agreed in its subcontract to name FabArc as an "insured." *See* Zurich's "Additional Insured - Designated Person or Organization Endorsement." Even this provision may be somewhat superfluous since FabArc was specifically named by Zurich as an additional insured.

insurance applies.  We will have the right and duty to defend any "suit" seeking those damages . . . .

    b.  This insurance applies to "bodily injury" and "property damage" only if:

        (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

        (2) The "bodily injury" or "property damage" occurs during the policy period.

. . . .

2.    Exclusions.

    This insurance does not apply to: . . .

    b.    Contractual Liability

        "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. <u> This exclusion does not apply</u> to liability for damages:

        (1) <u>Assumed in a contract or agreement that is an "insured contract"</u> provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

        (2) That the insured would have in the absence of the contract or agreement. (Emphasis added).

. . . .

**SECTION V - DEFINITIONS**

8.    <u>"Insured contract" means</u>: . . .

    f.    That part of any other contract or agreement <u>pertaining to your [FabArc's] business</u> (including an indemnification of a municipality in connection with work performed for a municipality) <u>under which you assume the tort liability of another party</u> [Shimizu] to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement. (Emphasis added).

**<u>Zurich's Additional Insured - Designated Person or Organization Endorsement</u>**

Name of Person or Organization:

"ANY PERSON, ORGANIZATION, TRUSTEE OR ESTATE TO WHOM THE INSURED HAS AGREED TO NAME AS AN ADDITIONAL INSURED BY WRITTEN CONTRACT OR AGREEMENT PRIOR TO LOSS.  COVERAGE WILL BE EXCESS OVER ANY OTHER VALID AND COLLECTIBLE INSURANCE UNLESS THE AGREEMENT BETWEEN THE INSURED AND ADDITIONAL INSURED REQUIRES THIS COVERAGE TO BE PRIMARY."

WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule as an insured but only with respect to liability arising out of <u>your operations</u> or premises owned by or rented to you. (Emphasis added).

**Zurich's Custom Cover Policy**

**Definitions**

**B.      Insured**

> . . . .

> 4.      All persons or organizations who are insureds or additional insureds on the scheduled primary insurance but not for broader coverage than is available to them under the scheduled primary insurance.

. . . .

**Coverage Part A-1 Excess Over Primary Insurance Occurrence**
**Section III-Coverages**
**Insuring Agreements**

A.      Our coverage applies excess of, but in the same manner and on the same basis as the primary insurance shown on our Schedule A as applying to Coverage Part A-1.  We follow all the terms, conditions, definitions and exclusions of the primary insurance, except as otherwise provided by this Coverage Part A-1.

. . . .

**Coverage Part B-1 Special Liability Occurrence**
**Insuring Agreements**

A.      We will pay on behalf of the insured, those sums the insured becomes legally obligated to pay or assumes under an insured contract, which are in excess of the Retained Limit specified in the Declarations of our policy or any valid and collectible other insurance.  The injury or damage must be caused by an occurrence which results in bodily injury, property damage, personal injury or advertising injury and which takes place during our policy period.

**Zurich's Certificate of Liability Insurance**

**Company A**   Zurich American Ins. Group

. . . .

**Description of Operations/Locations/Vehicles/Special Items**
PROJECT - TORAY CFA, DECATUR, AL
FABARC STEEL SUPPLY, INC., SHIMIZU AMERICA CORP. AND TORAY, INC. ARE ADDED AS ADDITIONAL INSUREDS AS RESPECTS THEIR INTEREST IN THE ABOVE PROJECT.
**Certificate Holder**

66

> FABARC STEEL SUPPLY, INC.
> KIM HANES - 205-831-8778
> P.O. BOX 606
> ANNISTON, AL   36202

The Zurich policy also provides:

> 7.   **Separation of Insureds**.
>       Except with respect to the Limits of Insurance, and
>       any rights or duties specifically assigned in this Cov-
>       erage Part to the first Named Insured, this insurance
>       applies:
>       1.      As if each Named Insured were the only Named Insured; and
>       2.      Separately to each insured against whom claim
>               is made or "suit" is brought.

