# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| FABARC STEEL SUPPLY, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 02-PT-449-E |
| | ) | |
| ZURICH AMERICAN INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This cause comes to be heard upon the defendant Zurich American Insurance Co.'s

Motion for Partial Summary Judgment as to All of the Claims of FabArc Steel Supply, Inc., for

Increased Insurance Premiums and "Loss of Negotiating Position," and Motion for Partial

Summary Judgment as to All of the Claims of FabArc Steel Supply, Inc., for Reimbursement of

all Monies Paid by Travelers for the Defense and Indemnity of FabArc, both filed on October 18,

2005, as well as the plaintiff FabArc Steel Supply, Inc.'s Motion for Relief on Sum-Certain

Damages Paid to Settle and Satisfy Third Party Claims and Judgments and Motion on Defense

Costs and Increased Premiums, both filed on October 21, 2005.

## FACTS[1] AND PROCEDURAL HISTORY

### I.      Insurance Policies

---

[1]The court notes where relevant facts appear disputed. For further development and
discussion of facts, see *FabArc Steel Supply, Inc. v. Composite Construction Systems, Inc.*, 914
So. 2d 344 (Ala. 2005).

1

On August 29, 1997, Shimizu American Corporation ("Shimizu")[2] and FabArc entered

into a subcontract wherein FabArc agreed to provide and erect structural steel for the Toray

Construction Project in Decatur, Alabama.  FabArc itself fabricated the structural steel for

Shimizu but subcontracted out erection and installation responsibilities to its own subcontractor,

Composite Construction Services, Inc. ("CCSI").

Provisions from the Shimizu/FabArc subcontract included:

**Article 10**
**INSURANCE**

All insurance required to be provided by the Subcontractor for the performance
of this work shall name SAC as a beneficiary and shall also designate SAC's
client as a separate and specific named additional beneficiary of such
insurance.  Subcontractor shall maintain insurance on materials, property and/or
equipment as set forth in the General Conditions to this Subcontract and said
insurance shall cover all such items provided to this Project by the Subcontractor
whether provided pursuant to this Agreement or provided by the Subcontractor
under separate purchase order agreement between the parties.

**SECTION 13**
**INSURANCE REQUIREMENTS**

**(A) CERTIFICATION OF INSURANCE**: . . . **All insurance in connection with this
project shall provide that it is primary coverage regarding any insurance event.**
(Emphasis added).[3]

. . . .

(3) Contractual Liability:  Each and every policy for liability insurance, carried by each
Subcontractor and lower tier subcontractor as required by this Section, shall specifically

---

[2] Shimizu was insured by Great American Assurance Company ("Great American"). It is
sometimes referred to as "SAC".

[3] Jackie Ward, Zurich's 30(b)(6) corporate representative, confirmed that the
Shimizu/FabArc contract includes this requirement regarding primary insurance coverage.  *See*
Jackie Ward Dep. at pp. 158-59.

2

include Contractual Liability coverage.[4]

. . . .

(G) THIRD PARTY REQUIREMENTS:  Should [FabArc] sublet any of the work to a third party, [FabArc] shall require such third party to furnish the same insurance and indemnity as are required of [FabArc] hereunder and show evidence therefor to SAC on a certificate furnished by SAC.[5]

. . . .

## SECTION 15
## INDEMNITY AGREEMENT;DAMAGES; LOSS

**(A) SUBCONTRACTOR'S PERFORMANCE**: To the fullest extent permitted by law, the Subcontractor shall indemnify and hold harmless the Owner, the Architect, SAC . . . and other contractors and subcontractors and all their agents and employees from and against all claims, damages, loss and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of the Subcontractor's Work provided that:

> (1) Any such claim, damage, loss, or expense is attributable to bodily injury, sickness, disease or death, or injury to or destruction of tangible property (other than the Subcontractor's Work itself) including the loss of use resulting therefrom to the extent caused or alleged to be caused in whole or in any part by any negligent act or omission of the Subcontractor or anyone directly or indirectly employed by the Subcontractor or anyone for whose acts the Subcontractor may be liable, regardless of whether it is caused in part by a party indemnified hereunder.

. . . .

## SECTION 23
## SUBCONTRACTS
No lower-tier subcontract entered into by Subcontractor shall relieve Subcontractor of any of his liabilities or obligations under this Subcontract, and Subcontractor shall be fully responsible to SAC for the acts and omissions of lower-tier

---

[4] Ward admitted that CCSI is a lower-tier subcontractor as contemplated by this section. *See* Ward Dep. at pp. 159-60.

[5] Again, Ward acknowledged this requirement in the Shimizu/FabArc contract.  *See* Ward Dep. at p. 162.  Ward stated that the terms of the construction contract control the relationship, though she does not specify which contract.  *See* Ward Dep. at p. 74.

subcontractors and of persons either directly or indirectly employed by them in the performance of the lower-tier subcontract. . . . Subcontract shall require any of its subcontractors or suppliers doing any work on or supplying any materials, equipment, tools, supplies or other items for the project to fully comply with all applicable provisions, terms and conditions of the subcontract . . . .

On November 10, 1997, FabArc and CCSI entered into a subcontract ("FabArc/CCSI subcontract"). CCSI assumed all of the on-site duties of FabArc under the Shimizu/FabArc contract. FabArc subcontracted its entire <u>erection</u> and angle clip <u>installation</u>[6] responsibilities to CCSI. *See* Alan Heathcock Dep. at pp. 14, 23.[7] CCSI was FabArc's only subcontractor on the Toray project and performed all of FabArc's on-site work there. *See* Donald Dobbins Dep. at pp. 44-45.[8]

The FabArc/CCSI subcontract required CCSI to purchase insurance coverage for FabArc and required CCSI to name FabArc as an additional insured (under CCSI's Zurich policies). In the FabArc/CCSI subcontract CCSI agreed to provide FabArc with general liability insurance coverage "for a minimum of $1,000,000/ occurrence and $1,000,000/ aggregate." The FabArc/CCSI subcontract provided: "As a condition precedent of [CCSI] beginning work on the project, [CCSI] shall furnish a certificate satisfactory to FabArc from each insurance company showing the required insurance is in force and effect . . . ." CCSI's indemnification obligation to FabArc was as follows:

---

[6] The angle clip installation issue, the court notes, comes into play because of the Sanchez plaintiff's claims against FabArc and/or its employees/agents, *see infra* p. 12.

[7] Alan Heathcock ("Heathcock") was FabArc's project manager on the Toray project. *See* Def. Ex. P. FabArc retained responsibility to Shimizu for the erection work even if FabArc had hired a subcontractor to actually do the erection work. *See* Heathcock Dep., pp. 15-16.

[8] Donald Dobbins ("Dobbins") is CCSI's president.

The Subcontractor [CCSI] hereby covenants and agrees to defend, indemnify, and exonerate FabArc from all liability claims, actions, causes of action, lawsuits, and demands (including all judgments and settlements made at arms length and all attorney fees and litigation expense connected therewith) for, personal injury or death (including personal injury or death of the Sub-Contractor's own employees) and/or property damage arising out of any work or operation performed by, for and on behalf of the Sub-Contractor or arising out of the Sub-Contractor's negligence, even if Sub-Contractor is only partly negligent for the damage or injury.  The foregoing covenant and Agreement shall include all such liabilities, claims, lawsuits and demands where it is charged, alleged or proven that the Sub-Contractor (or its agents or employees) was in any way at fault in causing or contributing to such injury, death or property damage. **The Sub-Contractor's liability insurance policies shall each contain contractual insurance coverage as to the covenant contained in this section**.  The contractor shall be named as an additional insured in the Sub-Contractor's general comprehensive and public liability policy. . . . (Emphasis added)[9]

The FabArc/CCSI subcontract stated:

> This agreement is made the 10th day of November, 1997 by and between FabArc Steel Supply, Inc., hereinafter called FabArc and Composite Construction Services, Inc. (CCSI), hereinafter called the Sub-Contractor.

> The Sub-Contractor agrees to furnish all labor, equipment, **and insurance** necessary to unload and complete the erection of steel and decking studs to include but not necessarily limited to: Structural steel, bar joists and bridging, composite deck, shear connectors, roof deck, checker plate, expanded metal grating, moment connections.

> All items per Attachment "A".  (Contract between Shimizu and FabArc Steel) (emphasis added).

*See also* Bruce Stewart Deposition at p. 73;[10] Dobbins Dep. at p. 42.

---

[9] Based on this policy language, Zurich argues: "The requirement of CCSI to indemnify FabArc is triggered, under the terms of the indemnity agreement, only when 'it is charged, alleged or proven that the Subcontractor (or its agents or employees) was in any way at fault in causing or contributing to such injury, death or property damage.'"

[10] Bruce Stewart ("Stewart") was CCSI's vice president of marketing.

Stewart signed the FabArc/CCSI subcontract on behalf of CCSI.  *See* Stewart Dep. at pp. 23, 27-28.  The FabArc/CCSI subcontract, Stewart testified, incorporated the Shimizu/FabArc contract.  *Id.* at pp. 73, 78.  Additionally, Dobbins reviewed and approved the FabArc/CCSI subcontract before CCSI entered into it and also reviewed and approved the attached Shimizu/FabArc contract.  *See* Dobbins Dep. at p. 38.  Dobbins stated that the FabArc/Shimizu contract is an essential part of the FabArc/CCSI contract because it sets out important matters relating to the scope of CCSI's work.  *Id.* at 58.  According to Dobbins, the FabArc/Shimizu contract is attached to the FabArc/CCSI contract so CCSI "can comply with project requirements as to [CCSI's] scope that [CCSI] can comply with what FabArc is committed in their contract to comply with related to the erection scope that we have."  *Id.* at 59.

The FabArc/CCSI subcontract also states:

> Sub-Contractor's Work shall be performed in accordance with the requirements of this Agreement and Contract Documents.  **With respect to Subcontractor's Work, Sub-Contractor agrees to be bound to FabArc by all the terms and provisions of the Contractor Documents, and to assume toward FabArc all of the duties, obligations, and responsibilities that FabArc, by those Contract Documents, assumes toward the Owner and/or the General Contractor, including all obligation of owners' and/or general contractors' safety program.**

*See* Pl. Ex. C at p. 3.[11] (Emphasis added).

_____

[11] Dobbins testified:

*Q: And was your company required to – basically say that your company was agreeing to be bound to FabArc by all of the terms and provisions of the contract or documents and to assume toward FabArc all of the duties, obligations and responsibilities that FabArc by those contract documents assumes toward the owners and/or the general contractor, including all obligations of owners and/or general contractor's safety program; is that correct?*
*A: Correct.*

Zurich issued two policies of insurance to CCSI for the policy period January 1, 1998 to January 1, 1999.[12]  The comprehensive general liability policy contained an Additional Insured Endorsement under which CCSI named FabArc as an additional insured.  The endorsement stated:

> THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ CAREFULLY
>
> ADDITIONAL INSURED - DESIGNATED PERSON OR ORGANIZATION
>
> This endorsement modifies insurance provided under the following:
> COMMERCIAL GENERAL LIABILITY COVERAGE PART: SCHEDULE
>
> Name of Person or Organization:
>
> "ANY PERSON, ORGANIZATION, TRUSTEE OR ESTATE TO WHOM THE INSURED HAS AGREED TO NAME **AS AN ADDITIONAL INSURED BY WRITTEN CONTRACT OR AGREEMENT PRIOR TO LOSS. COVERAGE WILL BE EXCESS OVER ANY OTHER VALID AND COLLECTIBLE INSURANCE UNLESS THE AGREEMENT BETWEEN THE INSURED AND ADDITIONAL INSURED REQUIRES THIS COVERAGE TO BE PRIMARY."** [Emphasis added.]
>
> (If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement)
>
> WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule as an insured but only with respect to liability arising out of **<u>your operations</u>** or premises owned by or rented to you.

(Emphasis added).  The Zurich policies further provided:

**SECTION I - COVERAGES**

---

[12] Zurich issued a comprehensive general liability policy of insurance to CCSI with policy number CPO 842234604.  The Zurich primary policy sets general liability limits of $ 1,000,000 for each occurrence.  Zurich also issued a policy of insurance to CCSI with policy number CC 8422349-03.  The Zurich policy sets limits of $ 5,000,000. There is a dispute as to whether the $5,000,000 policy is an "excess" or "umbrella" policy.

**COVERAGE A.  BODILY INJURY AND PROPERTY DAMAGE
LIABILITY**

**1.     INSURING AGREEMENT.**
a.     We will pay those sums that the insured becomes legally obligated
       to pay as damages because of "bodily injury" or "property damage"
       to which this insurance applies.  We will have the right and duty to
       defend any "suit" seeking those damages.  We may at our
       discretion investigate any "occurrence" and settle any claim or
       "suit" that may result.
. . . .
b.     This insurance policy applies to "bodily injury" and "property
       damage" only if:
       (1)     The "bodily injury" or "property damage" is caused by an
               "occurrence" that takes place in the "coverage territory";
               and
       (2)     The "bodily injury" or "property damage" occurs during the
               policy period.

The Zurich CGL policy also contains the following exclusion:

**2.     EXCLUSIONS.**
        This insurance does not apply to:
. . . .
**b.     Contractual Liability**

        "Bodily injury" or "property damage" for which the insured is
        obligated to pay damages by reason of the assumption of liability
        in a contract or agreement.  **This exclusion does not apply to
        liability for damages:**

        **(1) Assumed in a contract or agreement that is an "insured
        contract," provided the "bodily injury" or "property damage"
        occurs subsequent to the execution of the contract or
        agreement; or
        (2) That the insured would have in the absence of the contract
        or agreement.** (Emphasis added).

**SECTION V – DEFINITIONS**
. . . .

8.     **"Insured Contract"** means . . .

8

> f.    **That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization.  Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.** (Emphasis added).

The Zurich policy contains the following designation of an insured.

### SECTION II -WHO IS AN INSURED

> 1.    If you are designated in the Declarations as: . . .
>
> > c.    An organization under a partnership or joint venture, you are an insured . . . .

The Declarations page shows under "Named Insured" "Cable Concrete Structures" and further states "(See Endorsement TII-A-0008)."  That schedule lists the following as "Named Insureds": Cable Concrete Structures; Eastern Professional Group; Composite Construction Systems, Inc. (CCSI); CCS Special Structure, Inc.; and Executive Services, a Georgia Partnership.  Neither FabArc nor Shimizu is listed on the schedule.

Palmer and Cay is CCSI's insurance agent.  *See* Dobbins Dep. II at p. 20.  CCSI contacted Palmer and Cay and requested that they add FabArc to CCSI's primary[13] and excess (umbrella) policies as an additional insured.  *See* November 11, 1997 facsimile from CCSI to Palmer and Cay.[14]  It is undisputed, FabArc asserts, that Palmer and Cay had binding authority to issue certificates of insurance on behalf of Zurich and to issue certificates as evidence of additional

---

[13]The term "primary" may sometimes mean "basic" as opposed to indicating priority.

[14]The fax read: "Jen - Alan asks that we fax - (ASAP so he doesn't get fired!) AH Ins Cert on the Toray CFA Project, Decatur, AL."  The subject line read: "Insurance Certif." and said to fax to FabArc.

insured status under the above-stated Zurich policies.  *See* Ward Dep. at pp. 75-76; *see also*

Helen Farrell Dep. at p. 257.[15]  According to Ward, CCSI sent exemplars of certificates naming

contractors as additional insureds to Palmer and Cay.  *See* Ward Dep. at pp. 75-76.

Palmer and Cay issued certificates of insurance to FabArc.[16]  *See* Certificates of

Insurance.  The certificates cited the $1,000,000 Zurich basic policy limit and $5,000,000

excess/umbrella policy limit and further provided:

> PROJECT:   TORAY CFA, DECATUR, AL
> FABARC STEEL SUPPLY, INC. SHIMIZU AMERICA CORP. AND TORAY,
> INC. ARE ADDED AS ADDITIONAL INSUREDS AS RESPECTS THEIR
> INTEREST IN THE ABOVE PROJECT.

*Id.*

Neither Zurich, Palmer and Cay, nor CCSI ever provided FabArc with a copy of the

Zurich insurance policies.  *See* Farrell Dep. at Ex. 6.  Dobbins testified that FabArc was an

additional insured under both of CCSI's Zurich policies and that certificates of insurance were

issued to FabArc evidencing FabArc's position as an additional insured under those policies.  *See*

Dobbins Dep. II at p. 94.[17]

---

[15] Helen Farrell ("Farrell") is a Zurich Claims Case Manager.

[16] Ward testified that a certificate of insurance is relied upon to show that insurance is in place and represents the insurance coverage that was purchased and is in force at the time the certificate is issued.  *See* Ward Dep. at pp. 78-79.

[17] Specifically, Dobbins testified:

*Q: Is the issue of whether FabArc has protection under Zurich's policy an important issue to the business of CCSI?*
Mr. Rea: Objection to the form.
A: It was important to us to provide everything that we were contractually obligated to provide.  And that coverage as far as the additional insured was requested of us, so, yes, is the answer.

Zurich also relies on provisions from the Travelers Indemnity Company of Illinois ("Travelers") policy issued to FabArc, which allegedly resemble the Zurich provisions at issue.[18] The Travelers' additional insured endorsement provided:

**BLANKET ADDITIONAL INSURED (Contractors)** . . .

      a.    **WHO IS AN INSURED** (Section II) is amended to include any person or organization you are required by written contract to include as an insured, but only with respect to liability arising our of "your work."  This coverage does not include liability arising out of the Independent acts or omissions of such person or organization . . . .

      b.    Where required by written contract, this Insurance is primary and noncontributing as respects the person or organization included as an insured under this endorsement and any other Insurance available to any such person or organization shall be excess and noncontributing with this Insurance.