The defendant has emphasized the following distinctions between the Travelers language

and the Zurich language:

**Travelers**

WHO IS AN INSURED (Section II) is amended to include as an insured the
person or organization shown in the Schedule, **but only with respect to liability
arising out of 'your work' for that insured by or for you**.

**Zurich**

WHO IS AN INSURED (Section II) is amended to include as an insured
the person or organization shown in the Schedule as an insured **but only with respect
to liability arising out of your operations or premises owned by or rented to you**.

This court sees no substantial difference between "your work" and "your operations," particularly

in view of Zurich's reference to the applicable "Project: TORAY CFA, Decatur, AL" and "As

Respects Their Interest in the Above Project."

This court is satisfied that the Zurich policy and additional insured endorsement clearly

provide coverage to plaintiff under Section 1.a of the Top II Package Policy.  The plaintiff is

designated as "An Insured," and the claims of Sanchez, SAC, and Great American clearly relate to

67

liability "arising out of [plaintiff's] operations."[90]

Further, the claims against plaintiff pertain to "liability for damages: (1) Assumed in a contract or agreement" between FabArc and Shimizu for "bodily injury" which occurred subsequent to the execution of that contract or agreement. The next question is whether the Shimizu/FabArc contract is an "insured contract." It seems clear to this court, under 8.f., the contract pertains to FabArc's "business" under which it assumed "the tort liability of another party to pay for 'bodily injury' or 'property damage' to a third person or organization." The liability of the claimants against Shimizu was "imposed by law."

The court concludes that the plaintiff has coverage under the Insuring Agreement of the Zurich policy which is not excluded under the "contractual liability" exclusion clause in the policy. The court further concludes that the plaintiff is covered under Zurich's excess policy. The court's decision in the latter regard is premised on the following provisions of Zurich's excess policy:

**Part A - 1**

Insuring Agreements.
A.      Our coverage applies excess of, but in the same manner and on the same basis as the primary insurance shown on our Schedule A as applying to Coverage Part A-1. We follow all the terms, conditions, definitions and exclusions of the primary insurance, except as otherwise provided by this Coverage Part A-1.

. . . .
        ["Insured" is defined as:]
        4.      All persons or organizations who are insureds or additional insureds on the scheduled primary insurance but not for broader coverage than is available to them under the scheduled primary insurance.

---

[90] The court is of the mind that the claims of Sanchez, SAC, and Great American also clearly relate to liability arising out of CCSI's operations/work, as CCSI was indisputably FabArc's subcontractor on the Toray project.

Insuring Agreements

A.      We will pay, on behalf of the insured, those sums the insured becomes
        legally obligated to pay or assumes under an insured contract, which
        are in excess of the Retained Limit specified in the Declarations of
        our policy or any valid and collectible other insurance. The injury or
        damage must be caused by an occurrence which results in bodily
        injury, property damage, personal injury or advertising injury and
        which takes place during our policy period.

        . . . .

        ["Insured Contract" is defined as:]
        Any written or oral agreement entered into by the insured in the usual
        course of the insured's business operations, in which the insured assumes
        tort liability of another to pay damages because of bodily injury, personal
        injury, property damage, or advertising injury to a third person or
        organization, where the contract or agreement is made prior to the injury.

This court sees no real distinction between the coverage provided by Zurich to CCSI and that

provided by Zurich to FabArc. The coverages provided to both relate to "operations" at the

"project." The plaintiff's motion for summary judgment, filed on December 8, 2003, will be

**granted.**

Within ten (10) days the plaintiff will submit a proposed judgment consistent with the

holdings of this memorandum opinion. The defendant will have seven (7) days to respond. The

plaintiff will have seven (7) days to reply.[91]

This _10_ day of February, 2004.

                                    ROBERT B. PROPST
                            SENIOR UNITED STATES DISTRICT JUDGE

---

[91] The parties have agreed that this court is not to decide the various priorities of coverage between Zurich
and FabArc's insurer as to primary, excess, etc.