The Travelers policy also contained the following "insured contract" provisions:

    2.    **Exclusions.**

      This insurance does not apply to: . . .

      b.    Contractual Liability

---

Dobbins further testified: CCSI expected Zurich would provide "whatever coverage we paid for extending to whoever is due that coverage" (*Id.* at 102); CCSI desired that its insurance agents and insurance carriers would comply with all of the insurance provisions of its construction contracts (*Id.* at 72); The FabArc/CCSI contract requires that FabArc be named an additional insured under the Zurich policy (*Id.* at 102-03); The FabArc/CCSI subcontract requires that the insurance must be primary (*Id.* at 103); CCSI did everything it needed to do because it turned FabArc's demands for defense and indemnification over to Zurich (*Id.* at 72); "My concerns w[ere] that this was being handled for my customer, FabArc, and that our interests were protected.  I was assured by Zurich that it was being handled.  I was assured by my insurance agent it was being handled." (*Id.* at 83); He did not now why Zurich had not defended FabArc with regard to the claims asserted in the *Sanchez* case.  (*Id.* at 88-89).

[18] Zurich contends that this endorsement is similar to the one in the Zurich policies. FabArc contends that the Travelers' language is irrelevant to the issues in this case.

"Bodily Injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.  This exclusion does not apply to liability for damages:
(1) Assumed in a contract or agreement that is an "insured contract," provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or (2) That the insured would have in the absence of the contract or agreement. (p. 1 or 11).

**SECTION V - Definitions**

8.      "Insured contract" means: . . .

f.      That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement. (p. 9 of 11).

## II.     Sanchez Litigation

In May 10, 1999, Cynthia Sanchez ("Mrs. Sanchez") as personal representative of the estate of Evodio Fernando Sanchez ("Mr. Sanchez"), filed a wrongful death suit in the Circuit Court of Morgan County, Alabama.[19]  Mr. Sanchez was killed on the Toray project when a masonry wall being constructed by his employer, J&J Masonry, Inc., ("J&J") collapsed on April 13, 1998 during Mr. Sanchez's removal of J&J's scaffolding abutting the wall.  *See* Sanchez Compl.

Sanchez's initial complaint named the following defendants: Shimizu, certain individual managers and safety directors, J&J (the masonry contractor), and two J&J co-employees.

---

[19] The state suit was styled *Cynthia Sanchez as personal representative of the Estate of Evodio Fernando Sanchez, deceased v. Shimizu American Corp., et al.,* CV-99-304.

Sanchez's complaint averred that Shimizu had breached its duty as the general contractor.

On December 17, 1999, Sanchez amended the complaint to add several other defendants, including FabArc.[20]  Specifically, Sanchez alleged: "Defendant FABARC and any employees and/or agents thereof, negligently or wantonly failed **to provide and/or install proper and adequate supports, anchors, and fasteners to secure and stabilize the masonry wall which collapsed and killed Plaintiff's decedent, Evodio Sanchez.**  Said negligent or wanton conduct was a proximate cause of the wrongful death of Evodio Sanchez." (Emphasis added).

On January 20, 2000 (approximately one month after FabArc was added to the *Sanchez* suit), counsel for FabArc wrote to Stewart demanding defense and indemnity for FabArc for the claims brought against FabArc by the Sanchez estate.  This letter also demanded that CCSI place Zurich on notice of the claims against FabArc.  Further, the letter provided copies of the certificates of insurance naming FabArc as an additional insured under Zurich's policies.  *See* Farrell Dep. at pp. 180-181.  CCSI sent the January 20th demand letter to Palmer and Cay.  *See* Dobbins. Dep. II at p. 29.  Zurich admits to receiving a copy of the demand letter, along with attachments, from Palmer and Cay.  *See* Farrell Dep. at 131, 180-181.

After receiving no response, FabArc's counsel wrote directly to Zurich on May 23, 2000. In that letter (which enclosed copies of the certificates of insurance showing FabArc as an additional insured as well as the FabArc/CCSI contract with the Shimizu/FabArc contract attached), FabArc's counsel again demanded insurance coverage under the Zurich policies.

_____

[20] Shimizu contracted with the owner of the property, Toray Carbon Fibers America, Inc., to serve as a general contractor on the construction project.  *See* Toray/Shimizu contract.  The Toray/Shimizu contract contemplated that Shimizu would hire subcontractors to perform the actual construction of the project.

13

Zurich admits receiving the May 23, 2000 letter along with all of its attachments.  *See* Farrell

Dep. at pp. 139-143.

By letter dated June 3, 2000, Farrell on behalf of Zurich responded to FabArc's counsel,

acknowledging "several requests for defense and indemnification for FabArc Steel."  **Farrell**

**stated: "[Zurich] will provide FabArc Steel Supply, Inc. with a complete defense and**

**indemnification for the above action [the *Sanchez* lawsuit]."**  *Id.* (Emphasis added).

Moreover, FabArc argues, Zurich requested that Larry Harper ("Harper"), FabArc's counsel,

"provide the undersigned with a copy of your complete investigation in this matter along with

any medical bills, reports or funeral expense information."[21]  *Id.*  On the same day, Farrell

telephoned Harper and confirmed that Zurich would defend FabArc against the claims made in

the *Sanchez* litigation.  *See* Farrell Dep. at pp. 80-81; *see also* excerpts from Zurich's claim

notes.  Harper then forwarded his defense file in the *Sanchez* litigation to Zurich.  *See* June 15,

2000 letter from Harper to Farrell; Farrell Dep. at pp. 61-62.  Harper's defense file, which

contained attorney-client correspondence, mental impressions, and details of defense strategy,[22] is

still in Zurich's claims file.  Zurich has admitted that the materials were attorney work product

materials for the defense of FabArc in the underlying *Sanchez* litigation.[23]

In a June 14, 2000 letter from Farrell to Harper Zurich changed its position and withdrew

---

[21] Although the June 3, 2000 letter is addressed to Keith J. Pflaum, the court assumes that Mr. Harper acquired the case from Mr. Pflaum.

[22] *See, e.g.,* Ward Dep. at p. 187; Farrell Dep. at p. 67.  Zurich disputes the contents of the file.

[23] *See* Ward Dep. at p. 174; Farrell Dep. at p. 109.  The contents of this file are disputed by Zurich, *see infra*.

14

its unconditional offer of defense and indemnity.  Plaintiff contends: "[I]t went from an acceptance of complete defense and indemnity for FabArc, to withdrawing this acceptance and stating that FabArc would be accorded 'additional insured status but only in an excess capacity.'" *See* August 10, 2000 letter from Farrell to Harper.  Zurich did not provide a defense to FabArc. On November 29, 2000, Zurich sent another letter to FabArc's counsel, placing further limits on FabArc's position as an additional insured under Zurich's policies.  In the present litigation, FabArc argues, Zurich's position changed yet again as follows: in responses to FabArc's requests for admission, Zurich denied that FabArc is an insured under its policies; Zurich denies that the certificates of insurance issued by Palmer and Cay evidence that FabArc is an additional insured under the Zurich policies; and Zurich denies that FabArc is entitled to coverage in an excess capacity.

On October 26, 2000, Shimizu cross-claimed against FabArc for indemnity for the damages Shimizu would incur as a result of the Sanchez death, alleging breach of the Shimizu/FabArc subcontract as well as fraud.  Shimizu's cross-claim sought to enforce indemnity provisions in the Shimizu/FabArc subcontract.  On November 17, 2000, FabArc filed a third party complaint against CCSI seeking to enforce the indemnity agreement in the FabArc/CCSI subcontract.[24]  FabArc also claimed CCSI breached the subcontract by failing to name FabArc as an additional insured under its Zurich General Liability policy.  FabArc sought as relief the following declarations: that CCSI had a duty to defend and indemnify FabArc in the Sanchez death case, a duty to hold FabArc harmless from any and all claims and losses, and a

---

[24] Zurich emphasizes that the Sanchez estate did not name CCSI as a defendant in the Sanchez wrongful death case ("Sanchez case") or bring allegations against CCSI in pleadings or testimony.

15

duty to indemnify FabArc for all costs including attorneys' fees.

On or about January 30, 2001, Shimizu's insurers settled with the Sanchez estate as follows:

Tokio Marine & Fire Insurance Co., Ltd (Shimizu's primary carrier) for $1 million and Great American Assurance Company (Shimizu's excess carrier) for $2.5 million.  Travelers (FabArc's insurer) also settled with the Sanchez estate in the amount of $600,000.00.

On November 15, 2001, Great American filed a complaint in intervention in the pending state law case against various Travelers' companies, FabArc, and CCSI.  Great American's claims against CCSI were based on its claimed third party beneficiary status for FabArc's subcontract with CCSI.  Great American did not claim that it or its insured (Shimizu) had a contract with CCSI.  *See* Great American Complaint in Intervention.

On September 3, 2002, CCSI filed a "Motion for Final Summary Judgment" (and accompanying legal memorandum) as to Great American's claims against it, arguing: (1) The undisputed evidence in the Sanchez case was that CCSI was not negligent; (2) Great American was not a third-party beneficiary to the FabArc/CCSI subcontract and its indemnity provision; (3) Even if Great American were a third party beneficiary to the FabArc/CCSI subcontract and indemnity provision, Sanchez's death did not "arise from" CCSI's work within the meaning of the indemnity provision; and (4) CCSI was not contractually obligated to name Shimizu on CCSI's insurance policies or to provide Shimizu with any insurance.

On January 22, 2003, the Morgan County Circuit Court issued an order granting CCSI's Motion for Summary Judgment.  On April 9, 2003, the Morgan County Circuit Court signed an order reaffirming its grant of CCSI's Motion for Summary Judgment as to all of Great

16

American's claims.

On or about April 8, 2003, Travelers (FabArc's insurer) filed a third party complaint

against Zurich  in the Sanchez death case seeking a declaratory judgment that Zurich's

Commercial General Liability ("CGL") and excess/umbrella policies to CCSI provided primary

and excess coverage for Shimizu; for a decree that Zurich was obligated to defend, indemnify,

and cover all claims against Shimizu; and/or to declare that to the extent Travelers owes coverage

to Shimizu, Zurich must share in the coverage.  *See* Travelers' Third Party Complaint.  In

addition to seeking a declaratory judgment, Travelers also alleged that Zurich breached its

obligation to defend, indemnify and cover all claims asserted against Shimizu  in the Sanchez

case.  *Id.*  The insurance certificate relied upon by Travelers in the *Sanchez* suit is the same

certificate relied upon by FabArc and Travelers in this federal court action.  *See* Zurich Cert. of

Ins.

On September 2, 2003, the state court entered an Order on Partial Summary Judgment, in

which it ruled that FabArc's obligation to defend and indemnify Shimizu under the indemnity

provision in the Shimizu/FabArc subcontract was triggered only at the point at which the

Sanchez plaintiff amended her complaint to allege that the death was proximately caused by the

negligent or wanton act of the indemnitor FabArc.[25]  On September 9, 2003, the Morgan County

Circuit Court denied Great American's motion for reconsideration of the court's order granting

---

[25] Defendant argues: "The Sanchez Estate never added CCSI as a Defendant.  In fact, there has never been an allegation by the Sanchez plaintiff or by any other party to this action that Sanchez's death was proximately caused by any negligent or wanton act of CCSI.  Thus the Morgan County Circuit Court, by its grant of Summary Judgment to CCSI, has found that CCSI was not liable nor responsible in any way for the Sanchez death and that Sanchez's death did not 'arise from' CCSI's work within the meaning of the FabArc/CCSI indemnity agreement."

CCSI's motion for summary judgment.  On December 30, 2003, the circuit court entered an order finalizing its summary judgment order against FabArc and in favor of Great American on issues of contractual indemnity and entered a money judgment against FabArc in the amount of $2.5 million plus prejudgment interest.

On May 20, 2005, the Alabama Supreme Court considered FabArc's appeal of the summary judgment entered against it. *See FabArc Steel Supply, Inc. v. Composite Const. Systems, Inc.*, 914 So. 2d 344 (Ala. 2005). The Alabama Supreme Court reversed the summary judgment entered against FabArc, holding that a genuine issue of material fact as to the meaning and application of the subcontract's ambiguous indemnity clause precluded summary judgment. *Id*. at 363.

### III.    Facts Pertaining to FabArc's Contention that Any Liability of FabArc in the Underlying Sanchez Litigation Arose out of CCSI's operations[26]

CCSI was FabArc's sole agent on the Toray Project site (FabArc's "eyes and ears" on the job) and was responsible for the installation of the angle clips allegedly in question.  FabArc is solely a steel fabricator, while CCSI was a steel erector for FabArc's fabrications.  On the Toray project FabArc subcontracted all of its installation and erection work to CCSI.  *See* Stewart Dep. at 19; Tommy Hart Dep.[27] at 14.  According to Stewart, the FabArc/CCSI subcontract defines CCSI's "scope of work" on the Toray Project.  *See* Stewart Dep. at p 23.[28]  Stewart testified that the installation of angle clips on the Toray project became part of CCSI's scope of work as a

---

[26] Zurich disputes that FabArc's liability arose out of CCSI's operations, *see infra*.

[27] Tommy Hart ("Hart") was CCSI's field foreman on the Toray project.

[28] Stewart testified that he read the subcontract carefully before signing it.  *Id.* at 23, 27-28.

result of a change order (designated as "Change Order B") dated February 17, 1998 from FabArc. *Id.* at 34-35, 39; Change Order B.  According to Stewart, the installation of angle clips was not within the original scope of CCSI's work at the time of the November 20, 1997 subcontract with FabArc and not something that CCSI normally included in its scope of work because it is normally done by a masonry contractor.  *See* Stewart Dep. at 42-43.

Hart testified that Don Chambers ("Chambers"), who was Shimizu's project superintendent, requested that CCSI undertake to install angle clips on the job as part of its scope of work.  *See* Hart Dep. at pp. 17-19, 51.  Hart further testified that FabArc was not present when this request was made.  *Id.* at 20.  According to FabArc, Zurich admits that the installation of angle clips was within CCSI's scope of work as a result of the change order.  *See* Farrell Dep. at 154, 189.[29]

According to Heathcock, FabArc delegated to CCSI all duties to install the angle clips onto the horizontal beams.  *See* Heathcock Dep. at 37.  According to Hart, CCSI, not FabArc, was responsible for coordinating with Shimizu regarding the welding of the angle clips.  *See* Hart Dep. at pp. 101-02, 109.  While angle clips were included in CCSI's scope of work, Stewart testified, FabArc never directed CCSI in any manner with regard to the installation of the angle clips.  *See* Stewart Dep. at p. 82.

FabArc was not present and/or working on the Toray project job site on a daily or weekly basis.  *See* Dobbins Dep. at p. 45; Hart Dep. at 15; Heathcock Dep. at 14, 23.  Instead, Dobbins (CCSI's President) testified, CCSI served as FabArc's "eyes and ears" on the Toray project.  *See*

---

[29] CCSI argued in the state court action that no duty had arisen to install the angle clips on the beam because the wall was still unfinished, and it had received no notification from Shimizu to move forward prior to the wall's collapse on Mr. Sanchez.

Dobbins Dep. at p. 45.  According to Hart, CCSI attended the general contractor's meetings on

FabArc's behalf.  *See* Hart Dep. at p. 114.  Neither CCSI nor Shimizu expected FabArc to attend

the weekly meetings with Shimizu.  *See* John Lazau Dep. at p. 270; Hart Dep. at p. 114.[30]

> Dobbins testified:

> Q:   *Let me just read to you from the complaint filed by Ms. Cynthia Sanchez on December the 7th of '99 . . . . "FabArc, and any employees and/or agents thereof negligently or wantonly failed to provide and/or install proper and adequate supports, anchors and fasteners to secure and stabilize the masonry wall which collapsed and killed plaintiff's decedent, Evodio Sanchez . . . ."*
> A:   Okay.
> Q:   *Is there any entity other than CCSI and FabArc who would have had any obligation to install these anchors, supports, and fasteners?*
>       Mr. Rea: Object to the Form.
> *Q:   Let me –*
> A:   No.
> Q:   *And so insofar as this count seven, paragraph one, references FabArc and its employees, there were no employees of FabArc who were responsible for the actual installation of, quote, supports, anchors and fasteners to secure the masonry wall, were there?*
>       Mr. Rea: Object to the form.
>       Mr. Collins: Object to the form.
> A:   Well, the anchors actually were the responsibility of the block mason.  The clips would have been the responsibility of CCSI under its subcontract with FabArc.

*See* Dobbins Dep. II at 117-119.

## IV.   Procedural History of Federal Litigation

On February 20, 2002, FabArc filed its complaint for declaratory judgment in the above-

styled case, seeking a declaration of the rights, duties, status, and legal relations of the parties

under both Zurich's basic/primary and its excess/umbrella policies with CCSI described above.

---

[30] CCSI's representative testified that references in job site minutes to "FabArc" really refer to "CCSI."  *See* Hart Dep. at pp. 74-76, 108.  For example, while the April 3 and April 10 meeting minutes state that FabArc needs to install angle clips, Hart testified that this reference really referred to work that needed to be done by CCSI.

FabArc claimed that it was an additional insured under these two policies and relied on the

Certificate of Liability Insurance described above.  FabArc avers:"Zurich has a duty to defend

and indemnify FabArc against the claims of Sanchez, Shimizu, and Great American."  On May

16, 2003, Zurich simultaneously filed (1) a motion to stay the case pending resolution of the

underlying state court action or to dismiss without prejudice FabArc's claims and (2) a request to

add Travelers as a real party in interest. This court granted the motion to add Travelers on May

21, 2003.on May 21, 2003.  On August 15, 2003, this court denied Zurich's motion to stay and/or

dismiss without prejudice.  On September 22, 2003, FabArc filed a first amended complaint.[31]

On December 30, 2003, the Morgan County Circuit Court finalized Great American's $ 2.5

million judgment against FabArc. On February 10, 2004, this court granted a Motion for

Summary Judgment in favor of FabArc holding that FabArc was covered under the Insuring

Agreements of the Zurich policies which are not excluded under the "contractual liability"

exclusion clause and Zurich's excess policy. On March 22, 2004, this court entered an Order to

that effect. Zurich appealed that order. On September 27, 2005, the Eleventh Circuit Court of

Appeals affirmed this court's Order.

### LEGAL STANDARD

Summary judgment may be granted based upon facts developed through pleadings,

discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue

as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  A dispute is

---

[31] Plaintiff's first amended complaint struck references to the limit of $3,000,000 for the Zurich excess/umbrella policy because discovery had revealed a $5,000,000 policy limit. Plaintiff also asserted that Zurich could not deny coverage to FabArc based on the doctrines of estoppel and/or waiver.

genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party moving for

summary judgment bears the initial burden of explaining the basis of his motion.  *Celotex*, 477

U.S. at 323.  "It is never enough [for the movant] simply to state that the non-moving party could

not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000)

(quotation omitted).  The non-moving party then bears the burden of pointing to specific facts

demonstrating that there is a genuine issue of fact for trial.  *Celotex*, 477 U.S. at 324.  The non-

moving party "must either point to evidence in the record or present additional evidence

'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary

deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted).

Summary judgment is required where the non-moving party merely repeats its conclusory

allegations, unsupported by evidence showing an issue for trial.  *Comer v. City of Palm Bay,* 265

F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for

discovery.  *Comer*, 265 F.3d at 1192.  Moreover, "[w]hen deciding whether summary judgment

is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a

light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291,

1293 (11th Cir. 1999).  Finally, the trial court must resolve all reasonable doubts in favor of the

non-moving party, although it need not resolve all doubts in a similar fashion.  *Earley v.

Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

Under 28 U.S.C. Section 2202, "further necessary or proper relief based on a declaratory

judgment or decree may be granted, after a reasonable notice and hearing, against any adverse

party whose rights have been determined by the judgment." *See Kaspar Wire Works, Inc. v. Leco Eng. & Mach., Inc.*, 575 F.2d 530, 537 (5th Cir. 1978). Further, this court's power to construe and effectuate its declaratory judgments is both an inherent power and a power expressly conferred by 28 U.S.C. § 2202. *See Teas v. Twentieth Century-Fox Film Corp.*, 413 F.2d 1263, 1266-1267 (5th Cir. 1969).

**ARGUMENTS**[32]

**ZURICH'S MOTION FOR SUMMARY JUDGMENT**

**I.      Defendant Zurich's Motion for Partial Summary Judgment As to All of the Claims of FabArc Steel Supply, Inc., for Increased Insurance Premiums and "Loss of Negotiating Position."**

Zurich argues that it is due a partial summary judgment as to FabArc's claims for increased premiums and loss of "negotiating position" because the damage claims are speculative and because the method of calculating those damages was not disclosed to Zurich during discovery.

**A.      FabArc's claims for damages for increased premiums and "loss of bargaining position" as a result of Zurich's failure to defend and indemnify FabArc are speculative; and, therefore, FabArc can recover no damages for those claims.**

According to Zurich, during discovery: "FabArc produced for deposition underwriters with Travelers, Walker and Everhart. Walker and Everhart were identified by FabArc as the persons most knowledgeable about FabArc's claims for increased premiums...The testimony of Walker and Everhart demonstrate that FabArc's claims for increased premiums are based on speculation and conjecture."

---

[32] This section summarizes the arguments made by the parties and does not necessarily reflect the conclusions reached by the court.

I.      **Deposition of Scott Walker**

According to Zurich, during Walker's deposition, FabArc's counsel made on the record

statements of Walker's ability to supply information as it relates to Zurich's requested discovery.

Zurich provides as excerpts:

MS. SMITH:      Roy Scott Walker is a Travelers underwriter. He was assigned to this matter for the first three years of the coverage [1997-2000]. He is the underwriter who worked on getting the coverage up for the policy year '97-'98, April 23, -97 through April 23, '98, which is the policy year in which Mr. Sanchez's death occurred...

However, many of the requests and the itemization of topics on which examination is requested, no one person at Travelers could respond to...

But he has not had active involvement in the file since he was promoted to come to Nashville. So we cannot designate him to testify as to all of the items in the deposition notice.

Walker Depo. pp. 6-8.

According to Zurich, Walker offered the following in regard to the increased premiums sought by

FabArc:

Q.      Have you had an opportunity to look at or do you have any knowledge about the premiums charged to the insured Fabarc as far as the differences in the first year you wrote them as opposed to current premiums.

A.      I have a little bit of knowledge simply because, like Carol, [FabArc's Counsel] said, there's some regional reports that are available to us. I do know that since then their rates have gone up.

Walker Depo. p. 25.

Q.      One of the claims in this lawsuit is Fabarc is claiming increased cost of premiums as a result of that lawsuit, the Sanchez lawsuit and the resulting settlement. Were you aware of that?

A.      That's one of their claims, the increased costs in premiums, you said?

Q.      Yes.

A.      Yes.

Q.      Okay. Just in general, as to an insured who has a claim against it, when you are evaluating a renewal and setting a premium, do you look at a

24

premium increase at year's end on the basis of a claim being made or on the basis of a payment of a claim?

A.     We probably look at both, amongst other factors.

Q.     I perhaps missed it, but I didn't see anything in this file [Defendant's Exhibit 2 to Walker Depo.] that reflected the claim made against Fabarc and its impact on underwriting. Did you see anything in the file regarding that?

A.     I don't recall seeing that. I don't believe back at that time I was aware that the claim had occurred.

Q.     Okay. Is that something that would be kept in the underwriting file, notice of claims and how that impacted premium assessment or premium computation?

A.     There *might be some general comments, but it may not be just absolute specifically exactly how much it impacts.* (emphasis added).

Walker Depo. pp. 41-43.

Q.     So you have no knowledge sitting here today as to why, if they did, why the premiums went up after the payment of the Sanchez lawsuit?

A.     I don't have any knowledge of that.

Walker Depo. p. 50.

Q.     Have you had an opportunity to review the underwriting files for 2001 to 2001, 2001 to 2002 and 2002-2003.

A.     No I have not.

Walker Depo. p. 51.

Q.     Okay. The bottom line for me, Scott, is this: Can you tell me how much the premiums were increased by the payment of the $600,000 to the Sanchez estate?

A.     No, I can't.

Q.     Can anyone tell me that?

A.     It's possible, but since I don't - I never worked on the account after the year 2000. You would probably have to ask somebody else that worked on the file.

Q.     Okay. But if you had worked on the file, you believe you would have known that answer?

A.     *Probably not specifically to the dollar, no.* (emphasis added).

Walker Depo. p. 130.

A.     ...But basically, the premium is derived off of increased exposure, sales up or down, and whether or not the underwriter wants to keep the actual rate from the expiring policy the same or if he wants to move that up or down. It's a combination.

> Q.      Is that a subjective decision whether or not he wants to move the rate up or down?
>
> A.      Some of it's subjective and some of it is not subjective.

Walker Depo. p. 119.

According to Zurich, Walker testifies to numerous factors that would generally impact a change in premiums, but cannot testify as to the exact weight or percentage that the additional factors would have in the adjustment of the premiums. Included in those factors are: changes in the insured's sales, commission change of 12 to 15 percent, operational changes, changes in financial stability, changes in loss potential, and changes in exposure. With regard to the range of premiums charged, Zurich notes that Walker testified that there are "different ranges, but it's totally deal by deal. It's very difficult to really assess. You really have to underwrite and price accounts deal by deal." Walker Depo. p. 32. As to other variables that impact premiums, Zurich points to Walker's testimony that "what we do is we send our loss control personnel out to visit the site. And they have different categories they will grade risk low, moderate or high hazard. And that's kind of a starting point."

Zurich claims that FabArc paid $141,107 for general liability coverage for the 2002 to 2003 policy year. According to Zurich, the premiums paid for the year of 2003 to 2004 went down to $131,413. During that same period, Zurich claims, the commission rose from 12% to 15%. Walker Depo. pp. 116-117, 121.

Zurich argues that Walker's testimony is clear that the premiums for the first policy year in which Sanchez's death occurred were dependent on FabArc meeting Travelers' underwriting guidelines which specifically required FabArc to insure that all Certificates of Insurance from downstream contractors provided "primary and non-contributory insurance."

### ii.     Walker's testimony about the underwriting guidelines that FabArc failed to meet.

According to Zurich, Travelers has underwriting guidelines for an insured that uses subcontractors. Zurich claims that the insured must ask for "Certificates of Insurance showing $1 million per occurrence liability that were added as additional insured on their policy and that they show that their policy is primary non-contributory." Walker Depo. p. 20. Zurich asserts that, though Walker did not monitor whether or not the insured complied with the underwriting guidelines, a loss control representative would visit a customer and inspect certificates for compliance with Travelers' guidelines. Walker Depo. p. 21. Zurich avers that it is the responsibility of the agent to communicate to the insured its obligations under the guidelines. Walker Depo. p. 22. According to Zurich, Walker testified that "my expectation was really for the insured to monitor it and enforce, not necessarily the agent." Walker Depo. p. 149.

According to Zurich, the "Centex" Certificate of insurance was issued by American Liberty Insurance Company (FabArc's prior commercial general liability carrier). Zurich claims that FabArc's agent sent it to Walker as an example of language used by American Liberty to provide "primary and non-contributory" insurance to upstream contractors. Zurich asserts that Walker expected FabArc to secure the same coverage from its downstream contractors. Walker Depo. p. 149. According to Zurich, Travelers' intent was to pass the liability assumed by FabArc as a general contractor down to subcontractors by securing an additional secured endorsement from the subcontractor that provided "primary and non-contributory" insurance when FabArc at the same time provided "primary and non-contributory" insurance via an additional insured certificate to an upstream contractor. Walker Depo. pp. 149-150, 154-156.

27

### iii.    Deposition of Valerie Coles

Zurich cites with regard to the increased premiums claim brought by FabArc the

following excerpts from the deposition of Valerie Coles, a representative of Travelers:

> Q.    Some insurance companies charge expenses for litigation to an insured's policy; is that correct?
>
> A.    That's correct.
>
> Q.    Does Travelers do that?
>
> A.    Charge the expenses related to their defense?
>
> A.    Yes.
>
> Q.    Yes. So how much of these bills that are part of Exhibit 1 have been charged to Travelers' policy?
>
> A.    How much, I can't give you the specific amount as we sit here today, but the expenses related to the defense of Travelers [as opposed to FabArc's defense] would not have been charged to that file or to that policy.
>
> Q.    And who divided it out so that you did not charge the defense of Travelers to your insured, FabArc?
>
> A.    ...I would pay the expenses related to FabArc and then our law department would pay the expenses related to Travelers.
>
> ...
>
> Q.    ...what percentage was paid by the law department and what percentage was paid by the claims department?
>
> A.    I believe we split it 50/50, *just to simplify it.* (emphasis added).
>
> Q.    And as far as what fees and expenses were charged against your insured's policy, FabArc's policy, what number - how did you arrive at that number?
>
> A.    It was 50/50, if a bill was presented. Now all of the bills from Porterfield, Harper were obviously charged to the file, if it was presented - I'm sorry. After the claim was resolved, it was just split 50/50.

Coles Depo. pp. 123, 128.

> Q.    Okay. What is your understanding or your knowledge? Understanding is a word you don't like. So let's talk about knowledge. What is your knowledge of the impact of the settlement of $600,000 on the insurance premiums charged to FabArc, if any?
>
> A.    My understanding is that -
>
> Q.    That's not fair.
>
> A.    My understanding is that FabArc - *well, I don't know.* I'm not involved in anyway in the calculating of premiums. I have no way of knowing what FabArc paid or pays now in premiums...(emphasis added).

...

Q.     But you don't know how and how much?

A.     No, I do not.

Coles Depo. pp. 133-134.

Q.     But FabArc has not paid any of these defense costs, that's right, isn't it Ms. Coles?

MS. SMITH:     Absolutely. We will stipulate to that.

Q.     Travelers paid all of these defense costs in Exhibit 1?

A.     That's correct.

Coles Depo. p. 140.

Q.     Have you ever had an occasion before where expenses have been allocated by some sort of percentage basis as was done here?

A.     I don't ever recall handling another situation like this one, actually, where we've done that.

Q.     Have you ever handled a claim before when both Travelers and the insured was a party and one lawyer represented both?

...

A.     I don't recall ever having a situation where one attorney was handling both, but there may have been occasions where there was felt there was no conflict and it could be done. I just don't recall a specific situation.

Q.     Just so the record is clear, because we are having pronoun agreement issues or reference issues there, you don't recall another occasion, sitting here, when one attorney represented both Travelers and an insured; is that correct/

A.     Not as I'm sitting here, I can't think of a situation.

Coles Depo. p. 153.

### iv.   Deposition of Marilyn Everhart.

According to Zurich, Marilyn Everhart is the underwriter handling FabArc's coverage after Walker. With regard to the increased premiums sought by FabArc, Zurich offers the following excerpts:

Q.     Merrilyn, as I understood it, you know about the premiums charged to FabArc and the underwriting of the losses that resulted in premiums charged. Is that correct?

A.     Yes.

29

Everhart Depo. p. 38.

| | | |
|---|---|---|
| Q. | Okay. Tell me what you know about the loss [Sanchez claim] then. Let's approach it that way. |
| A. | I know that we paid monies as a result of a loss that we were notified about as a result of a lawsuit. That's it. |
| MS. SMITH: | Merrilyn, I think you know more about the nature of - |
| A. | I know a man died, but that's about it. |

Everhart Depo. p. 40.

| | |
|---|---|
| Q. | But for the purposes of establishing premiums, what kind of investigation did you do into the loss, if any? |
| A. | My investigation would have been basically how much was paid out. And I would have checked to see - I would have found out that there was a death. And my thing would have been, you know, are we going to have to pay this money? If we pay this money, will we get our money back? Is this our fault? Do I have the right controls in place? I am looking at the loss, based on how much my account stands. |

Everhart Depo. p. 41

| | |
|---|---|
| Q. | Do claims for which there was no payment [on a loss] impact premiums? |
| A. | Yes. |
| Q. | How? |
| A. | We look at what happened and evaluate what happened. |
| Q. | Do you know whether or not this particular reference on 4683 [engineering inspection report] relates back to the Sanchez claim? |
| A. | I don't know. |

Everhart Depo. p. 62.

| | |
|---|---|
| MS. SMITH: | I believe the question on the table is: What was the first year that the premium to FabArc was impacted by the death claim made against FabArc. Is that Right? |
| MS. MCMAHAN: | Absolutely. That's the question. |
| A. | Year '02-'03. |

Everhart Depo. p. 65.

| | |
|---|---|
| Q. | How can we come up with a number, what number is the result of that effect? What increase in premiums is the result of the effect of the death claim for the policy year 2002 to 2003? |
| MS. SMITH: | She has some right in front of her if you want to go through that. |
| MS. MCMAHAN: | That's exactly what I want to go through. |
| A. | Okay. The rate increased - |

30

MS. SMITH:      Now, Merrilyn, you need to put this in context so Ms. McMahan will understand it.

A.     I need to put it in context so you will actually understand what happened. Basically, as a result of the loss and the investigation on the loss and what happened then, it became necessary for this file to receive a high scrutiny that it would have had because of this loss. And one of the things that I had to do was to negotiate, discuss my account with a CURE officer, a person who was a little bit more experienced that I am with this, at the home office. I had to go to the home office to get approval for what I was trying to do as far as pricing is concerned on this account.

...

Q.     Merrilyn, as I understand the off-the-record discussion in regard to the premiums for the upcoming year 2002-2003, you made a recommendation to the home office regarding the premiums that would be charged FabArc. They did not accept that and made a counter basically?

A.     Yes.

Q.     You made a counter, as well, and there was some negotiating back and forth between you and the home office regarding the final decision on premiums?

A.     Yes.

Everhart Depo. pp. 69-75.

Q.     So the actual experience, as far as losses, would be point 501?

A.     Yes.

Q.     But it was modified to point 803?

...

Q.     I am just - so how did you go from a figure of point 501 to point 803? What was added to that to change that figure?

...

Q.     Well, then, how did we increase from point 503 to point 803?

A.     Because of the formula that's above it.

Q.     Was the death loss included in the formula above it?

A.     No.

Q.     Well, I am back to, then, document 3805. Where in these documents is the piece of paper that shows the effect of the death claim on the experience modification?

...

Q.     I just want you to tell me what impacted the premium as a result of the death loss?

A.     Okay. As a result of the death loss, we - I took a look at controls. I took a look at whether the controls were working. I took a look at what we had set aside as far as a comparison for rating. If FabArc had been doing the actual erection themselves, then the rating would have been substantially

higher than what we had - where we have them. But because FabArc was subbing out the actual erection to someone else and that person was providing us with coverage by naming us as additional insured, having the right limit, naming the project limit on there, because of that, then the rate you would normally charge for an erector was temperate. And we, like, basically, charged about fifteen percent of what you would normally charge. And that information is included in home office's response to my request.

...

Q.   Okay. Now, I am trying to get to the effect on the premium of the death loss. Is that on document, 03792?

A.   Okay. Now, the effect of the premium on the death loss made us look back at FabArc completely.

Q.   Okay.

A.   Look at the rating structure, look at the controls that were in place, because this is so far down the way, you don't know if - it appears as if this is not working. So he's becoming more of an exposure as opposed to it being all covered by his subcontractor. And we were looking at it in the beginning only showing about, maybe, ten or fifteen percent of what an erector would do, because we were saying to ourselves that somebody else is the primary. Somebody else's insurance is going to hold. And the only thing we have got this for here is just in case we need to get involved from a claims perspective from an expense perspective.

Q.   Right.

A.   So, basically, we were charging a rate of like 1.147. If you look back at our policy you see that we were only charging a premium of 14,338 on the prior year. This year, because the window was so far away and those losses happened so long ago, we were building up expenses. So we are thinking that maybe we have not funded ourselves enough to be able to handle something should it happen and that maybe we were not getting enough money, maybe our percentage was not far enough out that it needed to be. So we looked at back at our percentage and in the process of looking at the percentage, home office felt like the rate should be increased by 1,451 (sic) percent. And I was arguing the fact that we have certificates, the sub is providing insurance. The sub is naming us as an additional insured, and we are going to recoup that way and we don't have to worry about it. So I was arguing for a percentage of fifteen to twenty percent and home office is telling a percentage of 1,451 (sic) percent. So, where I started off at one percentage, at one percentage amount then home office came back with another percentage amount and then I had to go back to home office, because we had to do a lot of negotiations.

Everhart Depo. pp. 86-93.

Q.      So the expiring premium was which one of these figures?
A.      The expiring general liability premium was 76,231.
Q.      I see. Okay.
A.      And the premium, then, I was recommending was 158,947.
Q.      So that increase that's shown on 3817 is the proposal that you were
        making for increase in general liability premiums -
A.      Yes.
Q.      - for the policy year 2002-2003?
A.      Yes.
Q.      Now this figure, this increase, is it related to anything other than the death
        claim?
A.      No, that was the only general liability premium - that was the only
        general liability loss that we have ever had on this account.
Q.      Okay.
A.      That I know of.
Q.      There is no factor in that figure that relates to increase in commission or
        any other thing? It's solely the increases resulting from the death claim?
A.      I can't look at this and tell you that. I don't know.

Everhart Depo. pp. 99-100.

Q.      But some of the increase would be related to premium operations, for
        premium operations, prem ops?
A.      Uh-huh.
Q.      Would that include the erection aspect you were talking about earlier, the
        fabrication aspect that you were talking about earlier?
A.      Yes.

Everhart Depo. p. 104.

Q.      ...For the general liability coverage, the premium for the previous policy
        year was $76,231?
A.      Yes.
Q.      And that was the year in which the death loss was not considered?
A.      Yes.
Q.      And it's your testimony that that increase in premium relates solely to the
        death claim?
A.      Yes.

Everhart Depo. p. 119.

Zurich summarizes by arguing that Everhart testified to many factors that caused FabArc's

premiums to increase, although she claims that the premium increase was based solely on the

loss, but she could not quantify what effect the other factors applied had on the loss. Zurich notes

33

that she testified:

> Q.   There is no factor in that figure that relates to increase in commissions or
> any other thing?
>
> A.   I can't look at this and tell you that. I don't know.

**v.   The damages sought by FabArc for increased premiums and "loss of
negotiating position are speculative and cannot be established by
competent evidence.**

According to Zurich, it has long been the law in the State of Alabama that in order for a

claimant to recover damages, the claimant must not only establish the existence of, but also the

amount of, such damages by competent evidence. *See Revel v. Prince*, 69 So. 2d 470 (Ala. Civ.

App. 1954); *Crommelin v. Montgomery Independent Telecastors, Inc.*, 194 So. 2d 548 (Ala.

1967). Furthermore, Zurich claims, as stated in *Crommelin*, the fact of nor the amount of

damages, nor the cause of damages, can rest solely on speculation. *Crommelin*, 194 So. 2d at

551.

Zurich claims that it is further undisputed that in Alabama, in all civil actions, proof by

substantial evidence is required to submit an issue of fact to the trier of fact. According to Zurich,

proof by substantial evidence is required for testing the sufficiency of the evidence to support an

issue of fact. Alabama Code § 12-21-12 (1975). Zurich asserts that damages may not be awarded

where they are remote or speculative. *Parsons v. Aaron*, 849 So. 2d 932 (Ala. 2002).

Zurich cites the Eleventh Circuit case *Aldon Industries, Inc. v. Don Myers & Associates,
Inc.*, 517 F.2d 188 (11th Cir. 1975), for its proposition that "proof must show with reasonable

certainty that the plaintiff suffered damages and that the damages flowed as a natural and

proximate result of defendant's wrongful conduct." According to Zurich, the *Aldon* court also

held that the amount of damages must be capable of proof to a reasonable certainty and not left to

34

speculation or conjecture. Zurich argues that FabArc has failed to meet this standard.

According to Zurich, the three witnesses produced to establish the damages for increased premiums on behalf of FabArc failed to present substantial evidence which would warrant the submission of this issue to the trier of fact. Zurich claims that Walker, Coles, and Everhart all testified that they could not quantify what amount, if any, of FabArc's increased premiums were attributable to the actions of Zurich. Zurich argues that, absent this proof, any claims for damages are speculative and conjectural. Zurich submits that it is entitled to partial summary judgment on all claims of FabArc for increased insurance premiums.

**B.      FabArc's claims for increased premiums and/or "loss of negotiating position" as a result of Zurich's failure to defend and indemnify FabArc from Sanchez's claims relate only to one half of the costs of defending and indemnifying FabArc from Sanchez's claims.**

Zurich contends that, since both Zurich and Travelers owed primary coverage for Sanchez's claims against FabArc, the costs of defending and indemnifying FabArc for Sanchez's claims would be apportioned equally and the cost of indemnity would be divided pro rata between the coverages provided by FabArc and Travelers based on the "other insurance" provisions in the Travelers and Zurich policies. Zurich claims that the "other insurance" provisions in the Travelers Commercial General Liability policy provide as follows:

**SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS**

*                          *                          *

**4.      Other Insurance.**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

35

a.    **Primary Insurance.**

This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.

       *               *            *

c.    **Method of Sharing.**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limits of insurance to the total applicable limits of insurance of all insurers.

### AMENDMENT OF OTHER INSURANCE PROVISION

Paragraph 4.b. of the Commercial General Liability Conditions (Section IV) is amended as follows:

b.    **Excess Insurance**

This insurance is excess over any of the other insurance, whether primary, excess, contingent, or on any other basis.

       *               *            *

(4)    That is valid and collectible insurance available to you as an additional insured under a policy issued to:

(a) a contractor performing work for you; or

       *               *            *

When this insurance is excess, we will have no duty under Coverage A or B to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

The Travelers Commercial General Liability policy also includes the following "Other

Insurance - Additional Insureds" Endorsement:

Paragraph 4.b. of CONDITIONS (SECTION IV) is amended as follows:

**b. Excess Insurance.**

This insurance is excess over any of the other insurance; whether primary, excess, contingent or on any other basis;

&ast;    &ast;    &ast;

(4) That is valid and collectible insurance available to you if you are added as an additional insured under any other policy.

When this insurance is excess, we will have no duty under Coverage A or B to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

According to Zurich, the "other insurance" provisions in the Zurich Commercial General

Liability Policy provide, in part, as follows:

**SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS**

4.      **Other Insurance.**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

a.      **Primary Insurance.**

This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.

\*                          \*                          \*

c.      **Method of Sharing.**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

\*                          \*                          \*

**ADDITIONAL INSURED - DESIGNATED PERSON OR ORGANIZATION**

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**Name of Person or Organization:**

"ANY PERSON, ORGANIZATION, TRUSTEE OR ESTATE TO WHOM THE INSURED HAS AGREED TO NAME AS AN ADDITIONAL INSURED BY WRITTEN CONTRACT OR AGREEMENT PRIOR TO LOSS. **COVERAGE WILL BE EXCESS OVER ANY OTHER VALID AND COLLECTIBLE INSURANCE UNLESS THE AGREEMENT BETWEEN THE INSURED AND ADDITIONAL INSURED REQUIRES THIS COVERAGE TO BE PRIMARY.**" (emphasis added).

(If no entry appears above, information required to complete this endorsement will be

38

shown in the Declarations as applicable to this endorsement.)

WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule as an insured but only with respect to liability arising out of your operations or premises owned by or rented by you.

*                    *                    *

The "other insurance" provisions in the Travelers' excess policy, according to Zurich, provide as follows:

### SECTION IV - CONDITIONS

*                    *                    *

**10.    OTHER INSURANCE.**

This insurance **is excess** over any other valid and collectible insurance whether such other insurance is stated to be primary, contributing, excess, contingent or otherwise. This provision does not apply to a policy bought specifically to apply in excess of this insurance. (emphasis added).

Zurich claims that the "other insurance" provision in the Zurich excess policy provides as follows:

### SECTION II - GENERAL POLICY PROVISIONS –CONDITIONS

*                    *                    *

**I.    Other Insurance.**

If other insurance:

1.    Is available to pay claims;
2.    Applies, due to provisions of an Extended Reporting period; or
3.    Applies on a retroactive basis, or if primary insurance applies on a retroactive basis; **our policy applies excess of** and does not contribute with such insurance. (emphasis added).

According to Zurich, "[i]t has been long established in the law of State of Alabama that

when two or more insurance carriers have primary insurance coverage of the same insurable interest, subject matter, and risk, they share liability in accordance with the proportion that the limits of each policy bear to the total limit of insurance applicable to the loss." *State Farm Mutual Auto Insurance Co. v. General Mutual Insurance Co.*, 210 So. 2d 688 (Ala. 1968); *Nationwide Mutual Casualty Co. v. Hall*, 643 So. 2d 551 (Ala. 1994). Zurich claims that the same result was reached in *Fidelity & Casualty Co. of New York v. Thomas*, 315 F. Supp. 89 (S.D. Ala. 1970), an automobile insurance case in which the district court held that, where coverage of a vehicle is extended by more than one policy and the policies contain mutually repugnant "other insurance" clauses, proration of the loss should be required between the two insurers. The court went on to hold that pro rata application of the policies requires division of the loss between the two insurers in accordance with the limits of their respective policies.

According to Zurich, in *State Farm Auto Insurance Co. v. General Mutual Insurance Co.*, 210 So. 2d 688 (Ala. 1968), the Alabama Supreme Court adopted what is known as the "Lamb-Weston" Rule as to the proration of a loss according to the applicable policy limits. *See Lamb-Weston v. Oregon Auto Ins. Co.*, 346 P.2d 643 (Or. 1959). In *Lamb-Weston*, one insurer had insured up to $25,000, whereas the other had insured up to $5000. The Oregon Supreme Court held that the first insurer should shoulder 5/6 of the liability, while the second shouldered 1/6. *Id.* at 647. Zurich argues that should the court determine that Zurich owes any indemnification for the underlying litigation, such indemnity should be paid on a "pro rata" basis according to policy limits. Zurich claims that "should the court find that Zurich owes anything on the cost of the defense of the underlying suit, it should be no more than half of the total cost based on equal obligations to defend. Zurich quotes the *State Farm Mutual* court as holding that "both insurers

40

assume the same obligation to defend, and, for that reason, each should bear the same share of the cost of defending the insured."

> **C.    If it is FabArc's contention that the Zurich policy should have provided coverage that was primary and "non-contributing" to the Travelers' coverage and/or coverage "without exceptions(s)," that issue is before the State Court in regard to FabArc's claims against CCSI for CCSI's failure to procure adequate insurance; however, in this case, FabArc has no greater coverage under the Zurich policy than the coverages that are provided under the policy's terms.**

According to Zurich, in the recent Alabama Supreme Court case of *FabArc Steel Supply, Inc. v. Composite Const. Systems, Inc.*, 914 So. 2d 344 (Ala. 2005), the summary judgment granted CCSI on FabArc's "failure to procure insurance" claim was reversed and remanded. Specifically, that court found:

> *Failure to Procure Insurance*
>
> FabArc further argues that because the contract between it and Shimizu required that "[a]ll insurance furnished in connection with this project shall provide that it is primary coverage regarding any insurance event" and because under paragraph 5 of the contract between CCSI and FabArc CCSI assumed toward FabArc all FabArc's obligations toward Shimizu "with respect to" CCSI's work, that CCSI's obligation to FabArc was to provide it with primary coverage.
>
> *                    *                    *
>
> CCSI's position in opposition on this issue is simply that CCSI's only contractual obligation was to name FabArc as an additional insured under its general liability policy and that it is undisputed that FabArc was so named in CCSI's policy.
>
> *                    *                    *
>
> We conclude that genuine issues of fact remain with respect to whether CCSI was obligated to name FabArc as an additional insured "without exception(s)" under its liability insurance policies, including whether such coverage was to be primary as opposed to only excess.
>
> *                    *                    *

41

Because CCSI has not carried its burden of demonstrating the absence of any genuine issues of material fact as to this issue, a summary judgment as to the issue was not in order. Accordingly, we reverse the summary judgment entered in favor of CCSI as to this aspect of FabArc's third-party complaint against CCSI and remand the case.

*Id*. at 363-64.[33]

Therefore, Zurich reasons, as to Sanchez's claims against FabArc, any claims against Zurich for "loss of negotiating position" or increased premiums relate only to one half of the costs of defending Sanchez's claims and one half of the $600,000 and costs paid to Sanchez in settlement. Zurich claims that "any claim for loss of negotiating position and increased premiums that relate to the remaining one half of the Sanchez defense and indemnity is part of FabArc's claims that CCSI failed to procure insurance for FabArc 'without exception(s).'"

> **D.    FabArc's claims for increased Premiums and "Loss of Negotiating Position" resulting from Travelers' payments to Great American are the result of Travelers' decision not to defend and indemnify its insured Shimizu, an issue that is also before the State Court.**

According to Zurich, Shimizu makes claims against Travelers in State Court as an additional insured under the FabArc policy and for bad faith; Shimizu also claims that FabArc failed to provide adequate insurance coverage. Zurich claims that in FabArc's Reply to Zurich's Response to FabArc's Motion to Strike Portions of Zurich Pretrial Position, FabArc conceded that the additional insured endorsements in the Zurich and Travelers' policy are the same except for Travelers' additional "This coverage does not included liability arising out of the independent acts or omissions or such person or organization."

Zurich characterizes FabArc's reliance on the above sentence as determinative as being "misplaced." Zurich argues that, while the "Blanket Additional Insured" Endorsement in the

---

[33]The Alabama Supreme Court has well-stated the real issues.

Travelers' policy does include that sentence, the specific endorsement that names Shimizu as an additional insured does not. Zurich claims that the state court found that Travelers is equitably estopped from now claiming that the Zurich policy provides greater coverage than its own.

Zurich asserts that Travelers chose to pay the $2.5 million under FabArc's, and not Shimizu's, coverage. This, according to Zurich, resulted in the loss which FabArc and Travelers point to as the basis for the increased premiums and loss of negotiating position claims; the loss did not result from any action taken by Zurich.

Finally, Zurich claims that all issues regarding the coverages provided for Shimizu by Travelers, Great American and Zurich are before the state court. Additionally, Zurich asserts that all parties necessary for resolution of those coverage issues are not before this court. According to Zurich, "[t]he absence of CCSI, Great American, and Shimizu from these proceedings make it clear that the contribution among the carriers and Shimizu's status as an additional insured under the Travelers' policy must be prosecuted and determined in state court where Travelers is the real party in interest Plaintiff as to the claims asserted against Zurich."

**II.     Zurich's Motion for Partial Summary Judgment as to All of the Claims of FabArc Steel Supply, Inc., for Reimbursement of All Monies Paid by Travelers for the Defense and Indemnity of FabArc.**

**A.     In regard to claims for reimbursement of all monies paid by Travelers for the defense and indemnity of FabArc, Travelers is the real party in interest as to those claims and Travelers' claims against Zurich for reimbursement of those monies are pending in the State Court Action.**

According to Zurich, Travelers is the real party in interest as to claims for reimbursement of monies paid for the defense and indemnity of FabArc. Travelers, Zurich claims, chose to pursue those claims in state court, and all necessary parties are present in state court. Zurich

argues that Travelers, having chosen to prosecute its claims in state court, cannot now collect the monies that it paid via FabArc, a nominal party that has "no interest" in Travelers' claims. *See Hudson and Thompson v. First Farmers & Merchants National Bank of Troy*, 93 So. 2d 415, 418 (Ala. 1957) ("There is a distinct difference in principle between an action brought by the real party in interest, the party who has suffered the loss, and entitled to the recovery, and a suit by a nominal party to recover losses in which he has not interest."). Zurich asserts that FabArc is the real party in interest only as to the recovery of its claims for increased premiums and "loss of negotiating position" resulting from Zurich's failure to defend and indemnify FabArc.

Zurich argues that Travelers chose to have "its day" in state court, not federal court. According to Zurich, since Travelers chose to prosecute its claims in state court, it "cannot now collect the monies that it paid via FabArc, a nominal party that has 'no interest' in Travelers' claims." Zurich claims that, as was the case in *Hudson*, this court's order finding coverage for FabArc under Zurich's policies both for the claims of Sanchez and the claims of Great American, is not *res judicata* as to the claims asserted by Travelers in state court. Zurich argues that those coverage issues are before the state court, and at least as to Travelers' right to recover monies paid for the defense and indemnity of Great American's claims, the policies of Travelers, Zurich, and Great American are all at issue, and state court is the only forum in which those claims can be litigated. Zurich further asserts that if FabArc and Travelers claim that the Zurich policy provided FabArc with less coverage than it bargained for in the CCSI/FabArc contract, that claim too is pending in state court. *See FabArc Steel Supply, Inc. v. CCSI*, 914 So. 2d at 360-63. Zurich argues that Travelers, as a "nominal party" to this case, "does not get a second bite at the apple by re-litigating herein issues which may have already been decided in the State Court."

44

**B.      All parties necessary for the resolution of Travelers' claims for reimbursement of all monies paid for the defense and indemnity of FabArc for Sanchez's claims are in state court and are not before this Court.**

Zurich claims that all parties necessary to the resolution of Travelers' claims against Zurich to recover the $2.5 million and related costs on behalf of FabArc are parties to the state court litigation and are not parties to the federal court litigation. According to Zurich, necessary parties to this litigation include Great American, Shimizu, and CCSI. Zurich argues that it is undisputed that Travelers insured FabArc, and that Shimizu also claims primary additional insured status under the Travelers' policy. Zurich contends that Travelers is equitably estopped from claiming that Travelers' additional insured endorsement does not provide primary coverage for Shimizu based on the contention of FabArc and Travelers regarding the coverages provided by Zurich's additional insured endorsement. Zurich claims that if the state court finds that Travelers owed Shimizu coverage, Travelers should have and was required to pay Sanchez's claims out of Shimizu's, and not FabArc's, coverage.

**C.      Any recovery by Travelers of the monies paid for the defense and indemnity of FabArc is dependent on the coverage provisions of the Zurich, Travelers, and Great American policies.**

According to Zurich, FabArc objected to all discovery in this suit regarding Travelers' position as to the coverages provided by the Travelers' policy claiming that the coverage issues under the Travelers' policy were not issues in this litigation. Travelers' objections at issue are stated in Zurich's Narrative Summary of Undisputed Facts. Zurich argues that because Travelers chose the state court forum and refused to permit Zurich to conduct any discovery in regard to Travelers' coverages, Travelers' claims for recovery on behalf of FabArc must be litigated in state court.

### D. The Morgan County Circuit Court granted Zurich a final summary judgment as to all of Travelers' claims against Zurich.

Zurich claims that a state court has already granted it a final summary judgment against Travelers. Travelers has appealed this Order to the Alabama Supreme Court, where the matter is pending. According to Zurich, it is established precedent in Alabama that Supreme Court review is "limited to the issues that were before the trial court" and that "an issue raised on appeal must have first been presented to and ruled on by the trial court." *Cashion v. Torbert*, 881 So. 2d 408, 413 (Ala. 2003). Zurich asserts that the Morgan County Circuit Court clearly found that Travelers filed no evidence to rebut Zurich's claim of equitable estoppel. If, Zurich further asserts, FabArc contends that the Morgan County Circuit Court was in error in failing to consider this court's Order of March 22, 2004 (finding coverage for FabArc under the Zurich policies), that order was not presented to the Morgan County Circuit Court until after its final order on August 4, 2004, and should not be considered by the Alabama Supreme Court under *Cashion*. According to Zurich, its motion was pending for one year prior to the entry of a final order, and Travelers submitted no sufficient evidence in opposition to that motion. Zurich argues that Travelers had five months after this court's order to submit it to the state court, but failed to do so. Zurich claims that if FabArc and Travelers will contend that this court's order is dispositive, then Travelers should have petitioned the state court for a stay prior to its entry of a final order.

Zurich claims that all of the above entitle it to have this court grant its Motion for Partial Summary Judgment as to all of the claims of FabArc Steel Supply, Inc., for reimbursement of all monies paid by Travelers for the defense and indemnity of FabArc both from the claims of Sanchez and from the claims of Great American.

46

III.   **FabArc's Response to Zurich's Two Motions for Partial Summary Judgment.**

    A.   **Argument with Respect to Zurich's Motion Regarding Damages for Increased Insurance Costs and Loss of Market Position.**

    1.   **FabArc's claims for damages for increased premiums and "loss of bargaining position are supported by substantial evidence.**

    (a)   **Zurich's denial of coverage created an adverse insurance loss history for FabArc.**

According to FabArc, this court previously held that Zurich's primary and excess policies provide coverage to FabArc for the claims asserted in the *Sanchez* litigation. Also according to FabArc, this court held that Zurich has a duty to defend and indemnify FabArc, and its judgment was affirmed by the Eleventh Circuit. FabArc claims that Zurich has continued in its refusal to either defend or indemnify FabArc, and FabArc suffered damages as a result, including an increase in insurance premiums and a loss of bargaining position in the insurance market. In support of this, FabArc points to its loss history before the *Sanchez* incident, which was "excellent," and its loss history subsequent to that incident. FabArc claims that those claims were the first and only general liability claims made against it in its history.

    (b)   **FabArc's insurance premiums increase by $151,300 because of the adverse loss history caused by Zurich's denial of coverage.**

According to FabArc, Everhart testified in her deposition that the increase in FabArc's insurance premium for the year 2002/2003 related "solely" to the *Sanchez* loss:

    Q.   Exactly. And my point was, did you propose a higher premium than the year ... - as a result of the death claim?
    A.   Yes, you see my rate is increasing about thirty-seven percent.
    Q.   Okay. Was there anything else that factored in to your proposed increase in premium other than the death claim?
    A.   Not under general liability.

Everhart Depo. at 116-117.

FabArc claims that, during discovery, it produced to Zurich the entire underwriting file of Travelers. FabArc further claims that that file contains all the information necessary to calculate the exact amount of the increase in FabArc's premiums which resulted from the inclusion of the *Sanchez* loss. FabArc asserts that Everhart was prepared to provide a step-by-step computation, but Zurich did not request one in its deposition. FabArc claims that Everhart's affidavit provides the exact amount and method of computation of the increases. FabArc argues that, had Zurich provided coverage, the *Sanchez* loss would not have appeared on FabArc's loss history, and the pre-loss 2001/2002 insurance rates would have again been applied in 2002/2003. Because of Zurich's failure to provide coverage, FabArc contends, FabArc was forced to pay a total amount of $87,662 in 2002/2003 - an increase of $48,786 from the prior year. This scenario was duplicated for the 2003/2004 year according to FabArc, resulting in a total increase of $151,300 over those two policy years. FabArc claims that Paty Daves, FabArc's insurance agent, corroborates that the above was due solely to the *Sanchez* loss, and that he worked with other customers whose premiums only increased by 10-20% over those same two years if they were in "solid financial shape."

    **(c)**    **Zurich's reliance on irrelevant and out-of-context deposition testimony is misplaced; the evidence of increased insurance cost is undisputed in the record.**

FabArc claims that Zurich relies on out-of-context deposition testimony to bolster its arguments. FabArc cites as an example the Walker deposition. According to FabArc, Walker was the Travelers underwriter prior to the *Sanchez* loss and did not have the requisite knowledge to analyze the premium increase. FabArc argues that Everhart, on the other hand, did possess such requisite knowledge. Walker's testimony is therefore irrelevant, FabArc claims.

FabArc also points to the testimony of Coles, who also did not have knowledge of the rate increase. FabArc claims that Zurich, in its attempt to highlight Coles' lack of knowledge of the impact of the *Sanchez* settlement, fails to quote the most pertinent portion of her testimony: "I'm not involved in anyway in the calculating of premiums. I have no way of knowing what FabArc paid or pays now in premiums..." FabArc argues that Coles' testimony is irrelevant, as she lacks the requisite knowledge to formulate an informed opinion.

FabArc claims that Everhart's deposition provides the necessary information to remove the shadow of speculation from its claimed damages. According to FabArc, Everhart explained that the total general liability premium was calculated on several different aspects of general liability coverage provided to FabArc. FabArc further claims that each of these coverages carried a separate rate. FabArc argues that Zurich selected one page, number 3817, from a 5000 page file, eliciting the necessary response from Everhart that she could not testify as to the commissions on premiums from the one page. FabArc claims that its damages are clear, undisputed, and supported by the record evidence.

## 2.    By failing to fulfill its duty to defend and indemnify FabArc, Zurich alone caused FabArc's damages. Zurich alone is responsible for those damages.

FabArc claims that Zurich's contention that FabArc's claims relate only to one half of the costs of defending and indemnifying FabArc from the *Sanchez* suit fails for several reasons. First, FabArc argues that Zurich insurance is primary and noncontributing, and therefore Zurich is solely responsible. FabArc argues, in detail, that the express provisions of Zurich's policies provide primary coverage in this case, that FabArc is entitled to the benefit of its bargain with CCSI - CCSI intended and contracted to provide primary, noncontributing insurance to FabArc,

49

and the express provisions of both Travelers policies provide excess coverage over both Zurich policies.

Second, FabArc claims that Zurich is mistaken as to Alabama law on the apportionment of defense and indemnity costs between two insurers. According to FabArc, Zurich unduly relies on a default Alabama contract rule that applies only when two or more insurance provisions are mutually repugnant. *See State Farm Mutual Automobile Insurance Co. v. General Mutual Insurance Co.*, 210 So. 2d 688 (Ala. 1968). FabArc claims that this is not such an instance. FabArc argues that, in this case, Zurich's policies clearly provide that they are primary whereas Travelers' policies clearly provide that they are secondary. FabArc relies instead on *Continental National American Group v. Burleson*, 220 So. 2d 611 (Ala. 1969), for its holding that *General* does not apply in the absence of conflicting policy terms.  According to FabArc, because of Zurich's admission that "[i]f all of the other insurance permits contribution by equal shares, we will follow this method also,"this court should apportion defense and indemnity costs equally between Zurich and Travelers; Alabama law does not permit apportionment for indemnity on a *pro rata* basis.

Third, FabArc claims that Zurich is mistaken in its understanding of, and reliance on, the Alabama Supreme Court's holding in *FabArc Steel Supply Inc., v. Composite Construction Systems, Inc.*, No. 1031890, 2005 Ala. LEXIS 70 (Ala. May 20, 2005). According to FabArc, the Alabama Supreme Court recognizes that it is for this court, and this court alone, to decide Zurich's coverage obligations to FabArc, by stating: "if FabArc ultimately prevails against Zurich in [the] federal declaratory-judgment action, FabArc's claim against CCSI alleging breach of the contractual duty to procure insurance 'may be moot.'" *Id*. at *55. FabArc claims that the issue

50

before the Alabama Supreme Court was whether CCSI breached its contract to provide proper insurance to FabArc, a separate and distinct issue from the one before this court, namely whether Zurich's insurance is actually primary and noncontributing. Furthermore, according to FabArc, its claims against Zurich are not before the state court; that court will therefore never reach the central issue of whether Zurich must make FabArc whole for Zurich's denial of coverage.

Fourth, FabArc asserts that the claims of Shimizu for coverage from Travelers have no bearing on FabArc's damages in the present litigation; FabArc's increased premiums are a direct result of Zurich's failure to defend and indemnify FabArc. According to FabArc, Zurich's contention that FabArc cannot assert a claim for damages because Travelers' payments to Great American are the result of Travelers' decision not to defend and indemnify Shimizu must fail, because Zurich provides neither evidentiary support nor legal authority for this argument. FabArc characterizes Zurich's argument in this regard as, "Travelers paid the judgment against FabArc to make the loss appear on FabArc's loss history, and to set Zurich up to provide coverage to FabArc in the present lawsuit." FabArc claims that neither facts nor logic support this argument, if for no other reason than because all amounts paid by Travelers, whether on behalf of Shimizu or FabArc, would produce the same increase in premiums suffered by FabArc.

**B.** **Argument on Zurich's Obligation to Pay FabArc's Defense Costs, Settlement Costs, and Judgment Costs.**

**1.** **Zurich's argument that Travelers is the real party in interest does not defeat FabArc's claim for coverage and for payment of defense costs, settlement costs, and judgment costs.**

According to FabArc, Zurich's reliance on Travelers' "second bite at the apple" through litigation in both the state and federal courts is misplaced for a number of reasons. FabArc claims

that neither Travelers nor FabArc has ever brought any claim against Zurich in state court with

regard to coverage for FabArc. FabArc further claims that this court has already protected Zurich

from this threat by adding Travelers to this lawsuit on Zurich's motion to protect from the threat

of double recovery. FabArc also asserts that the Alabama cases cited by Zurich actually support

FabArc's own position. According to FabArc, those cases actually hold that, where claims

asserted in the state courts are not the same as those asserted in federal court, actions in state

court are permissible despite the pendency of federal court actions. *See Hudson & Thompson v.*

*First Farmers & Merchants Nat'l Bank of Troy*, 93 So. 2d 415, 418-419 (Ala. 1957); *Fidelity &*

*Guar. Fire Corp. v. Silver Fleet Motor Express, Inc.*, 7 So. 2d 290, 292 (Ala. 1942). Though

FabArc recognizes that Travelers is subrogated to FabArc's monetary interest in the settlements

and judgments paid on FabArc's behalf, FabArc claims that Travelers is not subrogated to

FabArc's interest in Zurich's taking the action to remove the blemish of a $3,691,369.86 loss

from its insurance record.

> **2.      Zurich's arguments regarding the state court litigation and regarding
> necessary and indispensable parties have already been rejected by this court
> and the Eleventh Circuit, and this court's judgment is now the law of the
> case.**

According to FabArc, this court's Memorandum Opinion and Order, as affirmed by the

Eleventh Circuit, dictate that it is now the law of this case that the state court proceedings

between Travelers and Zurich do not have any preclusive effect on the issues in this litigation.

FabArc further claims that the Eleventh Circuit rejected Zurich's argument that not all necessary

parties were present in the current litigation. FabArc lists the following as having been rejected

by this court:

- "Travelers' claims must be resolved in State Court where all necessary parties are present."
- "All parties, policies, and evidence necessary for the resolution of these issues are before the State Court."
- "All of the claims fo FabArc and Travelers for reimbursement of monies paid for the defense and indemnity of FabArc have been decided by the Morgan County Circuit Court."
- "State Court is the only forum in which those claims can be litigated."
- "All parties necessary to the resolution of Travelers' claims against Zurich to recover the $2.5 million and related costs on behalf of FabArc are parties to the State Court litigation and are not parties to the Federal Court litigation. Necessary parties not before this Court include Great American, Shimizu, and CCSI."
- "Travelers is equitably estopped from claiming that Travelers' additional insured endorsement does not provide primary coverage for Shimizu based on the contentions of FabArc and Travelers regarding the coverage provided by Zurich's additional insured endorsement."

**3.     Zurich was permitted an opportunity for full discovery of all issues before this court.**

FabArc claims that Zurich's argument that it was denied discovery regarding Travelers'

policies must fail, because neither FabArc nor Travelers are making a claim for recovery on

behalf of FabArc in state court. Furthermore, FabArc argues, Zurich was given full access during

discovery to Travelers' policies, with the exception of coverage for Shimizu. According to

FabArc, this court denied a Motion to Compel brought by Zurich with respect to Travelers'

Shimizu policies. FabArc concludes that Zurich was given all appropriate access to Travelers'

policies during discovery.

**4.     There are no issues involving FabArc between Travelers and Zurich in the Morgan County Court. That action involves only coverage issues relating to Shimizu.**

FabArc claims that in Travelers' Third-Party Complaint, "Travelers disputes that it owes

any insurance coverage to Shimizu. However to the extent that Travelers is found to owe

coverage to Shimizu, Zurich must share in the coverage under the terms of the 'other insurance' provisions of Travelers' policies, and Travelers is entitled to enforce the terms of these provisions." FabArc claims that there is no mention of FabArc in the above. FabArc asserts that the Eleventh Circuit has rejected Zurich's argument in favor of FabArc's position.

## C.    Conclusion

FabArc claims that there is no genuine issue of material fact as to FabArc's right to recovery, or the extent of its damages. According to FabArc, Zurich alone had the duty to defend and indemnify FabArc in the *Sanchez* litigation, and this court should grant a final summary judgment against Zurich. In no event, FabArc argues, is Zurich entitled to summary judgment.

## IV.    Reply of Zurich American Insurance Company to FabArc's Response to Zurich's Two Motions for Partial Summary Judgment.

According to Zurich, FabArc relies solely on the testimony of Everhart in support of FabArc's claims for increased premiums. Zurich claims that Travelers demonstrates that the home office underwriters who made the decision to increase FabArc's premiums were concerned about the following issues that did not relate to the *Sanchez* litigation:

a.    FabArc's "41M in sales and 12.5M in subcontracted work, we feel that we need more rate for both exposures."

b.    "[T]hey've gotten involved in some very large, highly visible projects with the potential of multiple person injuries in the event of collapse, such as Opry Land Hotel & Convention Center, malls and hospitals."

c.    "Regarding the pricing, I think we need to equate the exposure to loss for this risk as being closer to that of a contractor, since it is heavily involved in the structural

steel trade, both from a fabrication and a subcontracting standpoint. Their list of projects is significant w/ '9 story office buildings' and '5 & 6 story hospitals' listed on their website projects."

d.    "These structural steel risks are getting a lot of scrutiny from everyone."

e.    "He [FabArc's Insurance Agent] has been talking to some other steel people on a website for the steel association and several of them have placed their coverage with captives. He says that the insurance people are driving the steel people to go to captives and will probably end up with an adverse selection."

f.    Everhart documents a conversation with Paty Daves, FabArc's agent, in her email of 3/27/02. As of this date, Daves had premium quotes from Chubb and Cincinnati that were less than Travelers' quote. FabArc apparently out of loyalty chose to stay with Travelers even if they had to pay more.

Though Everhart relates the increased premiums to the Sanchez death claim, Zurich claims that Daves stated that "[t]he Toray claim paid a large role in this increase." Furthermore, Zurich argues that both it and Travelers share the obligation to defend and indemnify FabArc. Therefore, according to Zurich, the entire increase in premiums cannot be directly related to Zurich's failure to defend and indemnify FabArc as FabArc contends.

## FABARC'S MOTION FOR RELIEF ON SUM-CERTAIN DAMAGES FOR THIRD-PARTY CLAIMS AND JUDGMENTS

I.    **Plaintiff FabArc's Motion for Relief on Sum-Certain Damages Paid to Settle and Satisfy Third Party Claims and Judgments Against FabArc.**

    A.    **FabArc is entitled to immediate additional relief to effectuate this court's judgment.**

According to FabArc, this court has the inherent power to effectuate its March 22, 2004

Order granting FabArc declaratory judgment and declaring, *inter alia*, that Zurich owes FabArc a

duty to defend and indemnify. *See Teas v. Twentieth Century-Fox Film Corp.*, 413 F.2d 1263,

1266-67 (5th Cir. 1969). FabArc also claims that 28 U.S.C. § 2202, which provides for "[f]urther

necessary or proper relief based on a declaratory judgment," expressly grants this court the power

to effectuate its declaratory judgments. FabArc argues that, because Zurich still refuses to defend

or indemnify FabArc against the claims in the *Sanchez* case, further relief is necessary and

proper.

**B.      FabArc is entitled to immediate additional relief: Zurich's policy is primary.**

FabArc claims that the Shimizu/FabArc contract specifically requires that "[a]ll insurance

in connection with this project shall provide that it is primary coverage regarding any insurance

event." FabArc asserts that the contract also provides, "[e]ach and every policy for liability

insurance, carried by each Subcontractor and lower tier subcontractor as required by this Section,

shall specifically include Contractual Liability coverage." FabArc argues that the terms of the

Shimizu/FabArc contract are undisputedly incorporated by the FabArc/CCSI subcontract.

According to FabArc, FabArc's Travelers Commercial General Liability ("CGL") policy

states in two separate places that the policy is excess. First, FabArc claims, the Travelers CGL

provides that it is "excess" to any insurance available to FabArc "as an additional insured under a

policy issued to: (a) a contractor performing work for you...". Second, FabArc asserts, the

Travelers CGL also provides that it is excess "over any of the other insurance...available to

[FabArc] if [FabArc is] added as an additional insured under any other policy." FabArc argues

56

that these provisions are clear and unambiguous, and must be enforced as written under Alabama law. *See Dawkins v. Walker*, 794 So. 2d 333, 339 (Ala. 2001); *McDonald v. U.S. Die Casting & Development Co.*, 541 So. 2d 1064 (Ala. 1989). According to FabArc, this court has already found that FabArc is an "additional insured" under the Zurich primary policy and an "insured" under the Zurich excess policy. Therefore, FabArc claims, the Travelers CGL is excess to Zurich's coverage.

FabArc claims that the Travelers excess policy provides that it is "excess over any other valid and collectible insurance whether such insurance is stated to be primary, contributing, excess, contingent or otherwise...[but not] to a policy bought specifically to apply in excess of this insurance." FabArc argues that Zurich's policies are "valid and collectible insurance" for FabArc. FabArc further argues that Zurich's policies were bought by CCSI to apply "in excess" of FabArc's coverage with Travelers, as the Sanchez/FabArc and FabArc/CCSI contacts clearly require that CCSI provide "primary non-contributing" coverage.

According to FabArc, Zurich's policies also require that Travelers' coverage apply as excess over Zurich's coverage. FabArc notes that Zurich's primary policy states that it "is primary except when b. below applies[34]. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below." FabArc also claims that Zurich's primary policy includes an "Additional Insured" endorsement which provides that coverage for an additional insured is "excess over any valid and collectible insurance unless the agreement between the

---

[34]The referenced provision "b." regards fire and automobile insurance and FabArc claims that it does not apply in this case

insured and additional insured requires this coverage to be primary." FabArc argues that the

agreement between FabArc, Zurich's "additional insured" and Zurich's other insured, CCSI,

required that CCSI provide "primary non-contributing" insurance, and the Zurich policies

provide primary coverage.

> **C.    FabArc is entitled to immediate additional relief: when Zurich refused to defend and indemnify FabArc as primary insurance, FabArc did not receive the benefit of its bargain with CCSI.**

According to FabArc, it is undisputed that, because of Zurich's failure to defend and

indemnify FabArc, FabArc did not receive the benefit of its bargain with CCSI, its subcontractor.

FabArc claims that Zurich, through its representative Ward, admitted that the construction

contracts required that the insurance coverage obtained by lower-tier subcontractors be primary,

and that CCSI was just such a subcontractor. FabArc asserts that CCSI expected that Zurich

would provide to FabArc "whatever coverage we paid for extending to whoever is due that

coverage." FabArc argues that Zurich refused to honor its contractual obligations, and that as a

result FabArc's other carrier, Travelers, had to defend and indemnify FabArc. According to

FabArc, this happened even though FabArc and CCSI had agreed to shift the insurance burden to

CCSI, since CCSI would be the only group actually at the job site, and would be best able to

minimize the chance of an accident.

> **D.    Specific Relief Requested**

FabArc requests that this court provide the following relief:

(1)    A judgment requiring Zurich to pay $3,091,369.86 representing the amount paid

 by Travelers on FabArc's behalf in satisfaction of the Morgan County Circuit

 Court's judgment, including costs and interest, in the *Sanchez* case.

58

(2)     A judgment requiring Zurich to pay $600,000 representing the amount Travelers

paid on FabArc's behalf in settlement of the Sanchez Estate's claims against

FabArc.

(3)     An Order requiring Zurich to immediately undertake the ongoing and future

defense of FabArc against the claims filed against it by Shimizu in the action

styled *Cynthia Sanchez, as Personal Representative of the Estate of Evodio*

*Sanchez, deceased v. Shimizu American Corp., et al.*

(4)     Any other relief to which FabArc may be entitled.

## II.     Defendant Zurich's Response

### A.     FabArc and Travelers are judicially estopped from now contending that this court should award FabArc the monies that were paid by Travelers to defend and indemnify FabArc in the *Sanchez* litigation when FabArc and Travelers previously agreed "that this court is not to decide the various priorities of coverage between Zurich and [Travelers] as to primary, excess, etc.

According to Zurich, Travelers, not FabArc, paid all costs related to the defense of

FabArc in the *Sanchez* litigation. Zurich claims that this court found in it Memorandum Opinion

of February 10, 2004, that "[t]he parties have agreed that this court is not to decide the various

priorities of coverage between Zurich and FabArc's insurer as to primary, excess, etc." Zurich

contends that at all times prior to August 4, 2004, when the Morgan County Circuit Court

granted Zurich a final Order of Summary Judgment, FabArc and Travelers contended in this

Court that "[b]oth Travelers and Zurich are parties to the underlying *Sanchez* litigation, and the

insurance policies of the two carriers are properly before the Circuit Court of Morgan County..."

and "all other issues concerning coverage questions between Zurich and Travelers are properly

before the State Court and are not subject to discovery [in the Federal Court] case." Furthermore,

Zurich claims that FabArc has confirmed both in pleadings and argument before this court that FabArc and Travelers placed "any insurance coverage issues between Travelers and Zurich before the state court."

According to Zurich, FabArc and Travelers now ask this court to award FabArc one hundred percent of the monies paid by Travelers to defend and indemnify FabArc to avoid the consequences of Travelers' failure to respond to the Motion for Summary Judgment filed by Zurich in the Morgan County Circuit Court. Zurich claims that FabArc and Travelers no longer agree that this court is not to decide the various priorities of coverage between Zurich and Travelers to avoid the consequences of Travelers' failure to respond to Zurich's Motion for Summary Judgment in state court. According to Zurich, Travelers chose to litigate the various priorities of coverage between Zurich and Travelers in state court. Zurich points out that FabArc and Travelers successfully opposed Zurich's Motion to Stay these proceedings, Motion to Add Travelers as a Real Party in Interest Plaintiff, and Zurich's discovery regarding the insurance coverages provided to FabArc by Travelers, by contending that all issues as to the priorities of coverage were before the state court. As a result, Zurich claims, Travelers is now judicially estopped from "deliberately changing positions according to the exigencies of the circumstances." *New Hampshire v. Maine*, 532 U.S. 742, 749-750 (2001).

Zurich claims that FabArc cites the All Writs Act, 28 U.S.C. § 2202 and *Teas v. Twentieth Century Fox - Film Corp.*, 413 F.2d 1263 (5th Cir. 1969) for the proposition that this court should effectively withdraw from the state court the coverage issues placed before it by FabArc and Travelers. Zurich distinguishes *Teas* by noting that the defendant in that case, after losing in the district court, later filed a declaratory judgment action in state court. Zurich states:

> Travelers now seeks to enjoin the state court action that it filed to avoid the consequences of its decision to litigate its claims in state court. If the *Teas* plaintiffs had chosen to prosecute a second lawsuit regarding the leases in State Court and had received an unsatisfactory result, the District Court would not have rescued them via an injunction which is tantamount to what FabArc is seeking in this instance. *Teas* does not provide a mechanism for rescuing an unsuccessful litigant from the consequences of its own choices.

Furthermore, according to Zurich, Travelers is the real party in interest for the recovery of any monies paid by Travelers for the defense and indemnity of FabArc, and chose to litigate these issues in state, not federal, court. Zurich argues that this court should decline to decide the priority issues between Travelers and Zurich and leave those issues to the state courts, where Travelers "placed them in the first place."

> **B.  If this court chooses to determine the respective liabilities of Travelers and Zurich for the monies paid by Travelers to defend and indemnify FabArc, the "other insurance" provisions of the respective policies control.**

Zurich claims that this court has found that FabArc has coverage under Zurich's primary and excess policies, and that it is undisputed that FabArc has coverage under Travelers' primary and excess policies. Therefore, Zurich argues, the "other insurance" provisions of the respective policies are at issue. According to Zurich, the primary policies of both Travelers and Zurich have limits of $1 million, while the excess policy issued by Zurich has limits of $3 million[35], and Travelers' excess policy has limits of $10 million.

According to Zurich, the law in Alabama on "other insurance" clauses is settled. Zurich claims that it the "other insurance" clauses in two policies are mutually repugnant to each other,

---

[35]Zurich notes: "FabArc contends that Zurich's excess policy limits were $5 million, not $3 million. However, the excess policy limits were increased from $3 million to $5 million by an endorsement effective June 1, 1998. Sanchez died on April 13, 1998; therefore, the limits of Zurich's excess policy on the date of Sanchez's death were $3 million not $5 million."

they are disregarded and the coverage is pro-rated according to the policy limits. However,

Zurich claims, if the two clauses do not conflict they are to be given effect. Zurich cites *State*

*Farm Mut. Auto. Ins. Co. v. General Mutual Ins. Co.*, 210 So. 2d 688 (Ala. 1968); *Continental*

*National American Group v. Burleson*, 220 So. 2d 611 (1969); *Horace Mann Ins. Co. v. United*

*Intern. Ins. Co.*, 762 F. Supp. 1470 (M.D. Ala. 1990); *Nationwide Mutual Ins. Co. v. Hall*, 643

So. 2d 551 (Ala. 1994); *Fidelity & Casualty Co. of New York v. Thomas*, 315 F. Supp. 89 (S.D.

Ala. 1970).

Zurich claims that an amendment to the Travelers policy provides that it is "excess over

any of the other insurance, whether primary, excess, contingent or on any other basis...[t]hat is

valid and collectible insurance available to you as an additional insured under a policy issued

to...a contractor performing work for you." Zurich also claims that another "Other Insurance -

Additional Insured" Endorsement to the Travelers Primary Policy provides that "[t]his insurance

is excess over any of the other insurance; whether primary, excess, contingent or on any other

basis." Zurich argues that it is clear that by virtue of the two endorsements to the Travelers

policy, the "other insurance" provisions in the Travelers Primary Policy are of the "excess" type.

Zurich argues that its own policy's "other insurance" clause also provides that it is excess except

in one instance: where "the agreement between the insured [CCSI] and additional insured

[FabArc] requires this coverage to be primary."

Zurich contends that no contract required CCSI either directly or indirectly to procure

insurance for FabArc which was "primary non-contributing coverage." According to Zurich, the

only contract which utilizes the word "primary" in regard to insurance is the Shimizu/FabArc

contract, a contract to which CCSI was not a party and which by its terms expressly disclaims

"any sub-contractual relationship between SAC [Shimizu]...and lower tier contractor." Zurich claims that FabArc contends that "the terms of this Shimizu/FabArc contract are undisputedly incorporated by the FabArc/CCSI subcontract," a contention already made in, and rejected by, the Alabama Supreme Court. According to Zurich, that Court found:

> We conclude that genuine issues of fact remain with respect to whether CCSI was obligated to name FabArc as an additional insured 'without exception(s)' under its liability insurance policies, including whether such coverage was to be primary as opposed to only excess.

*FabArc Steel Supply, Inc. v. Composite Construction Systems, Inc.*, 2005 WL 1189588, at * 19 (Ala. 2005).

Zurich claims that it has been established as a matter of law that CCSI did not have a contract with Shimizu. Zurich further claims that FabArc's contention that Ward conceded that the terms of the construction contract (in this case, the Shimizu/FabArc contract) control whether Zurich's insurance is primary and non-contributing is not correct, as neither the questions posed nor the answers given by Ward reference what "work contract" is being discussed in deposition.[36]

Zurich argues that the Travelers Excess policy is an "excess" policy but that the Zurich policy is an "excess" policy which "does not contribute" with "other insurance." According to Zurich, the Alabama Supreme Court, construing an excess policy with a no-contribution clause held in *Independent Fire Ins. Co., Inc. v. Mutual Assur., Inc.*, 553 So. 2d 115, 118 (Ala. 1989)

---

[36] The referenced testimony is:

Q.     Let's look at some of these insurance certificates.
A.     A work contract is what we could claim controlled.
Q.     What is a work contract?
A.     The work contract, the contract under which the indemnity provisions are stated and our additional insured endorsement.
Q.     You mean the construction work contract?
A.     Right.

Ward Depo. at 74.

that:

> Finally, Independent Fire argues alternatively that both it and Mutual Assurance should contribute in proportion to their respective policy limits. This "pro rata" argument fails in light of Mutual Assurance's intent as revealed by the wording in its "other insurance" clause, which explicitly states that the Mutual Assurance umbrella policy "*shall be in excess of, and not contribute with, such other insurance*." Such language has been held to prevent two excess policies from being mutually repugnant and, thus, to preclude contribution.

Zurich notes that the two cases relied upon by the Alabama Supreme Court in making its decision, *Aetna Cas. & Surety Co. v. Beane*, 385 So. 2d 1087, 1089-1090 (Fla. Dist. Ct. App. 1980), and *State Farm Fire and Cas. Co. v. LiMauro*, 482 N.E. 2d 13 (N.Y. 1985), both hold that an insurance policy which claims that it is only "excess" but clearly contemplates contribution must be exhausted before a "non-contribution" excess policy.

### C.   The respective liabilities of Travelers and Zurich for the costs of defending and indemnifying FabArc.

Zurich again claims that the decision as to various priorities of coverage referenced above should be made in state court, where they are pending. According to Zurich, if the Morgan County Circuit Court finds that the FabArc/CCSI contract did not require CCSI to provide primary coverage for FabArc, then the "other insurance" clause in the Zurich primary policy is an excess clause as are the "other insurance" provisions in the Travelers primary policy. Zurich argues that the two clauses are mutually repugnant and should be prorated according to their limits. *See State Farm Mut. Auto. Ins. Co. v. General Mut. Ins. Co.*, 210 So. 2d 688 (Ala. 1968). Zurich claims that, since the limits of both policies are one million dollars, they should then split evenly the first two million dollars of exposure and the costs of defense until the primary limits of both policies are exhausted. According to Zurich, Travelers' excess policy limits must be

64

exhausted before Zurich's excess policy is implicated.

In its prayer for relief, Zurich asks that this Court will:

1.      Decline to decide the relative priority of coverage or "other insurance" issues

between Zurich and Travelers, leaving them to state court; and

2.      If the court undertakes to decide these issues, to

a.      await a ruling by the trier of fact in the *Sanchez* case after remand as to

"whether CCSI was obligated to name FabArc as an additional insured

'without exception(s)' under its liability insurance policies, including

whether such coverage was to be primary as opposed to only excess."; and

b.      allow the parties to brief the results of that factual determination, after it is

made, vis-a-vis the provisions of the respective policies of insurance.

## III.    FabArc's Reply.

### A.      This court, and not the Morgan County Circuit Court, has jurisdiction over issues of coverage for FabArc under Zurich's policies.

### 1.      This court previously rejected Zurich's arguments of collateral estoppel, *res judicata*, and equitable estoppel.

FabArc contends that, in 2004, one of Zurich's primary arguments was that this court did

not have jurisdiction over the cause and that this court could not rule on issues of coverage for

FabArc because of allegedly parallel proceedings in the Morgan Circuit Court. According to

FabArc, this court rejected Zurich's arguments and found, as a matter of law, that Zurich could

not defeat coverage for FabArc through arguments of collateral estoppel, *res judicata*, or

equitable estoppel because of the state court proceedings. FabArc argues that it is now the law of

this case that this court has jurisdiction over any issues of coverage for FabArc under Zurich's

policies.

**2.    Zurich's reliance on footnote 91 of the Memorandum Opinion is misplaced.**

FabArc argues that, while this court did state that "[t]he parties have agreed that this court is not to decide the various priorities of coverage between Zurich and FabArc's insurer as to primary, excess, etc.," this reference was to the parties' agreement that the issue of damage/relief would be presented only in the event of a finding of coverage. If anything, FabArc claims, this court's statement that "[a]ny issues with regard to the time issues related to the duties of defendant Zurich to defend are reserved for further determination by this court if it is determined that this court has jurisdiction to consider such issues," was an acknowledgment that this court had jurisdiction over all questions of FabArc's coverage under the Zurich policies. According to FabArc, it "should never have had to file this lawsuit," and is asking only for the relief necessary to make it whole.

**B.    Zurich's policies are primary and noncontributing.**

**1.    As a matter of law based on the undisputed facts, the written FabArc/CCSI contract required CCSI to procure primary insurance.**

FabArc claims that the written agreement between itself and CCSI clearly and unambiguously incorporates the Shimizu/FabArc contract, which provides that "[a]ll insurance in connection with this project shall provide that it is primary coverage regarding any insurance event." According to FabArc, its contract with CCSI reads as follows:

> The Sub-Contractor agrees to furnish all labor, equipment, and insurance necessary to unload and complete the erection of steel and decking studs.
>                    *                              *                              *
> Sub-Contractor's [[CCSI's] work shall be performed in accordance with the requirements of this Agreement and Contract Documents. **With respect to Sub-Contractors work, Sub-Contractor agrees to be bound by all of the terms**

**and provisions of the Contractor [sic] Documents, and to assume toward FabArc all of the duties, obligations, and responsibilities that FabArc, by those Contract Documents, assumes toward the Owner and/or [Shimizu], including all obligation of owners' and/or general contractors' safety program.** (Emphasis added).

FabArc claims that Zurich "fallaciously" contends that "the only contract which utilizes the word 'primary' in regard to insurance is the Shimizu/FabArc contract." FabArc argues that whether CCSI had a contract with Shimizu is beside the point, because CCSI was a party to a contract with FabArc that required CCSI to abide by the terms of the Shimizu/FabArc contract, including the requirement that "[a]ll insurance in connection with this project shall provide that it is primary coverage regarding any insurance event." FabArc further argues that the issue in this case is CCSI's agreement with FabArc, a matter entirely separate from the Morgan County Circuit Court's determination as to CCSI's obligations to Shimizu.

    2.    **Zurich's policies are "noncontributing" because, based on the language of FabArc's policies, Travelers' policies are excess to Zurich's.**

        a.    **Travelers' policies are excess because FabArc is an additional insured under Zurich's policies.**

According to FabArc, both Travelers' policies are excess to insurance provided by FabArc as an additional insured. FabArc claims that both insurers intended that this would be the result, and agreed on a premium price in accordance with that intention.

        b.    **As a matter of law, Zurich's comparison of the "other insurance" provisions in the "primary" policies" is flawed.**

FabArc claims that Zurich argues that both Zurich's and Travelers' policies each provide that it is "excess" to the other, and are mutually repugnant and must be disregarded in favor of the rule of *State Farm Mut. Auto. Ins. Co.*, 210 So. 2d at 688. FabArc argues that this is incorrect.

FabArc claims that Zurich bases its contention on the "Additional Insured" endorsement to

Zurich's primary policy. That endorsement, according to FabArc, provides that coverage for "an

additional insured" is "excess over any valid and collectible insurance unless the agreement

between the insured [CCSI] and additional insured [FabArc] requires this coverage to be

primary." FabArc claims that by virtue of the agreement between FabArc and CCSI, Zurich's

insurance is primary in this case, and Traveler's policies are excess to Zurich's primary policy.

> **c.**      **As a matter of law, Zurich's comparison of the "other insurance" provisions in the excess policies is flawed. Travelers' excess policy is a "true excess" (umbrella) policy, and its coverage applies only after coverage under all other policies, including Zurich's "ordinary excess" policy, is exhausted.**

According to FabArc, Travelers' excess policy meets all case law requirements to qualify

as a "true excess," or "umbrella," policy. First, the Travelers excess policy provides broader

coverage than the relevant primary policies, and is not a "form-following instrument,"

incorporating the terms, conditions, definitions and exclusions of any underlying policy. Second,

the policy both acts as excess insurance when other coverage has been exhausted, and "drops

down" and pays claims that fall outside the coverage provided by FabArc's other insurance.

FabArc claims that Zurich's excess policy, however, has "all the earmarks of an 'ordinary excess'

policy," following the form of an underlying policy and not dropping down to provide coverage

in the absence of coverage under its underlying primary policy. Therefore, FabArc argues,

Travelers' excess coverage only applies after the exhaustion of Zurich's excess coverage.

> **d.**      **Both Travelers' policies apply in excess of both Zurich policies.**

FabArc claims that Zurich's primary policy must be exhausted first, followed by Zurich's

excess policy. FabArc points to *Scottsdale Ins. Co. v. Safeco Ins. Co. of Am.*, 111 F. Supp. 2d

1273, 1276 (2000), for its holding that, in a case with similar insurance issues, the "other insurance" provisions did not even come into consideration because [the property owner's] primary and excess policies "were written together to protect [the realty company] pursuant to the Management Agreement." *Id*. at 1280-1281. The reasoning of the court was that the intention of the property owner's insurers that his excess policy "would have priority in paying for any liability that exceeded that liability of" his primary policy. *Id*. at 1281. FabArc argues that "[r]equiring the exhaustion of Zurich's excess policy limits before payment under Travelers' policies gives full effect to all the terms of Zurich's excess policy." FabArc contends that the *Scottsdale* and *Horace Mann* courts "recognized that the limitations of *Independent Fire* make it inapplicable in a case where two insurers both provided 'ordinary excess' insurance, as is the case with Zurich's excess and Travelers' CGL policies.

> **C.      Zurich's excess policy has limits of $5,000,000.**

FabArc claims that this court established in its February 10, 2004 Memorandum Opinion that Zurich's excess policy has limits of $5,000,000. According to FabArc, Zurich never contested this amount, nor raised its argument that Sanchez' death occurred before the excess policy reached that amount, until now, and that FabArc would be unduly prejudiced if the argument were permitted.

> **D.      What Zurich owes now.**

According to FabArc, Zurich now must assume the defense of FabArc in the ongoing state court action, pay FabArc's increased costs of insurance, plus interest, to pay the $1,000,000 limits of Zurich's primary policy, to pay, under its primary policy, FabArc's defense costs in the amount of $458, 275.51, to pay under its primary policy the prejudgment interest paid to Great

American in the amount of $591,369.86, and to pay under its excess policy the sum of $2,100,000, and to pay interest due on these obligations in the amount of $369,606.77.

### FABARC'S MOTION FOR RELIEF ON DEFENSE COSTS AND INCREASED PREMIUMS

**I.    FabArc's Motion for Relief on Defense Costs and Increased Premiums.**

FabArc argues that because Zurich has not yet defended or indemnified FabArc against the claims in the *Sanchez* litigation, further relief is necessary to effectuate this court's March 22, 2004 Declaratory Judgment Order. FabArc further argues that it is entitled to immediate relief because Zurich's policy is primary.

**A.    FabArc is entitled to immediate additional relief; when Zurich refused to defend and indemnify FabArc, FabArc was deprived of the benefit of its bargain with CCSI.**

FabArc contends that it is "undisputed that, because of Zurich's failure to defend and indemnify FabArc, FabArc did not receive the benefit of its bargain with CCSI, its subcontractor." According to FabArc, CCSI's president Don Dobbins acknowledged that Zurich's coverage was intended to be primary and was required to be so in the construction documents:

> Q.    ...[Y]ou also requested that FabArc be added as an additional insured [under the Zurich policies]?
>
> A.    I believe that would be correct also.
>
> Q.    And CCSI made those requests of its carrier because that was required in CCSI's contract with FabArc?
>
> A.    Yes.
>
> Q.    Let's just look at the contract...at section 13 have you got that?
>
>                *                      *                  *
>
> A.    All insurance furnished in connection with this project shall provide the primary coverage regarding any insurance event.
>
> Q.    And that was language that was provided to CCSI before CCSI signed its contract with FabArc, correct?

>A.      Yes.
>Q.      And that would have been some of the language that you reviewed before you
>        signed the contract with FabArc?
>A.      Yes.
>Q.      And that language is incorporated into your contract with FabArc, correct?
>A.      Yes.

Dobbins Depo. II at 47-48.

FabArc further quotes Dobbins as saying that the FabArc/CCSI contract required that FabArc be named an additional insured under the Zurich policy, and that he "knows of no reason why Zurich would not have defended FabArc with regard to the claims asserted in the *Sanchez* litigation."

According to FabArc, "[d]espite CCSI's agreement to procure the required insurance for FabArc, and CCSI's expectation that Zurich would take care of CCSI's customer, FabArc, Zurich refused to honor its contractual obligations."[37] FabArc claims that it took into account the cost of insurance in negotiating its contract with CCSI, and it required that the cost of insurance and the risk of personal injury loss be shifted to CCSI. FabArc argues that, because this shift did not occur, it lost its status as a preferred risk in the insurance market. As a result of the *Sanchez* loss, FabArc argues, its insurance premiums grew exponentially. *See* Everhart Depo. at 111.

FabArc claims that Paty Daves, FabArc's insurance agent, testified that had Zurich settled the *Sanchez* suit, the loss would not have become a part of FabArc's loss history. Additionally, according to FabArc, Zurich's refusal to defend FabArc resulted in FabArc's turning to its own provider, Travelers, to provide a defense.

### B.      Specific Relief Requested

---

[37]The court notes that it is not clear that CCSI's interpretation of its policies is significant. Its interpretation of its contract with FabArc may be.

FabArc requests that this court grant it the following relief:

(1)      That the court order Zurich to pay $458,275.51, representing the amount of

attorney's fees and expenses, plus interest, incurred in the defense of FabArc in

the *Sanchez* case.

(2)      That the court order Zurich to pay increased insurance costs, plus interest, that

FabArc has sustained because of the damage to its insurance loss history caused

by Zurich's refusal to defend and indemnify. Further, FabArc requests that the

court grant it leave to prove the specific amount by which its premiums have

increased because of Zurich's failure to defend and indemnify, either at the trial in

this matter or in whatever manner this court deems appropriate.

(3)      That if FabArc is mistaken in any special relief herein prayed for, then it prays for

such other, further or more general relief to which it may be entitled.

## II.      Defendant Zurich's Response.

### A.      Travelers' underwriting file.

Zurich quotes a number of emails from the Travelers' underwriting file. They are as

follows:

**3/19/02 Email from Karen E. Kearns [underwriter in Travelers' home office] to Everhart:**
"With 41M in sales and 12.5M in subcontracted work, we feel that we need more rate for both exposures. I looked at the project list on their website and they've gotten involved in some very large, highly visible projects with the potential of multiple person injuries in the event of collapse, such as Opry Land Hotel and Convention Center, malls and hospitals."

           *                              *                              *

"I'm glad we don't have the Umbrella for the account. At this point, we feel more comfortable with 'limiting the limits' we have on these risks."

**3/25/02 Email from Edmund Acquesta [upper level underwriter] to Everhart:**
"I believe Karen's position is unwarranted and we need to push back. Normally, we should accept the following:
* COI's showing proof of insurance from the subs
* Contract which includes an intermediate indemnification/hold harmless provision, insurance requirements section including limits of $1,000,000 on GL and CO and addition of our insured as additional insured on the subs policies."

**3/25/02 Email from Everhart to Kearns:**
"Manuscript T. Endorsement: We are putting this endorsement on there to exclude all work performed by contractor on FabArc's behalf. There is a sub contractors classification on the policy and we are charging for work subbed. Am I missing something or are we charging and excluding at the same time...**One of the changes that they are working on now is to include wording to make the subs insurance primary and non-contributory**." (emphasis added by Zurich).

**3/26/02 Email from Kearns to Everhart:**
"Regarding the pricing, I think we need to equate the exposure to loss for this risk as being closer to that of a contractor, since it is heavily involved in the structural steel trade, both from a fabrication and a subcontracting standpoint. Their list of projects is significant w/ '9 story office buildings' and '5 & 6 story hospitals' listed on their website projects. If we view it that way, our rates and premiums seem realistic.
It's true that they have some good controls in place, but quite frankly, if they didn't we wouldn't consider the risk at all. We just feel that they can be better (from our standpoint) and that we need more dollars for the exposures presented."
                    *             *             *
"These structural steel risks are getting a lot of scrutiny from everyone. I know you don't want to hear this, but to be honest, if the account can find someone to do it for less or without some of our requirements we are prepared to let it go."

**3/27/02 Email from Everhart to Acquesta re: her discussion with the agent:**
"We created this problem when we fax [sic] him [FabArc's insurance agent] his quote at 4:20 and he talked to the insured at 4:40....Basically he feels at this time he needs to prove his worth. Because of this and the Insured being aware of the first quote that we gave (4 times expiring and the T-endorsement) [the insurance agent] will not be calling off Chubb or Cincinnati. He feels that the Insured wants to stay with Travelers because of all that has happen [sic] with the large claim, coverage has been written for 5 years, and we are defending the claim for them in the large claim case. The insured recognizes what we have done. If the premium is about the same he feels that they will stay with Travelers. He even thinks if there is a $20,000.00 difference they will stay with Travelers.
He said he does not understand what is going on but we are acting like his 5 year old. We come out with a quote 4 times expiring and the endorsement. The we take away the

endorsement and leave the price as is and when he indicates that the other carriers were interested at 2 times then we come back and reduce our price.

He has been talking to some other steel people on a web site for the steel association and several of them have placed their coverage with captives. He says that the insurance people are driving the steel people to go to captives and will probably end up with an adverse selection."

## B.     Argument

According to Zurich, FabArc "argues essentially that in the negotiations of the FabArc/CCSI subcontract, FabArc intended to obtain from CCSI coverage that was 'primary and non-contributory.'" Zurich argues that FabArc's intent is irrelevant; its contract with CCSI does not require the coverages to be either "primary" or "non-contributory." Instead, Zurich claims, that contract only required that CCSI name FabArc as an additional insured and that the policy provide "contractual insurance coverage as to the covenant contained in this section [paragraph 4 of the CCSI/FabArc Contract]." Zurich summarizes the position as follows: "if FabArc intended to secure 'primary and non contributory' coverage from CCSI, either FabArc failed to carry out its responsibility to ensure that its contract with CCSI conformed to Travelers requirements or CCSI failed to procure the coverage that was required."

According to Zurich, "[i]f FabArc wanted primary and non-contributing coverage, FabArc knew what wording it was to require in coverages provided by CCSI." Zurich claims that as late as March of 2002, emails between Travelers and FabArc show that FabArc still was not meeting Travelers' requirement of securing primary and non-contributory insurance from downstream contractors.

Zurich claims that FabArc's argument that the *Sanchez* loss would not have been part of FabArc's loss history had Zurich settled the suit is flawed for a number of reasons. First, Zurich

asserts that Travelers' underwriting file shows that in 2002 FabArc had quotes from Chubb Insurance Company and Cincinnati Insurance Company for one half of what Travelers was quoting. Second, Zurich claims that had FabArc moved its coverage in 2002, the loss would not have been part of its loss history with a new insurer. Zurich claims that this could have been done, bu "FabArc stayed with Travelers in 2002 and chose to do so even if 'there is a $20,000.00 difference' because of Travelers perceived loyalty to FabArc."

Zurich argues that Karen Kearns, a Travelers underwriter stated "[t]hese structural steel risks are getting a lot of scrutiny from everyone. I know you don't want to hear this, but to be honest, if the account can find someone to do it for less or without some of our requirements we are prepared to let it go." According to Zurich, FabArc was not told about this philosophy; had FabArc known of it prior to the substantial loss payment in 2003, it could have moved its coverages to another insurance provider, such as Chubb or Cincinnati. Zurich contends that FabArc's increased premiums were due to many factors, which FabArc cannot quantify. As such, according to Zurich, FabArc's claims for damages are speculative and are not recoverable.

**III.    Plaintiff FabArc's Reply.**

    **A.    FabArc's damages as a result of Zurich's refusal to defend and indemnify are not speculative.**

According to FabArc, "Zurich has presented no credible evidence to refute the fact that, had Zurich paid the $600,000 settlement and the $2,500,000, plus interest, in satisfaction of the judgment against FabArc, these amounts would have never appeared on FabArc's loss history, and its insurance premiums would not have increased."

        **1.    Zurich's case law supports FabArc's claims for damages.**

FabArc claims that cases which Zurich cited without discussion - *Parsons v. Aaron*, 849 So.2d 932 (Ala. 2002), and *Crommelin v. Montgomery Independent Telecasters, Inc.*, 194 So.2d 548 (Ala. 1967) - actually support FabArc's contention that it has presented sufficient evidence to support an award of damages. According to FabArc, both of these cases stand for the basic proposition that damages cannot be "remote or speculative." However, FabArc contends that it has presented undisputed evidence of the specific extent to which its premiums increased as a direct result of Zurich's failure to defend and indemnify FabArc.

## 2.   Zurich's specific arguments regarding FabArc's alleged speculative damages.

FabArc characterizes Zurich's assertion that Everhart did not testify that the increase in FabArc's insurance premiums related solely to Zurich's failure to defend and indemnify as "absolutely incorrect." FabArc claims that Zurich's argument that problems in the "steel industry as a whole" could have caused an increase premiums is nothing more than an unsubstantiated hypothesis. FabArc argues that Zurich has failed to meet its burden of production in this regard. Furthermore, according to FabArc, Zurich's excerpts from Travelers underwriting file do not support any argument put forth by Zurich, but rather "highlight the extra scrutiny to which Travelers subjected FabArc's account once Zurich refused to pay the Sanchez loss." Ultimately, FabArc argues, "Zurich has presented no credible evidence to refute the fact that, had Zurich paid the $600,000 settlement and the $2.5 million, plus interest, in satisfaction of the judgment against FabArc rather than Travelers, these amounts would never have appeared on FabArc's loss history, and its insurance premiums would not have increased as a result.

## 3.   What Zurich owes FabArc

According to FabArc, it is entitled to the $151,300 it paid in increased insurance premium costs because of Zurich's breach. FabArc claims it is also entitled to statutory interest of 6% running from April 23, 2004, resulting in the amount of $14,176.60. FabArc also requests "that, if it is mistaken in any special relief herein prayed for, then it prays for such other, further or more general relief to which it may be entitled.

## CONCLUSIONS OF THE COURT

The court concludes that it has jurisdiction over this case. In *Donovan v. City of Dallas*, 377 U.S. 408, 412 (1964), the Supreme Court of the United States held that, "where the judgment sought is strictly in personam, both the state court and the federal court, having concurrent jurisdiction, may proceed with the litigation at least until judgment is obtained in one of them which may be set up as res judicata in the other." Furthermore, the Eleventh Circuit has stated that, "[i]t seems clear that a federal court may not abdicate its authority on the grounds that a similar action is pending in a state court." *Strode Publishers, Inc. v. Holtz*, 665 F.2d 333, 335 (11th Cir. 1982) (*quoting Carr v. Grace*, 516 F.2d 502, 503 (5th Cir. 1975)). In a hearing before this court on January 30, 2006, Zurich admitted that this court had concurrent jurisdiction:

> THE COURT:          ...Those issues could be pending in both courts, at the same time, could they not?
>
> MR. BENEFIELD:    It is possible but I don't think they're properly before this Court. And I would like to tell you why.
>
> THE COURT:          Well, is your answer to my question "yes"?
>
> MR. BENEFIELD:    Yes.

In that same hearing, Zurich acknowledged that it owed at least half coverage to FabArc under its

primary policy.[38]

On May16, 2003, Zurich filed a motion asking that this court add Travelers as a real party in interest in this case. Travelers opposed the motion. The court granted Zurich's motion. Now, Zurich argues that Travelers should not be considered as a party. Travelers insists that it is. The court agrees with Travelers. The court notes that Zurich alleged in its motion that Travelers is the "real party in interest." The court "Granted" the motion as written. As noted by the court in its Memorandum Opinion filed February 10, 2004, Zurich, at that stage, had made reference to provisions of the Travelers policy and had given indication of reliance on certain of its provisions.  The complaint requested the court to declare rights under Zurich's policies. Interestingly, plaintiffs, which now wish to have Travelers as a party, on June 5, 2003 requested a reconsideration of the court's grant of Zurich's motion which Zurich now apparently wishes to disavow.

The court is aware of the following language in a August 15, 2003 transcript of a telephone conference:

> The Court:     Well, what if I just say this? Travelers will be a party to this case solely for the purpose of protecting whatever subrogation interest it may have in this case.
>
> Ms. Smith:     That suits us fine.

While, at that time, the subrogation interest may have been only $600,000 or so, it has now increased. The increase would be a part of "whatever subrogation interest **it may have** in the case." The court is not clear as to what bearing this issue of Travelers as a party might otherwise

---

[38]This case would not have been so extended if, early on, Zurich had at least acknowledged some coverage.

have on this case.

An "Order" substantially drafted by the plaintiff, with the defendant having the right to respond, and filed by this Count on March 22, 2004 states that Zurich owes FabArc insurance coverage as an "additional insured" under Zurich's commercial general liability insurance policy and as an "insured"[39] under the excess/umbrella[40] liability policy. The order further states: "5. That as a result of this court's declaration that Zurich owes FabArc insurance coverage, Zurich owes FabArc a duty to defend and a duty to indemnify under both the Zurich primary policy and the Zurich excess policy." Paragraph 6 of that order is somewhat enigmatic.[41] The order and its affirmance remove any questions as to whether FabArc and Travelers (the real party in interest as asserted by Zurich) are entitled to some coverage under the two policies of Zurich. That determined coverage is independent of any issues of whether the death arose out of Composite Construction's work, operation or negligence. The established coverage inures to FabArc, regardless.[42]

The court notes the following provisions in various contract and insurance documents

---

[39]Note that it does not say "additional insured." Zurich did not object to the language.

[40]Plaintiffs argue that the excess policy of Zurich is not an "umbrella" policy.

[41]Paragraph 6 of the order states:
Any issues with regard to the time issues related to the duties of defendant Zurich to defend are reserved for further determination by this court if it is determined that this court has jurisdiction to consider such issues. Otherwise, such timing issues should be determined by the court or courts which determine priority issues and/or other issues related to the respective liability of defendant Zurich and other insurers."

[42]The affirmed order that FabArc was an "insured," not an "additional insured," is apparently of some significance. Zurich specifically agreed to the language. See filings on March 3, 2004 and March 12, 2004.

which are relevant to the issue of coverage priority:

### I. Excerpts From Travelers' Policies

b.    Excess Insurance

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

...

(4)    That is a valid and collectible insurance available to you as an **additional insured under a policy issued to:**

(a)    **a contractor performing work for you**; or
(b)    a lessee of equipment owned by you. (Emphasis added).

When this insurance is excess, we will have no duty under Coverage A or B to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1)    The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2)    The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

Document 150, Exhibit "E," Travelers' $1MM Policy, Form GN 01 21 01 95.

*       *       *

10.    OTHER INSURANCE.

This insurance is excess over any other valid and collectible insurance whether such other insurance is stated to be primary, contributing, excess,

contingent or otherwise. This provision does not apply to a policy bought
specifically to apply in excess of this insurance.

Document 150, Exhibit "G," Travelers'$10MM Umbrella Policy, Form UM 00 01 01 86, at Pgs.
1 of 10 and 5 of 10.

## II. Excerpts From Zurich's Policies

### ADDITIONAL INSURED - DESIGNATED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE PART
**SCHEDULE**

Name of Person or Organization:
"ANY PERSON OR ORGANIZATION, TRUSTEE OR ESTATE TO WHOM THE
INSURED HAS AGREED TO NAME AS AN ADDITIONAL INSURED BY
WRITTEN CONTRACT OR AGREEMENT PRIOR TO LOSS. COVERAGE
WILL BE EXCESS OVER ANY OTHER VALID AND COLLECTIBLE
INSURANCE **UNLESS THE AGREEMENT BETWEEN THE INSURED AND
ADDITIONAL INSURED REQUIRES THIS COVERAGE TO BE PRIMARY**."

(Emphasis added).

WHO IS AN INSURED (Section II) is amended to include as an insured the person
or organization shown in the Schedule as an insured but only with respect to liability
arising out of your operations or premises owned by or rented to you.

Document 91, Exhibit "U," Zurich's $1MM Policy No. CPO 8422346-04, at Bates Number
00065.

\*       \*       \*

**Insuring Agreements**

A.      Our coverage applies excess of but in the same manner and
on the same basis as the **primary insurance** shown on our
Schedule A as applying to Coverage Part **A-1.** We follow all
the terms, conditions, definitions and exclusions of the
**primary insurance**, except as otherwise provided by this
Coverage Part **A-1**. Should any of the provisions of the
**primary insurance** conflict with our General Policy
Provisions, the General Policy Provisions will apply.

Document 91, Exhibit "V," Zurich's $5MM Policy No. CC 8422349-03, at Bates 141.

## III. Excerpts from FabArc's Contract With CCSI

81

5.     Sub-Contractor's Work shall be performed in accordance with the requirements of this Agreement and Contract Documents. With respect to Subcontractor's Work, Sub-Contractor agrees to be bound to FabArc by all of the terms and provisions of the Contractor Documents, and **to assume toward FabArc all of the duties, obligations, and responsibilities that FabArc, by those Contract Documents, assumes toward the Owner and/or the General Contractor, including all obligation of owners' and/or general contractors' safety program**. (Emphasis added).

FabArc's Contract with CCSI, p. 3.

\*    \*    \*

## SECTION 13

INSURANCE REQUIREMENTS

(A) CERTIFICATION OF INSURANCE: ... All insurance furnished in connection with this project shall provide that it is primary coverage regarding any insurance event.

Document, 91, Exhibit "C," Shimizu/FabArc contract, dated August 29, 1997 attached as "Attachment A" to, and made part of, the FabArc/CCSI subcontract.

## IV. Deposition Testimony

Don Dobbins, President of CCSI, has testified:

Q.     And section one, paragraph A, would you read the last sentence in paragraph A?

Mr. Collins: You said section one. Did you mean section thirteen?

Q.     I mean section thirteen, paragraph A, that last sentence.

A.     All insurance furnished in connection with this project shall provide the primary coverage regarding any insurance event.

\*    \*    \*

Q.     And that language is incorporated into your contract with FabArc, correct?

A.     Yes.

Document 151, Exhibit "B," Deposition of Don Dobbins, at pages 47-48.

## <u>V. Excerpts from Zurich's Top II Package Policy</u>

Excerpts from Zurich's Top II Package Policy read:

2.      Exclusions
      This insurance does not apply to:...

    b.      Contractual Liability
           "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. <u>This exclusion does not apply</u> to liability for damages:
           (1) <u>Assumed in a contract or agreement that is an "insured contract"</u> provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or
           (2) That the insured would have in the absence of the contract or agreement. (Emphasis added).

**SECTION V - DEFINITIONS**
8.     <u>"Insured contract" means</u>: ...
    f.      That part of any other contract or agreement <u>pertaining to your [FabArc's] business</u> (including an indemnification of a municipality) <u>under which you assume the tort liability of another party</u> [Shimizu] to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement. (Emphasis added).

*      *      *

Name of Person or Organization:
"ANY PERSON, ORGANIZATION, TRUSTEE OR ESTATE TO WHOM THE INSURED HAS AGREED TO NAME AS AN ADDITIONAL INSURED BY WRITTEN CONTRACT OR AGREEMENT PRIOR TO LOSS. COVERAGE WILL BE EXCESS OVER ANY OTHER VALID AND COLLECTIBLE INSURANCE UNLESS THE AGREEMENT BETWEEN THE INSURED AND ADDITIONAL INSURED REQUIRES THIS COVERAGE TO BE PRIMARY."

*      *      *

**Company A**   Zurich American Ins. Group
....

83

Description of Operations/Locations/Vehicles/Special Items
PROJECT - TORAY CFA, DECATUR, AL
FABARC STEEL SUPPLY, INC. SHIMIZU AMERICAN CORP. AND TORAY,
INC. ARE ADDED AS ADDITIONAL INSUREDS AS RESPECTS THEIR
INTEREST IN THE ABOVE PROJECT.
**Certificate Holder**

FABARC STEEL SUPPLY, INC.
KIM HANES -205-831-8778
P.O. BOX 606
ANNISTON, AL 36202
Zurich's Top II Package Policy.

The court notes that Zurich initially agreed to provide FabArc with "complete defense and indemnification," and requested and received from FabArc's attorney the attorney's investigational file.[43]

The court also notes that Zurich's Certificate of Insurance included not only FabArc as an additional insured, but also Shimizu and Toray, Inc. in an apparent acceptance of the fact that CCSI's contract with FabArc required CCSI to assume all the duties and obligations of FabArc to the Owner and General Contractor. It is apparent that Travelers had primary coverage vis-a-vis FabArc and the Owner and General Contractor. There is no plausible reason why Zurich does not have the same primary coverage vis-a-vis FabArc and CCSI.

The language of the contract and insurance documents place primary liability with Zurich. This court is of the opinion that the Supreme Court of Alabama would so decide. While a determination of liability to the Sanchez estate on the part of either FabArc or CCSI may be highly questionable, liability could not reasonably (if possibly) have been imposed on either except based on some alleged deficiency as to the on the job work. There has been no suggestion

---

[43]This court does not reach the issue of whether this resulted in a waiver or estoppel.

that the fabrication of steel by FabArc was in any way involved. The sequence of the various

contracts and policies clearly demonstrates that the intent of the parties was to focus the ultimate

responsibility on the entity which could arguably be responsible. *See FabArc Steel Supply, Inc. v.*

*Composite Constr. Systems, Inc.*, 914 So. 2d 344, 359-361 (Ala. 2005).

The court concludes that Zurich's estoppel defenses are groundless. According to the

Alabama Supreme Court:

> [T]he doctrine of judicial estoppel "applies to preclude a party from assuming a
> position in a legal proceeding inconsistent with one previously asserted." *Selma
> Foundry & Supply Co. v. Peoples Bank & Trust Co.*, 598 So. 2d 844, 846 (Ala. 1992)
> (quoting *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419 (3d
> Cir. 1988). "The law is settled in Alabama that a party who has, with knowledge of
> the facts, assumed a particular position in a judicial proceeding is estopped from
> assuming a position inconsistent to the first one to the prejudice of an adverse party."
> *Russell v. Russell*, 404 So. 2d 662, 665 (Ala. 1981).

*Carver v. Foster*, — So. 2d — (Ala. Nov. 18, 2005), 2005 WL 3082254.

The Alabama Supreme Court has also held on the same day:

> In *Ex parte First Alabama Bank*, 883 So.2d 1236, 1246 (Ala.2003), we "embrace[d]
> the factors set forth in *New Hampshire v. Maine* [, 532 U.S. 742, 121 S.Ct. 1808,
> 149 L.Ed.2d 968 (2001),] and join[ed] the mainstream of jurisprudence in dealing
> with the doctrine of judicial estoppel." We held:
> "The United States Supreme Court in *New Hampshire v. Maine*, 532 U.S. 742, 121
> S.Ct. 1808, 149 L.Ed.2d 968 (2001), recently observed that ' "[t]he circumstances
> under which judicial estoppel may appropriately be invoked are probably not
> reducible to any general formulation of principle" ' and then identified several factors
> as informative in determining the applicability of the doctrine of judicial estoppel.
> 532 U.S. at 750-51, 121 S.Ct. 1808, 149 L.Ed.2d 968 (quoting *Allen v. Zurich Ins.
> Co.*, 667 F.2d 1162, 1166 (4th Cir.1982)). **The Court held that for judicial estoppel
> to apply (1) 'a party's later position must be "clearly inconsistent" with its earlier
> position'; (2) the party must have been successful in the prior proceeding so that
> 'judicial acceptance of an inconsistent position in a later proceeding would create
> "the perception that either the first or second court was misled."** ' (quoting *Edwards
> v. Aetna Life Ins. Co.*, 690 F.2d 595, 599 (6th Cir.1982)); **and (3) the party seeking
> to assert an inconsistent position must 'derive an unfair advantage or impose an
> unfair detriment on the opposing party if not estopped.'** 532 U.S. at 750-51, 121
> S.Ct. 1808. No requirement of a showing of privity or reliance appears in the

> foregoing statement of factors to consider in determining the applicability of the doctrine of judicial estoppel."

*Austin v. Alabama Check Cashers Ass'n*,  2005 WL 3082884, at *24 (Ala. Nov. 18, 2005) (emphasis added).

At least some of the alleged positions of Travelers were taken before the affirmed judgment in this case. Others were merely the usual alternative arguments. In this case there is no substantial evidence of prejudice. In essence, Travelers took the same position in state court with regard to other parties that Zurich is taking in this case. Both were apparently wrong.

In FabArc's Summary Brief submitted on February 21, 2006 FabArc notes that Travelers' $1MM policy provides that it is excess over any other insurance, "whether primary, excess, contingent or on any other basis...(4) that is valid and collectible insurance available to you if you are added as an additional insured under any other policy." Doc. 150, Ex. F. *Travelers CGL Policy, Form CG DO 37 01 92, § IV, Endorsement to Commercial General Liability Coverage Part,* ¶ 4.b(4). As this court stated in its Order dated March 22, 2004, FabArc is an "additional insured" or "insured" under the Zurich $1MM and $5MM policies.

As noted above, Zurich claims that the "other insurance" clauses in both its and Travelers primary policies are mutually "repugnant,"[44] and that any liability on Zurich's part should therefore be split pro rata with Travelers. However it is not necessary to compare and contrast the two primary policies in this case, because it was the clear intention of the parties that Zurich would provide the primary liability insurance under the contract between CCSI and FabArc. As Zurich notes in its Summary Brief filed on February 21, 2006, the Zurich policy contains an additional insured endorsement which modifies the initial "other insurance" clause and provides,

---

[44]The above quoted language suggests to the contrary.

86

in pertinent part, that, "coverage will be excess over any other valid and collectible insurance unless the agreement between the insured [CCSI] and additional insured [FabArc] requires this coverage to be primary." Zurich notes that the Alabama Supreme Court, in *FabArc v. CCSI*, *supra*, at 364, concluded that "genuine issues of fact remain with respect to whether CCSI was obligated to name FabArc as an additional insured...including whether such coverage was to be primary as opposed to only excess." However, Zurich overlooks that CCSI filed the Motion for Summary Judgment being reviewed by the Alabama Supreme Court, and all that decision signified was that CCSI had failed to demonstrate the absence of any genuine issues of material fact with regards to the issue of whether CCSI was contractually obligated to name FabArc as an additional insured on its primary policy. This determination by the Alabama Supreme Court is far from dispositive on this issue, yet somehow Zurich concludes that the Supreme Court's decision represents its rejection of FabArc's argument that "the terms of the Shimizu/FabArc contract are undisputedly incorporated by the FabArc/CCSI subcontract." This court does not so interpret that holding.

In its Order entered on March 22, 2004, this court held that Zurich owed coverage to FabArc under both its primary and excess policies. On September 9, 2005 the Eleventh Circuit affirmed that Order. As far as this court is concerned there are, therefore, no genuine issues of material fact remaining as to whether FabArc was covered, or intended to be covered, under Zurich's policies.

If it were clear that the fault of the accident lay at least partially with CCSI, this court would have little question that Zurich would have primary coverage as to both defense and indemnity under both of its policies. That would be consistent with the state court rulings vis-a-

87

vis the owner and the general contractor and FabArc.

While there appears to be a significant question as to whether either FabArc or CCSI should have been held liable in the Sanchez case, the only possibly reasonable basis for liability of either of them relates to CCSI's on the job contractual obligations. Thus, this court concludes that the holding should be the same as if CCSI were clearly liable.

It is clear from the structure of the relationship between CCSI and FabArc that the parties intended that: 1) CCSI, being present on the Toray site, would both represent FabArc's interests there and perform FabArc's contractual installation obligations to Shimizu; 2) FabArc would manufacture and supply the steel as required by the project, while CCSI would physically install and erect the steel; and 3) CCSI would add FabArc as an additional insured under its own primary and excess policy. Since FabArc was not going to be present on the Toray job site, and was not going to engage in any installation or erection activity, FabArc contracted with CCSI to insure FabArc under its (CCSI's) primary and excess policies. FabArc, CCSI, and Zurich were all apprised of and approved this arrangement.[45]

This analysis applies equally not only to whether Zurich owes coverage under its primary policy, but also to the priority of the payment of all of the Zurich and Travelers policies. The arrangement of the parties was such that CCSI's insurance was to be paid out, in its entirety, before FabArc's policies were implicated. Therefore, the order of payment went as follows: Zurich primary, Zurich excess, Travelers primary, Travelers excess (or umbrella).[46]

_____

[45]The lock-step nature of the agreement between CCSI and FabArc is further evidenced by the basically similar agreement between FabArc and Shimizu.

[46]The same as between Shimizu and FabArc.

The court will grant FabArc's Motion for Relief on Sum-Certain Damages Paid to Settle and Satisfy Third Party Claims and Judgments. All other motions will be denied.

Within seven days, the plaintiffs will submit and serve a proposed judgment pursuant to Federal Rule of Civil Procedure 54(b). The defendant will have seven days to respond.

The court has been advised that FabArc Steel Supply, Inc. is the plaintiff in another pending action in this court wherein Zurich American Insurance Company is named as the defendant. Within seven days, the parties will show cause, if any, why any remaining claims in this case should not be consolidated with that action.

This 19th day of April, 2006.

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**